ACCEPTED
03-15-00314-CV
6400418
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/7/2015 10:52:52 AM
JEFFREY D. KYLE
CLERK

## CAUSE NO. 03-15-00314-CV

IN THE THIRD COURT OF APPEALS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

8/7/2015 10:52:52 AM

JEFFREY D. KYLE
~~Clerk~~

CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, OKLAHOMA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, AND TEXAS PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, *Appellants*

v.

HILL BROTHERS TRANSPORTATION, INC., *Appellee*

APPEAL FROM CAUSE NO. D-1-GN-09-001010
201ST JUDICIAL DISTRICT COURT OF TRAVIS COUNTY, TEXAS
HON. LORA LIVINGSTON PRESIDING

## APPELLANTS' BRIEF

## ORAL ARGUMENT REQUESTED

Dan Price (SBN 24041725)
James Loughlin (SBN 00795489)
STONE LOUGHLIN & SWANSON, LLP
P.O. Box 30111
Austin, Texas 78755
(512) 343-1300
(512) 343-1385  Fax
dprice@slsaustin.com

*Attorneys for Appellants*

# IDENTITY OF PARTIES AND COUNSEL

**Appellants/Plaintiffs:**

California Insurance Guarantee Association ("CIGA")
Oklahoma Property and Casualty Insurance Guaranty Association ("OPCIGA")
Property and Casualty Insurance Guaranty Association ("TPCIGA")

**Counsel for Appellants/Plaintiffs (Trial Court and Appeal):**

Dan Price
James Loughlin
STONE LOUGHLIN & SWANSON, LLP
P.O. Box 30111
Austin, Texas 78755
(512) 343-1300

**Appellee/Defendant:**

Hill Brothers Transportation, Inc. ("Hill Bros.")

**Counsel for Appellee/Defendant (Trial Court and Appeal):**

Adrian Ciechanowicz
William Johnson
Leila Melhem
DUGGINS WREN MANN & ROMERO, LLP
P.O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . xi

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    About the Guaranty Associations. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.    Guaranty Associations are Statutorily Created Entities Which Protect Citizens in the Event of an Insurer's Insolvency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.    The Guaranty Associations have the Authority to Enforce the Terms of the Policies Within the Scope of the Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Hill Bros. Was Insured Under the Policy. . . . . . . . . . . . . . . . . . . . . 4

    C.    The Policy Required Hill Bros. to Reimburse Deductibles Within 30 Days of Demand. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    D.    Hill Bros.' Extra-Contractual Deductible Reimbursement Arrangement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E.    Legion Liquidation Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . 8

F.     After Liquidation, Pennsylvania Law Required Legion in Liquidation to Invoice Mutual Indemnity for Hill Bros.' Deductible Obligation to the Guaranty Associations.. . . . . . . . . . . 10

G.     Hill Bros. Failed to Meet its Contractual Obligations Under the Policy.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ISSUE ONE: Can a guaranty association's cause of action for breach of contract for failure to reimburse amounts paid within the deductibles of a workers' compensation policy accrue prior to: (1) a judicial finding that a property and casualty insurer is insolvent and/or the insurer has been designated impaired by the Texas Commissioner of Insurance, (2) the guaranty association's payment of the deductible amounts that are the subject of its suit, and (3) the guaranty association making demand for reimbursement?. . . . . . . . . . . . . 19

A.     The Guaranty Associations Did Not Have Standing to Take Any Action Under the Policy on April 1, 2002... . . . . . . . . . . . . . . 20

1.     TPCIGA Did Not Have Standing To Discharge the Policy Obligations Until at Least October 25, 2002.. . . . . . . . 20

2.     CIGA and OPCIGA Did Not Have Standing To Discharge Policy Obligations Until July 28, 2003.. . . . . . . . . 21

B.     On April 1, 2002, the Guaranty Associations Had Not Yet Paid Any of the Covered Claims For Which They Sued Hill Bros... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. On April 1, 2002, the Guaranty Associations had Not Yet Made Demand on Hill Bros. for Reimbursement of Deductibles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ISSUE TWO: Is the Guaranty Associations' compliance with the Pennsylvania Act a mitigating circumstance making the reasonableness of their alleged delay in making demand or filing suit against Hill Bros. a fact question?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ISSUE THREE: Is the Policy a continuing contract that must be fully performed before the Guaranty Associations' causes of action for breach of contract can accrue?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

A. The Policy is a Continuing Contract.. . . . . . . . . . . . . . . . . . . . . . . . . . 29

B. The Statute of Limitations Did Not Accrue on This Continuing Contract Until it was Fully Performed on April 28, 2009.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ISSUE FOUR: Are the Guaranty Associations' causes of action for failure to reimburse deductibles barred in whole when some deductible payments were made within four years from the date suit was filed?.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION AND PRAYER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

APPENDIX

TEX. INS. CODE. art. 21.28-C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 1

CAL. INS. CODE §§ 1063.1(c)(1), 1063.2(b). . . . . . . . . . . . . . . . . . . Tab 2

36 OKLA. STAT. ANN. §§ 2004(6), 2004(8), 2007(A)(2). . . . . . . . . . . . Tab 3

The Policy WC1-1945251.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Tab 4

*Wyoming Medical Center, Inc. v. Wyoming Ins.Guar. Ass'n*,
225 P.3d 1061, 1068 (Wyo. 2010). . . . . . . . . . . . . . . . . . . . . . . . .  Tab 5

40 PA. CONS. STAT. § 221.23a. . . . . . . . . . . . . . . . . . . . . . . . . . . .  Tab 6

2004 Pa. Legis. Serv. 2004-46 (S.B. No. 815). . . . . . . . . . . . . . . . . .  Tab 7

*Canal Ins. Co. v. Pro Search*,
648 S.E.2d 497, 498 (Ga. Ct. App. 2007).. . . . . . . . . . . . . . . . . . . . .  Tab 8

*AMS Constr. Co., Inc. v. Reliance Ins. Co.*,
No. Civ.A. 04-CV-2097, 2004 WL 2600792
(E.D. Penn. Nov. 15, 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Tab 9

Final Summary Judgment, dated March 6, 2015. . . . . . . . . . . . . . . . .  Tab 10

# INDEX OF AUTHORITIES

**Cases:**

*AMS Constr. Co., Inc. v. Reliance Ins. Co.*,
No. Civ.A. 04-CV-2097, 2004 WL 2600792 (E.D. Penn. Nov. 15, 2004). . .  27-28

*Canal Ins. Co. v. Pro Search*,
648 S.E.2d 497, 498 (Ga. Ct. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . 24, 30-31

*Dell Computer Corp. v. Rodriguez*,
390 F.3d 377, 392 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Durish v. Channelview Bank,*
809 S.W.2d 273, 275-77 (Tex.App.–Austin 1991, writ denied). . . . . . . . . . . . . . 2

*F.D. Stella Products Co. v. Scott,*
875 S.W.2d 462, 465 (Tex. App.–Austin 1994). . . . . . . . . . . . . . . . . . . . . . 32-33

*Hubble v. Lone Star Contracting Corp.*,
883 S.W.2d 379, 381 (Tex.App.–Fort Worth 1994. . . . . . . . . . . . . . . . . . . 29-30

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*,
962 S.W.2d 507, 514 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*KPMG Peat Marwick v. Harrison County Housing Finance Corp.*,
988 S.W.2d 746, 748 (Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Latter v. Autry*,
853 S.W.2d 836, 839 n.1 (Tex. App.–Austin 1993). . . . . . . . . . . . . . . . . . . . . 2

*Lear Sigler, Inc. v. Perez*,
819 S.W.2d 470, 471 (Tex. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Morriss v. Enron Oil & Gas Co.*,
948 S.W.2d 858, 869 (Tex.App.–San Antonio 1997). . . . . . . . . . . . . . . . . . . . 18

*Murray v. San Jacinto Agency, Inc.*,
800 S.W.2d 826, 828 (Tex. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Myer v. Cuevas*,
119 S.W.3d 830, 834 (Tex. App.–San Antonio 2003) . . . . . . . . . . . . . . . . . . . . 22

*Nixon v. Mr. Property Mgmt. Co.*,
690 S.W.2d 546, 548-49 (Tex. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nobles v. Marcus*,
533 S.W.2d 923, 927 (Tex. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rhône-Poulenc, Inc. v. Steel*,
997 S.W.2d 217, 223 (Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rolling Lands Investments, L.C. v Nw. Airport Mgmt. L.P.*,
111 S.W.3d 187, 196 (Tex. App.–Texarkana 2003). . . . . . . . . . . . . . . . . . . . . 23

*Spin Doctor Golf, Inc. v. Paymentech, L.P.*,
296 S.W.3d 354, 363 (Tex.App.–Dallas 2009). . . . . . . . . . . . . . . . . . . . . . . 33

*Stevens v. State Farm Fire and Cas. Co.*,
929 S.W.2d 665, 671 (Tex. App.–Texarkana 1996). . . . . . . . . . . . . . . . . . . . 23, 26

*Velsicol Chem. Corp. v. Winograd*,
956 S.W.2d 529, 530 (Tex. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Wyoming Medical Center, Inc. v. Wyoming Insurance Guaranty Association*,
225 P.3d 1061, 1068 (Wyo. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Statutes:**

CAL. INS. CODE §1063.1(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21

CAL. INS. CODE §1063.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

36 OKLA. STAT. ANN. § 2004(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21

36 OKLA. STAT. ANN. § 2004(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

36 OKLA. STAT. ANN. § 2007(A)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

40 PA. CONS. STAT. § 221.23a.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 26-28

40 PA. CONS. STAT. § 221.23a(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 26

40 PA. CONS. STAT. § 221.23a(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 26-27

2004 Pa. Legis. Serv. 2004-46 (S.B. No. 815). . . . . . . . . . . . . . . . . . . . . . . . 26

TEX. CIV. PRAC. & REM. CODE § 16.004.. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TEX. INS. CODE. art. 21.28-C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TEX. INS. CODE. art. 21.28-C § 5(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TEX. INS. CODE. art. 21.28-C § 5(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

TEX. INS. CODE. art. 21.28-C § 8(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20

**Rules:**

TEX. R. APP. P. 9.4(i)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

TEX. R. APP. P. 39.1(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

TEX. R. CIV. P. 166a(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**STATEMENT OF THE CASE**

Plaintiffs/Appellants CIGA, OPCIGA, and TPCIGA (collectively, the "Guaranty Associations") sued Defendant/Appellee Hill Bros. for breach of contract in an action filed on March 31, 2009.[1] (CR 4). The suit alleges Hill Bros. failed to reimburse the Guaranty Associations for their payment of workers' compensation benefits and claim handling expenses within the per claim deductible limits of a workers' compensation policy issued to Hill Bros. by Legion Insurance Company ("Legion") identified by policy no. WC1-1945251 (the "Policy"). (CR 295). Hill Bros. answered alleging the suit was barred by the statute of limitations. (CR 982).

Hill Bros. filed a motion for summary judgment on January 5, 2015 arguing, among other things, the Guaranty Associations' claims are barred because the breach of contract causes of action accrued on April 1, 2002, when Hill Bros. stopped making its premium and deductible payments to Legion. (CR 2063).

The Honorable Lora Livingston granted Hill Bros.' summary judgment on limitations only (CR 3889), explaining in her letter ruling that the Guaranty Associations had the "duty to sue within four years of the date that Legion's cause of action accrued against Hill Brothers." (CR 3790).

---

[1]    The Florida Workers' Compensation Insurance Guaranty Association, Illinois Insurance Guaranty Fund, and the Nebraska Property and Liability Insurance Guaranty Association were also plaintiffs in the Original Petition. These parties were dismissed with prejudice on February 10, 2015, and are not parties to this appeal. (CR 3796).

## STATEMENT REGARDING REQUEST FOR ORAL ARGUMENT

The Court should grant oral argument because oral argument would give the Court a more complete understanding of the facts presented in this appeal, and would allow the Court to better analyze the complicated legal issues presented in this appeal. *See* TEX. R. APP. P. 39.1(c).

# ISSUES PRESENTED

Issue 1:     Can a guaranty association's cause of action for breach of contract for failure to reimburse amounts paid within the deductibles of a workers' compensation policy accrue prior to: (1) a judicial finding that a property and casualty insurer is insolvent and/or the insurer has been designated impaired by the Texas Commissioner of Insurance, (2) the guaranty association's payment of the deductible amounts that are the subject of its suit, and (3) the guaranty association making demand for reimbursement?

Issue 2:     Is the Guaranty Associations' compliance with the Pennsylvania Act a mitigating circumstance making the reasonableness of their alleged delay in making demand or filing suit against Hill Bros. a fact question?

Issue 3:     Is the Policy a continuing contract that must be fully performed before the Guaranty Associations' causes of action for breach of contract can accrue?

Issue 4:     Are the Guaranty Associations' causes of action for failure to reimburse deductibles barred in whole when some deductible payments were made within four years of the date suit was filed?

## CAUSE NO. 03-15-00314-CV

IN THE THIRD COURT OF APPEALS
AT AUSTIN

**CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, OKLAHOMA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, AND TEXAS PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION,** *Appellants*

v.

**HILL BROTHERS TRANSPORTATION, INC.,** *Appellee*

APPEAL FROM CAUSE NO. D-1-GN-09-001010
201ST JUDICIAL DISTRICT COURT OF TRAVIS COUNTY, TEXAS
HON. LORA LIVINGSTON PRESIDING

## APPELLANTS' BRIEF

TO THE HONORABLE COURT OF APPEALS:

Appellants CIGA, OPCIGA, and TPCIGA (collectively, the "Guaranty Associations") file this their Appellants' Brief asking the Court to reverse the summary judgment granted against them on the issue of limitations.

**STATEMENT OF FACTS**

**A.    About the Guaranty Associations**

    1.    <u>Guaranty Associations are Statutorily Created Entities Which Protect Citizens in the Event of an Insurer's Insolvency.</u>

The Guaranty Associations are statutory entities created and governed by the laws of their respective jurisdictions to provide protection to insureds and claimants against the hardships of property and casualty insurer insolvencies.[2] Under the various guaranty association statutes, upon the entry of an order of liquidation by a court of competent jurisdiction determining the insolvency of an insurance company licensed in the state of the guaranty association, or by the designation of a company as an "impaired insurer" by the Texas Commissioner of Insurance, the Guaranty Associations become obligated to pay "covered claims" arising under certain policies issued by the insolvent insurer.

---

    [2]    Effective April 1, 2007, the Texas Property and Casualty Guaranty Act (the "Texas Act") was codified into the TEXAS INSURANCE CODE at chapter 462. The pre-codified Texas Act, TEX. INS. CODE art. 21.28-C (Vernon), applies to this matter because Legion was designated an impaired insurer on October 25, 2002, prior to codification. The Court must focus on the Texas Act as it appeared at the time of impairment for TPCIGA. *See Latter v. Autry*, 853 S.W.2d 836, 839 n.1 (Tex. App.–Austin 1993) (citing *Durish v. Channelview Bank,* 809 S.W.2d 273, 275-77 (Tex.App.–Austin 1991, writ denied)). For that reason, all statutory references in this motion refer to the sections of the Texas Act as provided in the pre-codified TEX. INS. CODE ANN. art. 21.28-C, in effect on October 25, 2002. The remaining Appellants' statutory obligations were triggered on July 28, 2003, when the Commonwealth Court of Pennsylvania issued its Order of Liquidation of Legion. This brief cites to the guaranty statutes in California (the "California Act") and Oklahoma (the "Oklahoma Act") which were in effect on July 28, 2003.

"Covered claims," in general, are claims arising out of and within the coverage of a policy of insurance issued by an insolvent insurer to a resident of the state of the guaranty association's domicile.[3]

2.      The Guaranty Associations have the Authority to Enforce the Terms of the Policies Within the Scope of the Act.

To maintain sufficient assets to fulfill their statutory purpose, the Guaranty Associations' liability is strictly limited to payment of "covered claims." The Guaranty Associations are empowered to enforce the duties and obligations imposed on the insured under any policy of insurance within the scope of the guaranty statutes, including enforcing the obligation to pay deductibles.[4]

_____

[3]      *See* CAL. INS. CODE ANN. § 1063.1(c)(1) (West 2002) (California: "covered claim" means an unpaid "obligation[] of an insolvent insurer . . . within the coverage of an insurance policy of the insolvent insurer . . . presented as a claim to the . . . [guaranty] association . . . ; which were incurred prior to the date coverage . . . terminated and prior to, on, or within 30 days after the liquidator was appointed; . . . in the case of a policy of workers' compensation insurance, to provide workers' compensation benefits under the workers' compensation laws of [California]"); 36 OKLA. STAT. ANN. § 2004(6) (West 2002) (Oklahoma: "'Covered claim' means an unpaid claim of an insured or third party liability claimant . . . which arises out of and is within the coverage . . . of an insurance policy to which [the Oklahoma act] applies and is issued by . . . an insolvent insurer . . . and . . . the claimant or insured is a resident of [Oklahoma] at the time of the insured event. . . ."); and TEX. INS. CODE art. 21.28-C § 5(8) (Texas: "'Covered claim' means an unpaid claim of an insured or third-party liability claimant that arises out of and is within the coverage . . . of an insurance policy to which this Act applies, issued . . . by an insurer licensed to do business in [Texas], if that insurer becomes an impaired insurer and the third-party claimant or liability claimant or insured is a resident of [Texas] at the time of the insured event. . . .").

[4]      CAL. INS. CODE ANN. § 1063.2(b) (West 2002) (CIGA "shall have the same rights as the insolvent insurer would have had if not in liquidation. . . ."); 36 OKLA. STAT. ANN. § 2007(A)(2) (West 2002) (OPCIGA shall "[b]e deemed the insurer to the extent of the obligations on covered claims and to that extent shall have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent."); and TEX. INS. CODE. art. 21.28-C § 8(b) (TPCIGA shall

## B. Hill Bros. Was Insured Under the Policy

Hill Bros. was insured under a workers' compensation insurance policy issued by Legion for policy period September 1, 2001, through September 1, 2002, identified by policy no. WC1-1945251.[5] (CR 2513). The Policy contained large deductible endorsements under which Hill Bros. received a substantial premium discount, but which required Hill Bros. to reimburse Legion for the first $250,000 of claims and claim handling expenses paid on each claim. (CR 2044; CR 2506 at ¶¶5-6; CR 2513-2514; CR 2914 ¶4).

## C. The Policy Required Hill Bros. to Reimburse Deductibles Within 30 Days of Demand

The deductible endorsements in the Policy required Hill Bros. to reimburse Legion for the amounts paid within the deductible within 30 days after demand was made by Legion. None of the endorsements required Legion to make demand within

---

"discharge the policy obligations of the impaired insurer, . . . to the extent that the policy obligations are covered claims under [the Texas guaranty act]," and shall "enforce any duty imposed on the insured party or beneficiary under the terms of any policy of insurance within the scope of [the Texas guaranty act]."). *See Wyoming Medical Center, Inc. v. Wyoming Insurance Guaranty Association*, 225 P.3d 1061, 1068 (Wyo. 2010) (holding that the Wyoming Insurance Guaranty Association was "entitled to reimbursement of deductibles just as [the insurer] would have been had it remained solvent.").

[5]     A true and correct copy of the Policy is provided for the Court's convenience at Tab 4 of the Appendix.

a specified time frame. The applicable provisions from the Kansas, Nebraska, Oklahoma, and Texas deductible endorsements provide as follow:

Kansas:

6.     We will have the right at our discretion, to pay any amounts within the deductible amounts or to pay allocated loss adjustment expenses to effect settlement of any claim or suit, and you shall reimburse us for any sums we may have paid.

7.     Upon notification of payments by us, you will promptly reimburse us for any such amounts that we have paid. If you fail to reimburse us, we may, at our option, cancel either this endorsement or this policy by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect. Any resulting return premium may be applied to the reimbursement amounts due.

(CR 2552).

Nebraska:

6.     We will have the right at our sole discretion to pay any amounts within the deductible amounts or to pay allocated loss adjustment expenses to effect settlement of any claim or suit, and you shall reimburse us for any sums we may have paid.

7.     Upon notification of payments by us, you will promptly reimburse us for any such amounts that we have paid. If you fail to reimburse us, we may, at our option, cancel either this endorsement or this policy by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect. Any resulting return premium may be applied to the reimbursement amounts due.

(CR 2557).

Oklahoma:

6.     We will have the right at our sole discretion, to pay any amounts within the large deductible limits or to pay allocated loss adjustment expenses within the large deductible limits to effect settlement of any claim or suit, and you shall reimburse us for any sums we may have paid.

7.     Upon notification of payments by us, you will promptly reimburse us for any such amounts that we have paid. If you fail to reimburse us, we may cancel this endorsement by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect. We will remain fully responsible for the full amount of all claims incurred prior to the effective date of cancellation. The failure to reimburse the insurer will not affect coverage for an eligible insured employee under the policy.

(CR 2559-2560).

Texas:

4.     We will pay the deductible amount for you, but you must reimburse us within 30 days after we send you notice that payment is due. We will send you notice that payment is due on a periodic basis, but not more frequently than on a monthly basis. If you fail to fully reimburse us when due, we may cancel the policy for nonpayment of premium. We may keep the amount of unearned premium that will reimburse us for the payments we made. These rights are in addition to other rights we have to be reimbursed.

(CR 2554).

**D. Hill Bros.' Extra-Contractual Deductible Reimbursement Arrangement**

To meet its deductible reimbursement obligation to Legion under the Policy, Hill Bros. entered into a three-part, extra-contractual deductible reimbursement arrangement with third parties Mutual Indemnity (Bermuda) Ltd. ("Mutual Indemnity") and Mutual Holdings (Bermuda) Ltd. ("Mutual Holdings").

Under the first part of the arrangement, Hill Bros. executed a Deductible Reimbursement Policy with Mutual Indemnity pursuant to which Mutual Indemnity paid the deductible amounts due under the Policy directly to Legion on Hill Bros.' behalf. (CR 2935-2936). The Deductible Reimbursement Policy created a course of action whereby Legion billed Mutual Indemnity for deductibles due under the Policy while Mutual Indemnity made all deductible reimbursement payments directly to Legion. (CR 2507 ¶¶8, 10).

As a condition of its Deductible Reimbursement Policy with Mutual Indemnity, and representing the second part of the arrangement, Hill Bros. was required to comply with the requirements of a Shareholder Agreement which it executed with Mutual Holdings. (CR 2935). The Shareholder Agreement stated that Hill Bros. would provide sufficient funds to both Mutual Indemnity and Mutual Holdings to indemnify each for any losses that they may suffer in administering the Deductible Reimbursement Policy for Hill Bros. The provision obligated Hill Bros. to provide

payment or collateral to Mutual Holdings or Mutual Indemnity following 30 days written notice that additional payments were needed so that Mutual Indemnity could make the required deductible reimbursement payments to Legion.

The third part of the arrangement was an excess of loss reinsurance agreement between Mutual Indemnity and Legion which created an aggregate limit of liability on Mutual Indemnity's obligations under its Deductible Reimbursement Policy with Hill Bros. (CR 2507 ¶9, CR 2567).

Despite this complex arrangement with Mutual Indemnity and Mutual Holdings, Hill Bros. remained directly liable to Legion under the Policy for the deductible payments made on Hill Bros.' behalf.

## E.    Legion Liquidation Proceedings

Effective April 1, 2002, the Commonwealth Court of Pennsylvania placed Legion in receivership for rehabilitation, naming the Pennsylvania Insurance Commissioner as Rehabilitator ("Order of Rehabilitation"). (CR 2083 ¶2).

Pursuant to the Order of Rehabilitation, the Rehabilitator was prohibited from disavowing any policies or contracts of insurance as a result of the rehabilitation. The order expressly stated: "The entry of this Order of Rehabilitation shall not constitute an anticipatory breach of any such contracts." (CR 2087 ¶17).

On October 23, 2002, an ancillary receiver was appointed and Legion was declared insolvent by the 200th Judicial District Court of Travis County, Texas. On October 25, 2002, the Commissioner of Insurance of the State of Texas issued an Order of Impairment designating Legion as an impaired insurer ("Impairment Order"). (CR 2912). The ancillary receivership order and the Impairment Order triggered the statutory obligations of TPCIGA to pay "covered claims" under policies of insurance issued by Legion, including the Policy at issue in this case.

Effective July 28, 2003, the Commonwealth Court of Pennsylvania declared Legion insolvent, entered an order of liquidation with a finding of insolvency ("Liquidation Order"), and named the Pennsylvania Commissioner as Legion's "Liquidator."[6] (CR 2903). The Liquidation Order triggered the statutory obligations of CIGA and OPCIGA to pay "covered claims" under the policies of insurance issued by Legion, including the Policy at issue in this case.

Beginning with the issuance of these orders, the Guaranty Associations began paying "covered claims" under the Policy.

---

[6] Effective July 28, 2003, Legion became "Legion in Liquidation," the entity is identified by this name for events occurring after this date.

CIGA's first payment on a "covered claim" was issued on March 4, 2003 (CR 2975, *see* $622), and CIGA's last payment on a "covered claim" was issued on April 24, 2007. (CR 2977, *see* $84 payment).

OPCIGA's first payment on a "covered claim" was issued on September 24, 2003 (CR 2885, *see* $528 payment), and OPCIGA's last payment on a "covered claim" was issued on April 28, 2009, *after* suit was filed. (CR 2890, *see* $112.40 payment).

TPCIGA's first payment on a "covered claim" was issued on October 7, 2003 (CR 2898, *see* $3,556 payment), and TPCIGA's last payment on a "covered claim" was issued on February 19, 2007. (CR 2897, *see* $3.78 payment).

In total, the Guaranty Associations paid $274,188.94 in unreimbursed "covered claims" within the deductible limits of the Policy. (CR 2719).[7]

**F.     After Liquidation, Pennsylvania Law Required Legion in Liquidation to Invoice Mutual Indemnity for Hill Bros.' Deductible Obligation to the Guaranty Associations**

Although the orders triggered the Guaranty Associations' statutory obligations to make payments under the Policy, Pennsylvania law required Legion in Liquidation to continue to invoice Mutual Indemnity and collect reimbursement for the payments

---

[7]     Of this total, CIGA paid $29,648.82, OPCIGA paid $126,209.00, and TPCIGA paid $117,770.12. (CR 2719).

the Guaranty Associations made on Hill Bros.' behalf within the deductible limits under the Policy. *See* 40 PA. CONS. STAT. § 221.23a (2004).[8]

In accordance with 40 PA. CONS. STAT. § 221.23a(g) (2004) (the "Pennsylvania Act"), after collecting deductible reimbursements paid by Mutual Indemnity on Hill Bros.' behalf, Legion in Liquidation was then required to reimburse the Guaranty Associations for the claims payments which the Guaranty Associations made in accordance with Policy. If efforts at collection from Mutual Indemnity for reimbursement of deductibles paid by the Guaranty Associations failed, the Pennsylvania Act required Legion in Liquidation to then bill Hill Bros. for reimbursement of deductibles. *Id.*

From the inception of the Policy through at least mid-2005, Legion in Liquidation invoiced Mutual Indemnity for the payments it and the Guaranty Associations made within the deductible limits on the Policy. (CR 2507-2508). Until at least mid-2005, Mutual Indemnity made reimbursement payments to Legion on Hill Bros.' behalf. (CR 2507-2508, CR 2050).

---

[8]     A true and correct copy of 40 PA. CONS. STAT. § 221.23a (2004), is included in the Appendix to this Brief.

**G.      Hill Bros. Failed to Meet its Contractual Obligations Under the Policy**

On or about August 22, 2005, Mutual Indemnity sent Hill Bros. a request for additional funds required to meet Hill Bros.' deductible obligations under the Policy. (CR 2940). Hill Bros. failed and refused to provide the requested funds to Mutual Indemnity contrary to the contractual arrangement among Mutual Indemnity, Mutual Holdings, and Hill Bros. After a second request on October 11, 2005 by Mutual Indemnity was fruitless, Mutual Indemnity referred the file to Legion in Liquidation for collection. (CR 2943, CR 2945).

Because efforts at collection from Mutual Indemnity failed, in accordance with the Pennsylvania Act, Legion in Liquidation sent collection letters to Hill Bros. on December 14, 2005, January 13, 2006, June 28, 2006, and June 24, 2008. The letters demanded reimbursement of the deductible amounts paid by Legion and the Guaranty Associations under the Policy.

The December 14, 2005 letter explained to Hill Bros. why Legion in Liquidation was seeking reimbursement directly from Hill Bros., and stated that the amount due within the deductibles was limited by the extra-contractual arrangement among Legion, Mutual Indemnity, and Hill Bros. The total amount then demanded was $145,373.27. (CR 2945). The January 13, 2006 letter enclosed a copy of the

December letter and asked that the deductible reimbursement liability be "addressed without further delay." (CR 2951).

The June 28, 2006 letter explained that Mutual Indemnity provided an additional $30,823.75 to Legion in Liquidation on Hill Bros.' behalf and that Hill Bros.' deductible reimbursement liability, as limited by the extra-contractual arrangement, was now reduced to $114,549.52. (CR 2952).

As a result of this additional payment by Mutual Indemnity, Legion in Liquidation was fully reimbursed for the amounts Legion had paid on Hill Bros.' behalf within the deductibles of the Policy. (CR 2719). Following this payment by Mutual Indemnity, however, deductible amounts remained due to the Guaranty Associations. (CR 2719).

In its June 24, 2008 demand letter, Legion in Liquidation advised Hill Bros. that it was referring for collection to the Guaranty Associations the unreimbursed deductible amounts due to the Guaranty Associations. Hill Bros. was advised that the Guaranty Associations may pursue all claims and claim handling expenses paid within the per-claim deductible limits regardless of any extra-contractual arrangement among Hill Bros., Legion, and Mutual Indemnity. (CR 2968).

On March 13, 2009, the Guaranty Associations sent to Hill Bros a demand letter for the total amount of unreimbursed deductible payments made on Hill Bros.'

behalf by the Guaranty Associations. In the letter, the Guaranty Associations explained that Legion's Reinsurance Agreement with Mutual Indemnity is not within the coverage of the applicable guaranty statutes. Therefore, the Aggregate Cap that limited Legion in Liquidation's collection to $114,549.52 did not in any way limit the Guaranty Associations' collection of the entire sum which they have paid within the deductible limits on the Policy. (CR 2970-2971).

Hill Bros. never reimbursed the Guaranty Associations for the outstanding deductible amounts.

On March 31, 2009, the Guaranty Associations filed their original petition in this case alleging Hill Bros. breached its contractual obligations under the Policy by failing and refusing to reimburse the Guaranty Associations for their payment of claims and claims handling expenses within the per claim deductible limit of the Policy.[9] (CR 7).

---

[9] The Florida Workers' Compensation Insurance Guaranty Association, Illinois Insurance Guaranty Fund, and the Nebraska Property and Liability Insurance Guaranty Association were plaintiffs in the Original Petition. These parties were dismissed with prejudice on February 10, 2015, and are not parties to this appeal. (CR 3796).

## SUMMARY OF ARGUMENT

The District Court erred in granting summary judgment because the statute of limitations does not bar the Guaranty Associations' right to recover their payment of "covered claims" within the deductible limits of the Policy. The statute of limitations cannot accrue against the Guaranty Associations for breach of the deductible reimbursement provisions until at least three events occur. First, the statutory obligation to pay "covered claims" must be triggered by an adjudication of an insurer's insolvency by a court of competent jurisdiction and, in the case of TPCIGA, the designation of the insurer as an "impaired insurer" by the Texas Commissioner of Insurance. Second, the Guaranty Associations must have paid the "covered claims" for which they seek reimbursement in this suit. And third, the Guaranty Associations must have made demand for reimbursement of the deductible amounts and Hill Bros. must have failed to reimburse the Guaranty Associations within thirty days of the demand. Because none of these three events occurred by April 1, 2002, the District Court's summary judgment is wrong as a matter of law.

Any alleged delay in the Guaranty Associations' making demand or filing of this suit was caused by their compliance with the Pennsylvania Act. Whether or not the Guaranty Associations' compliance with the Pennsylvania Act was reasonable is

a fact question that must be presented to the trier of fact, and this outstanding fact question precludes summary judgment.

Regardless of any alleged delay in making demand or filing suit, the Guaranty Associations contend their suit was timely filed within the limitations period. The Policy was a continuing contract requiring ongoing payments of workers' compensation benefits for the benefit of Hill Bros.' injured employees. The Policy was not fully performed by the Guaranty Associations until April 28, 2009. Because this suit for breach of a continuing contract was filed on March 31, 2009, prior to the date the Policy was fully performed, the statute of limitations does not bar the Guaranty Associations' claims.

Alternatively, the Guaranty Associations' breach of contract claims are not completely barred by limitations because the Guaranty Associations made payments within the deductible limits of the Policy within four years of the date suit was filed. Even if earlier payments are barred by the statute of limitations, the Guaranty Associations submit the statute of limitations would not bar their recovery of deductible payments made within four years of the date they filed suit.

## ARGUMENT AND AUTHORITIES

The District Court erred in granting summary judgment to Hill Bros. based on the statute of limitations affirmative defense because the accrual date identified by the court, April 1, 2002, is wrong as a matter of law. Alternatively, the District Court erred because the Guaranty Associations raised a fact issue regarding the date their causes of action accrued.

## Standard of Review

The standard for review of a summary judgment is whether the successful movant met its burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *KPMG Peat Marwick v. Harrison County Housing Finance Corp.*, 988 S.W.2d 746, 748 (Tex. 1999) (citing *Lear Sigler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991); *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985)); TEX. R. CIV. P. 166a(c). In conducting its review, the appellate court shall "take as true all evidence favorable to the nonmovant, and . . . make all reasonable inferences in the nonmovant's favor." *KPMG Peat Marwick*, 988 S.W.2d at 748 (citing *Nixon*, 690 S.W.2d at 548-49).

A defendant moving for summary judgment on a limitations affirmative defense has the burden to conclusively establish the defense. *Rhône-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999) (citing *Velsicol Chem. Corp. v. Winograd*,

956 S.W.2d 529, 530 (Tex. 1997)). First, the movant must establish the applicable limitations period. Second, the defendant must prove when the cause of action accrued. "A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514 (Tex. 1998) (citing *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990)). If the movant meets its burden, the nonmovant must then raise a fact issue to avoid summary judgment. *Id.* (internal citations omitted).

The applicable limitations period for the Guaranty Associations' breach of contract suit is four years from the date the causes of action accrued. *Morriss v. Enron Oil & Gas Co.*, 948 S.W.2d 858, 869 (Tex.App.–San Antonio 1997); TEX. CIV. PRAC. & REM. CODE § 16.004.

The District Court erred in granting summary judgment because the April 1, 2002 accrual date identified by the court is wrong as a matter of law, and because the Guaranty Associations raised a fact issue about when their causes of action accrued.

**Issue 1:** Can a guaranty association's cause of action for breach of contract for failure to reimburse amounts paid within the deductibles of a workers' compensation policy accrue prior to: (1) a judicial finding that a property and casualty insurer is insolvent and/or the insurer has been designated impaired by the Texas Commissioner of Insurance, (2) the guaranty association's payment of the deductible amounts that are the subject of its suit, and (3) the guaranty association making demand for reimbursement?

The answer to this question is no. Before a guaranty association's breach of contract claim for failure to reimburse deductibles can accrue, at least three events must occur. First, the guaranty association's statutory obligation to pay "covered claims" of an insolvent insurer must be triggered by order of a court of competent jurisdiction based on a judicial finding of insolvency and by the Texas Commissioner of Insurance's designation that the insurer is impaired. Second, the guaranty association must pay the amounts within the deductible limits of the policy that are the subject of its suit. And finally, the guaranty association must make demand to the insured for reimbursement of the amounts paid within the deductibles.

In this case, the District Court erred because none of these events had occurred on April 1, 2002.

**A. The Guaranty Associations Did Not Have Standing to Take Any Action Under the Policy on April 1, 2002**

The Guaranty Associations are statutory entities created and governed by the laws of their respective jurisdictions. They become obligated to pay "covered claims" under policies of insurance issued by insolvent or impaired insurance carriers as provided in their respective enabling statutes.

On April 1, 2002, the Guaranty Associations' statutory obligations to pay "covered claims" had not been triggered by their enabling statutes.

1. <u>TPCIGA Did Not Have Standing To Discharge the Policy Obligations Until At Least October 25, 2002</u>

In accordance with the Texas Act, TPCIGA becomes obligated to discharge the policy obligations of a member insurer when that insurer is "placed in temporary or permanent receivership under an order of a court of competent jurisdiction . . . based on a finding of insolvency and . . . has been designated an impaired insurer by the [Texas Commissioner of Insurance]." TEX. INS. CODE art.21.28-C, § 5(9), 8(b).

In this case, Legion was placed in ancillary receivership and a judicial finding of insolvency was entered by the 200th Judicial District Court, Travis County, on October 23, 2002. On October 25, 2002, the Texas Commissioner of Insurance entered the Impairment Order designating Legion an impaired insurer. TPCIGA's

statutory obligations were triggered upon entry of the October 25, 2002 Impairment Order.

Prior to October 25, 2002, TPCIGA had no authority to pay claims or otherwise discharge the policy obligations of Legion—including the authority to sue Hill Bros. for breach of the deductible endorsements of the Policy. Because TPCIGA did not have authority to sue Hill Bros. for breach of the Policy on April 1, 2002, TPCIGA's cause of action against Hill Bros. did not accrue on that date.

2. <u>CIGA and OPCIGA Did Not Have Standing To Discharge the Policy Obligations Until July 28, 2003</u>

Under the California Act and the Oklahoma Act, CIGA's and OPCIGA's statutory obligations are triggered when a court of competent jurisdiction enters an order of liquidation with a finding of insolvency against a member insurer. CAL. INS. CODE § 1063.1(c)(1); 36 OKLA. STAT. ANN. § 2004(8). Effective July 28, 2003, the Commonwealth Court of Pennsylvania entered against Legion the Liquidation Order with a finding of insolvency.

Prior to July 28, 2003, neither CIGA nor OPCIGA had authority to pay claims or discharge the policy obligations of Legion—including the authority to sue Hill Bros. for breach of the Policy. Because CIGA and OPCIGA did not have authority

to sue Hill Bros. for breach of the Policy on April 1, 2002, their causes of action against Hill Bros. did not accrue on that date.

**B.     On April 1, 2002, the Guaranty Associations Had Not Yet Paid Any of the Covered Claims For Which They Sued Hill Bros.**

No cause of action may accrue to the benefit of a plaintiff until its legal right to reimbursement is breached. *See Myer v. Cuevas*, 119 S.W.3d 830, 834 (Tex. App.–San Antonio 2003) ("Without breach of a legal right belonging to the plaintiff, no cause of action can accrue to his benefit.") (citing *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976)).

In this case, the Guaranty Associations sued Hill Bros. for failure to reimburse on demand the Guaranty Associations for their payment of covered claims within the deductible limits of the Policy. All of the payments subject to the Guaranty Associations' suit occurred *after* their statutory obligations were triggered (*i.e.*, after October 25, 2002, for TPCIGA, and after July 28, 2003, for CIGA and OPCIGA). The Guaranty Associations had no right to reimbursement for their deductible payments they made until they *actually made* the deductible payments for which they sued.

The first payments by each of the Guaranty Associations of a "covered claim" under the Policy were made on the following dates: CIGA, March 4, 2003; OPCIGA, September 24, 2003; and TPCIGA, October 7, 2003.

Because on April 1, 2002, the Guaranty Associations had not yet made *any* deductible payments under the Policy, as a matter of law, their causes of action did not accrue on April 1, 2002.

**C.      On April 1, 2002, the Guaranty Associations had Not Yet Made Demand on Hill Bros. for Reimbursement of Deductibles.**

"[W]hen demand is an integral part of a cause of action, or demand is a condition precedent to the right to sue, the statute of limitations does not begin to run until demand has been made unless the right to make a demand was waived or unreasonably delayed." *Rolling Lands Investments, L.C. v Nw. Airport Mgmt. L.P.*, 111 S.W.3d 187, 196 (Tex. App.–Texarkana 2003) (internal citations omitted). *See Stevens v. State Farm Fire and Cas. Co.*, 929 S.W.2d 665, 671 (Tex. App.–Texarkana 1996).

The deductible endorsements in the Policy required Legion (prior to liquidation and impairment) and the Guaranty Associations (after liquidation and impairment) to make demand on Hill Bros. for reimbursement of deductible amounts. The endorsements do not specify a time by which demand had to be made, only that Hill Bros. must "promptly reimburse" the deductibles or reimburse the deductibles "within 30 days." *See e.g.,* (CR 2552) ("Upon notification of payments by us, you will promptly reimburse us for any such amounts that we have paid."); (CR 2557) (same);

CR 2559-60(same); and CR 2554 ("We will pay the deductible amount for you, but you must reimburse us within 30 days after we send you notice that payment is due. We will send you notice that payment is due on a periodic basis, but not more frequently than on a monthly basis."). Absent a demand, Hill Bros. would have no notice of the amounts paid within the deductibles for which it is liable and for which payment was due under the Policy.

In *Canal Ins. Co. v. Pro Search*, 648 S.E.2d 497, 498 (Ga. Ct. App. 2007), a Georgia appellate court reached the same conclusion in construing similar deductible endorsement language in a workers' compensation policy. The endorsement in *Canal* read, "We will pay the deductible amount for you to the claimant or provider of services, but you must reimburse us within 30 days after we sent you notice that payment is due." *Id.* The court explained, "Under the clear language of the contract, payment was not due until 30 days after [the insurer] sent notice to [the policyholder] of the amount due. Accordingly, there could have been no suit under the contract until notice was sent." *Id.* That court held that the statute of limitations did not begin to run on the insurer's deductible reimbursement claim until demand had been made. *Id.*

Because on April 1, 2002, the Guaranty Associations had not yet made demand for reimbursement of amounts they paid within the deductible limits of the Policy, their causes of action for failure to reimburse deductibles did not accrue on that date.

A cause of action for breach of contract did not accrue against the Guaranty Associations on April 1, 2002, because as of that date: (1) their statutory obligations had not been triggered in accordance with their respective enabling statutes, (2) the Guaranty Associations had not yet paid the deductibles for which they filed suit in this case, and (3) the Guaranty Associations had not yet made demand for reimbursement of the deductible payments they had yet to make. None of these three events occurred by April 1, 2002. Therefore, the District Court erred in granting summary judgment to Hill Bros. on its limitations defense.

**Issue 2:** **Is the Guaranty Associations' compliance with the Pennsylvania Act a mitigating circumstance making the reasonableness of their alleged delay in making demand or filing suit against Hill Bros. a fact question?**

Yes. The Guaranty Associations' compliance with the Pennsylvania Act is a mitigating circumstance which requires the finder of fact to determine whether the Guaranty Associations' alleged delay in making demand or filing suit for reimbursement was reasonable.

Demand for reimbursement of deductibles is a prerequisite to filing suit against Hill Bros. for failure to reimburse the Guaranty Associations for the amounts they have paid within the deductibles under the Policy. "Where demand is a prerequisite to a right of action, the injured party must make the demand within a reasonable time

after it may lawfully be made." *Stevens v. State Farm Fire and Cas. Co.*, 929 S.W.2d 665, 671 (Tex. App.–Texarkana 1996) (internal citations omitted). "The reasonableness of the delay is normally a fact question, but in the absence of mitigating circumstances, the law will ordinarily consider a reasonable time as being coincident with the running of the statute, and an action will be barred if a demand is not made within that period." *Id.* (internal citations omitted).

On June 28, 2004, after the Liquidation Order was entered and while the delinquency proceeding was still open and pending, the Pennsylvania Legislature passed into law S.B. No. 815, section 523.1, codified at 40 PA. CONS. STAT. § 221.23a (West 2004).[10]

In accordance with 40 PA. CONS. STAT. § 221.23a, the law governing the delinquency proceeding, Legion in Liquidation was required to invoice and collect from offshore insurer Mutual Indemnity the deductible payments the *Guaranty Associations* made on Hill Bros.' behalf in accordance with the Deductible Reimbursement Policy Hill Bros. obtained for this purpose. *See* 40 PA. CONS. STAT. §§ 221.23a(f) & (g) (2004). After collecting the deductibles, Legion in Liquidation

---

[10] In accordance with its terms, Section 523.1 became immediately effective: "This act shall take effect immediately." 2004 Pa. Legis Serv. 2004-46 (S.B. 815). Section 221.23a(l) states, "This section will apply to all delinquency proceedings which are open and pending as of the effective date of this section." S.B. 815 was approved on June 28, 2004. Because the delinquency proceeding of Legion in Liquidation was open and pending on June 28, 2004, 40 PA. CONS. STAT. § 221.23a applies to the Legion in Liquidation delinquency proceeding.

was then required to reimburse the Guaranty Associations for the deductible payments they had made in accordance with the Policy. *Id.*

The Guaranty Associations were not permitted to initiate their own collection efforts until Legion in Liquidation failed to make a good faith effort to collect deductibles. *See* 40 PA. CONS. STAT. § 221.23a (g). Legion in Liquidation pursued collection efforts through June 24, 2008, when it turned over collection of deductibles to the Guaranty Associations.

Notably, in a different Pennsylvania delinquency proceeding, the Florida Workers' Compensation Insurance Guaranty Association filed a motion to intervene to protect its right to deductible reimbursements in an action between the Pennsylvania Liquidator and an insured employer. *AMS Constr. Co., Inc. v. Reliance Ins. Co.*, No. Civ.A. 04-CV-2097, 2004 WL 2600792 (E.D. Penn. Nov. 15, 2004). Construing the statutory language of 40 PA. CONS. STAT. § 221.23a, the court explained:

> A review of the language of Pennsylvania's statute establishes that a scheme is in place whereby the Pennsylvania Commissioner, as receiver, has the primary duty to collect unpaid deductible amounts under Pennsylvania law . . . . This statutory scheme provides a mechanism for the prompt payment of a guaranty association's fair share of deductible reimbursements. It further delineates the rights and remedies of the

guaranty association in pursuing its own claims should the receiver not make a good faith effort to collect the reimbursements.[11]

*Id.* at *4. Under 40 PA. CONS. STAT. § 221.23a, the court concluded, "[T]he Pennsylvania Commissioner, as receiver, has the statutory right and obligation to represent all state guaranty associations in connection with deductible amounts owed by policyholders." *AMS Constr.*, 2004 WL 2600792 at *5. Until the receiver failed to meet this statutory obligation, under 40 PA. CONS. STAT. § 221.23a, the guaranty associations were not permitted to collect deductibles. *AMS Constr.* 2004 WL 2600792 at *5.

In this case, the Legion Liquidator also had the primary duty to collect deductibles from Hill Bros., and the Guaranty Associations were not permitted to collect until the Liquidator failed to meet its statutory obligation. This occurred on or after June 24, 2008, when Legion in Liquidation referred collection to the Guaranty Associations.

The Guaranty Associations made their demand and filed their original petition in March 2009, only nine months after collection efforts were turned over by Legion

---

[11] Although referred to as "receiver" throughout the case, the court in *AMS Constr.* recognized that the "Pennsylvania Commissioner of Insurance, was appointed statutory liquidator of [the insurer]." *AMS Constr.*, 2004 WL 2600792 at *1, n.1.

in Liquidation in accordance with the Pennsylvania Act. Compliance with the Pennsylvania Act is itself a mitigating circumstance which makes the reasonableness of any alleged delay in making demand or filing suit against Hill Bros. a fact question.

Because the reasonableness of the Guaranty Associations' alleged delay in filing suit is a fact question, the District Court erred in granting summary judgment to Hill Bros.

**Issue 3:** **Is the Policy a continuing contract that must be fully performed before the Guaranty Associations' causes of action for breach of contract can accrue?**

Yes. The Policy was a continuing contract which required the Guaranty Associations to make ongoing and indivisible payments of workers' compensation benefits for the benefit of Hill Bros.' injured employees. Because the Policy was not fully performed until all workers' compensation benefits were paid to Hill Bros.' injured employees, the Guaranty Associations' causes of action for failure to reimburse deductibles did not accrue until that date.

## A. The Policy is a Continuing Contract

A continuing contract is an agreement in which, "the contemplated performance and payment are divided into several parts, or where the work is continuous and indivisible, [and] the payment for work is in installments as the work

is completed." *Hubble v. Lone Star Contracting Corp.*, 883 S.W.2d 379, 381 (Tex.App.–Fort Worth 1994). The Policy is a continuing contract which required continuous and indivisible payment of workers' compensation benefits on an ongoing basis by the Guaranty Associations and reimbursement by Hill Bros. to the Guaranty Associations of amounts paid within the deductibles.

**B.  The Statute of Limitations Did Not Accrue on This Continuing Contract Until it was Fully Performed on April 28, 2009.**

The statute of limitations begins to run on a continuing contract on the earlier of the following: "(1) when the work is completed; (2) when the contract is terminated in accordance with its terms; or (3) when the contract is anticipatorily repudiated by one party and this repudiation is adopted by the other party." *Id.* (internal citations omitted). *See Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 392 (5th Cir. 2004) ("On a continuing contract, however, the statute of limitations does not commence to run until the contract is terminated or fully performed."). A workers' compensation policy is not fully performed, and a breach of the deductible endorsements cannot accrue, if benefits payments are ongoing under the contract. *See Canal*, 648 S.E.2d 497, 498 (because the insurer's payments under the Policy were ongoing, and demand was made while benefit payments were being made, the

insurer's cause of action to recover deductibles could not accrue until demand was made).

Because the deductible endorsements of the Policy were never terminated by any party, and because the Guaranty Associations did not adopt any anticipatory repudiation by Hill Bros., the statute of limitations on the deductible endorsements of the Policy accrued when the Guaranty Associations fully performed on the contract.

The Guaranty Associations each fully performed on the contract when they made their final payment of workers' compensation benefits under the Policy. These final payments occurred on April 24, 2007, for CIGA; on April 28, 2009, for OPCIGA; and on February 19, 2007, for TPCIGA.[12]  Therefore, CIGA's cause of action accrued on August 24, 2007; OPCIGA's cause of action accrued on April 28, 2009; and TPCIGA's cause of action accrued on February 19, 2007. Because the earliest of these accrual dates, February 19, 2007, is less than four years before the date the Guaranty Associations filed suit on March 31, 2009, their claims for breach of the continuing contract are not barred by limitations.

---

[12]    CIGA's last payment was issued on April 24, 2007, CR 2977 (*see* $84 payment); OPCIGA's last payment was issued on April 28, 2009, CR 2890 (*see* $112.40 payment); and TPCIGA's last payment was issued on February 19, 2007. CR 2897 (*see* $3.78 payment).

The District Court erred in granting summary judgment to Hill Bros. because the Policy was a continuing contract which required full performance before limitations could run against the Guaranty Associations. Full performance under the Policy did not occur until at least February 19, 2007, which was well within the four year statute of limitations for breach of contract.

> **Issue 4:** **Are the Guaranty Associations' causes of action for failure to reimburse deductibles barred in whole when some deductible payments were made within four years from the date suit was filed?**

No. Under no construction can the entirety of the Guaranty Associations' claims be barred by limitations because each of the Guaranty Associations made deductible payments on covered claims within four years of the date they filed suit, or on or after March 31, 2005.

Where a contract requires ongoing payments on specific dates, a separate cause of action accrues for each missed payment. *F.D. Stella Products Co. v. Scott*, 875 S.W.2d 462, 465 (Tex. App.–Austin 1994). The Court explained:

> The cause of action accrues when each payment is due, and the injured party has four years to bring suit. Thus, a suit for breach of contract requiring payment in periodic installments may include all payments due within the four-year statute of limitations period, even if the initial breach was beyond the limitations period. Recovery of any payments

due before the four-year limit is barred, since a suit on each individual payment more than four years overdue would also be barred.

*Id.* (Internal citations omitted).

In this case, although the deductible endorsements did not require payments by Hill Bros. in fixed amounts on specified dates, the rationale of *Scott* is applicable. *See Spin Doctor Golf, Inc. v. Paymentech, L.P.*, 296 S.W.3d 354, 363 (Tex.App.–Dallas 2009) (holding that fixed payments are not required for a continuing contract). While the statute of limitations may bar recovery for payments made four years *before* suit was filed, it will not bar recovery for deductible payments made by the Guaranty Associations *within* four years of the date the suit was filed. *See id.* ("We hold that the parties' agreement constituted a continuing contract and claims based on breaches within four years before . . . the date the lawsuit was filed, are not barred by limitations.").

Each of the Guaranty Associations made payments under the Policy within four years of the date they filed suit.[13] Because the causes of action on such payments cannot have accrued until the deductible payments are actually made, the Guaranty Associations' claims for reimbursement on these more recent payments are not barred by the statute of limitations.

---

[13] *See supra* note 8.

The District Court erred in granting summary judgment to Hill Bros. because the Guaranty Associations' right to reimbursement for payments made within four years of the date suit was filed are not barred by the statute of limitations.

# CONCLUSION AND PRAYER

As a matter of law, the statute of limitations did not begin to run against the Guaranty Associations on April 1, 2002. As of that date, the Guaranty Associations had no authority to sue Hill Bros., had not yet made the deductible payments for which they sued Hill Bros., and had not yet made a demand for reimbursement to Hill Bros. for the deductible payments they had yet to pay. To the extent the Guaranty Associations are viewed as having delayed in demanding reimbursement, whether their alleged delay was reasonable is a fact issue precluding summary judgment. In fact, because the Policy was a continuing contract, the Guaranty Associations' breach of contract claims could not have accrued until they fully performed under the Policy, and the earliest any of the Guaranty Associations fully performed under the Policy was February 19, 2007. Alternatively, even if earlier payments were barred by the statute of limitations, the statute of limitations would not bar the Guaranty Associations' recovery of deductible payments made within four years of the date the Guaranty Associations filed suit.

For the reasons stated, the Guaranty Associations, Appellants, ask the Court to reverse the District Court's summary judgment and to remand the case for further proceedings.

Respectfully submitted,

STONE LOUGHLIN & SWANSON, LLP
P.O. Box 30111
Austin, Texas 78755
(512) 343-1300
(512) 343-1385  Fax
dprice@slsaustin.com


By:  _____

Dan Price (SBN 24041725)
James Loughlin (SBN 00795489)

*Attorneys for Appellants*


## CERTIFICATE OF COMPLIANCE

Relying on the word count of the computer program used to prepare Appellants' Brief, the total number of words in this document, excluding sections that are not to be counted under TEX. R. APP. P. 9.4(i)(1), is 7,498.


_____

Dan Price

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2015, a true and correct copy of the foregoing

document served as indicated to the parties listed below.

**Via e-Filing/e-Service**
Adrian Ciechanowicz
William Johnson
Leila Melhem
DUGGINS WREN MANN & ROMERO, LLP
P.O. Box 1149
Austin, Texas 78767-1149
Telephone: (512) 744-9300
E-mail: aCiechanowicz@dwmrlaw.com


Dan Price

G:\SLS\21744\Appeal\Signature pages.wpd

# APPENDIX

| Document | Tab |
|---|---|

Tex. Ins. Code. art. 21.28-C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Ins. Code §§ 1063.1(c)(1), 1063.2(b). . . . . . . . . . . . . . . . . . . . . . . . . 2

36 Okla. Stat. Ann. §§ 2004(6), 2004(8), 2007(A)(2). . . . . . . . . . . . . . . . . . . 3

The Policy WC1-1945251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Wyoming Medical Center, Inc. v. Wyoming Insurance Guaranty Association*,
225 P.3d 1061, 1068 (Wyo. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

40 Pa. Cons. Stat. § 221.23a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2004 Pa. Legis. Serv. 2004-46 (S.B. No. 815). . . . . . . . . . . . . . . . . . . . . . . . 7

*Canal Ins. Co. v. Pro Search*,
648 S.E.2d 497, 498 (Ga. Ct. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*AMS Constr. Co., Inc. v. Reliance Ins. Co.*,
No. Civ.A. 04-CV-2097, 2004 WL 2600792 (E.D. Penn. Nov. 15, 2004). . . . . . . 9

Final Summary Judgment, dated March 6, 2015. . . . . . . . . . . . . . . . . . . . . . 10

# TAB 1

TEX. INS. CODE. art. 21.28-C

V.A.T.S. Insurance Code, Art. 21.28-C
VERNON'S <mark>TEXAS</mark> STATUTES AND <mark>CODES</mark> ANNOTATED
INSURANCE <mark>CODE</mark> (1951)
**TITLE 1. THE INSURANCE <mark>CODE</mark> OF 1951**
**CHAPTER TWENTY-ONE—GENERAL PROVISIONS**
SUBCHAPTER D. CONSOLIDATION, LIQUIDATION, REHABILITATION, REORGANIZATION OR
CONSERVATION OF INSURERS

Art. <mark>21.28</mark>-C. Property and Casualty Insurance Guaranty Act

Short title

<mark>Sec</mark>. 1. This article shall be known as the <mark>Texas</mark> Property and Casualty Insurance Guaranty Act.

Purpose

<mark>Sec</mark>. 2. The purpose of this Act is to:
(1) provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment;
(2) avoid financial loss to claimants or policyholders because of the impairment of an insurer;
(3) assist in the detection and prevention of insurer insolvencies; and
(4) provide an association to assess the cost of that protection among insurers.

Scope

<mark>Sec</mark>. 3. (a) This Act applies to all kinds of direct insurance, and except as provided in Section 12 of this Act, is not applicable to the following:
(1) life, annuity, health, or disability insurance;
(2) mortgage guaranty, financial guaranty, or other forms of insurance offering protection against investment risks;
(3) fidelity or surety bonds, or any other bonding obligations;
(4) credit insurance, vendors' single-interest insurance, collateral protection insurance, or any similar insurance protecting the interests of a creditor arising out of a creditor-debtor transaction;
(<mark>5</mark>) insurance of warranties or service contracts;
(6) title insurance;
(7) ocean marine insurance;
(8) any transaction or combination of transactions between a person, including an affiliate of such a person, and an insurer, including an affiliate of such an insurer, that involves the transfer of investment or credit risk unaccompanied by the transfer of insurance risk; or
(9) any insurance provided by or guaranteed by government.
(b) This Act applies to insurance written through the <mark>Texas</mark> Mutual Insurance Company only as provided by this subsection. The application of this article to the <mark>Texas</mark> Mutual Insurance Company is on a prospective basis on and after January 1, 2000. That company is only liable for assessments for a claim with a date of injury that occurs on or after January 1, 2000. The association, with respect to an insolvency of the company, is only liable for a claim with a date of injury that occurs on or after January 1, 2000.

Construction

<mark>Sec</mark>. 4. This Act shall be liberally construed to effect the purposes under Section 2 of this Act, which will constitute an aid and guide to interpretation.

Definitions

**Sec**. **5**. In this Act:

(1) "Account" means any one of the three accounts created under Section 6 of this Act.

(2) "Affiliate" means a person who, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with an impaired insurer on December 31 of the year next preceding the date the insurer becomes an impaired insurer.

(3) "Association" means the **Texas** Property and Casualty Insurance Guaranty Association.

(4) "Board" means the board of directors of the association.

(**5**) "Claimant" means any insured making a first-party claim or any person instituting a liability claim. A person who is an affiliate of the impaired insurer may not be a claimant.

(6) "Commissioner" means the commissioner of insurance.

(7) "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise, unless the power is the result of an official position with or corporate office held by the person. Control is presumed to exist if any person, directly or indirectly, owns, controls, holds with the power to vote, or holds proxies representing 10 percent or more of the voting securities of any other person. This presumption may be rebutted by a showing that control does not exist in fact.

(8) "Covered claim" means an unpaid claim of an insured or third-party liability claimant that arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Act applies, issued or assumed (whereby an assumption certificate is issued to the insured) by an insurer licensed to do business in this state, if that insurer becomes an impaired insurer and the third-party claimant or liability claimant or insured is a resident of this state at the time of the insured event, or the claim is a first-party claim for damage to property that is permanently located in this state. "Covered claim" shall also include unearned premiums, but in no event shall a covered claim for unearned premiums exceed $25,000. Individual covered claims (including any and all derivative claims by more than one person which arise from the same occurrence, which shall be considered collectively as a single claim under this Act) shall be limited to $300,000, except that the association shall pay the full amount of any covered claim arising out of a workers' compensation claim made under a workers' compensation policy. "Covered claim" shall not include any amount sought as a return of premium under a retrospective rating plan or any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries, reinsurance recoveries, contribution, indemnification, or otherwise, and the insured of an impaired insurer is not liable, and the insurer is not entitled to sue or continue a suit against that insured, for any subrogation recovery, reinsurance recovery, contribution, or indemnity asserted by a reinsurer, insurer, insurance pool, or underwriting association to the extent of the applicable liability limits of the policy written and issued to the insured by the insolvent insurer. "Covered claim" shall not include supplementary payment obligations, including adjustment fees and expenses, attorney's fees and expenses, court costs, interest and penalties, and interest and bond premiums incurred prior to the determination that an insurer is an impaired insurer under this Act. "Covered claim" shall not include any prejudgment or postjudgment interest that accrues subsequent to the determination that an insurer is an impaired insurer under this Act. "Covered claim" shall not include any claim for recovery of punitive, exemplary, extracontractual, or bad-faith damages, whether sought as a recovery against the insured, insurer, guaranty association, receiver, special deputy receiver, or commissioner, awarded in a court judgment against an insured or insurer. "Covered claim" shall not include, and the association shall not have any liability to an insured or third-party liability claimant, for its failure to settle a liability claim within the limits of a covered claim under this Act. With respect to a covered claim for unearned premiums, both persons who were residents of this state at the time the policy was issued and persons who are residents of this state at the time the company is found to be an impaired insurer shall be considered to have covered claims under this Act. If the impaired insurer has insufficient assets to pay the expenses of administering the receivership or conservatorship estate, that portion of the expenses of administration incurred in the processing and payment of claims against the estate shall also be a covered claim under this Act.

(9) "Impaired insurer" means:

(A) a member insurer that is placed in temporary or permanent receivership under an order of a court of competent jurisdiction, including the courts of any other state, based on a finding of insolvency and that has been designated an impaired insurer by the commissioner; or

(B) a member insurer placed in conservatorship after it has been determined by the commissioner to be insolvent and that has been designated an impaired insurer by the commissioner.

(10) "Member insurer" means any insurer who:

(A) writes any kind of insurance to which this Act applies under Section 3 of this Act, including the exchange of reciprocal or

inter-insurance contracts; and

 (B) is licensed to transact insurance in this state, including any stock, mutual, Lloyds insurer, reciprocal or inter-insurance exchange, or county mutual insurance company.

 (11) "Net direct written premiums", when assessing other than the workers' compensation line of business, means direct premiums written in this state on insurance policies to which this Act applies, less return premiums on those policies and dividends paid or credited to policyholders on that direct business. The term does not include premiums on contracts between insurers or reinsurers. When assessing the workers' compensation line of business, the term "net direct written premiums" includes the modified annual premium prior to the application of any deductible premium credit, less return premiums on those policies and dividends paid or credited to policyholders on that direct business. The term does not include premiums on contracts between insurers or reinsurers.

 (12) "Person" means any individual, corporation, partnership, association, or voluntary organization.

Association

 Sec. 6. The Texas Property and Casualty Insurance Guaranty Association is a nonprofit, unincorporated legal entity composed of all member insurers, who must be members of the association as a condition of their authority to transact insurance in this state. The association shall perform its functions under a plan of operation approved under Section 9 of this Act and shall exercise its powers through the board of directors. For purposes of administration and assessment, the association is divided into the workers' compensation insurance account, the automobile insurance account, and the account for all other lines of insurance to which this Act applies.

Board of directors

 Sec. 7. (a) The board of directors of the association is composed of nine persons who serve terms as established in the plan of operation. Five members shall be selected by member insurers, subject to the approval of the commissioner. To be eligible to serve as an insurance industry board member, a person must be a full-time employee of a member insurer. The remaining members shall be representatives of the general public appointed by the commissioner. Vacancies on the board shall be filled for the remaining period of the term by a majority vote of the remaining board members, subject to the approval of the commissioner.

 (b) In approving selections to the board, the commissioner shall consider whether all member insurers are fairly represented.

 (c) Members of the board of directors may be reimbursed from the assets of the association for expenses incurred by them as members of the board of directors.

 (d) A public representative may not be:

 (1) an officer, director, or employee of an insurance company, insurance agency, agent, broker, solicitor, adjuster, or any other business entity regulated by the Texas Department of Insurance;

 (2) a person required to register with the Texas Ethics Commission under Chapter 305, Government Code, in connection with the person's representation of clients in the field of insurance; or

 (3) related to a person described by Subdivision (1) or (2) of this subsection within the second degree of affinity or consanguinity.

 (e) Each member of the board of directors shall file a financial statement with the secretary of state in accordance with Sections 3 and 4, Chapter 421, Acts of the 63rd Legislature, Regular Session, 1973 (Article 6252-9b, Vernon's Texas Civil Statutes).

 (f) A director of the association or any member company or other entity represented by the director may not receive any money or valuable thing directly, indirectly, or through any substantial interest in any other corporation, firm, or business unit for negotiating, procuring, participating, recommending, or aiding in a transaction, reinsurance agreement, merger, purchase, sale, or exchange of assets, policies of insurance, or property made by the association or the supervisor, conservator, or receiver on behalf of an impaired insurer. The director, company, or entity may not be pecuniarily or contractually interested, as principal, co-principal, agent, or beneficiary, directly, indirectly, or through any substantial interest in any other corporation, firm, or business unit, in the transaction, reinsurance agreement, merger, purchase, sale, or exchange.

Powers and duties of association

 Sec. 8. (a) The association shall pay covered claims that exist before the designation of impairment or that arise within 30 days after the date of the designation of impairment, before the policy expiration date if the policy expiration date is within 30 days after the date of the designation of impairment, or before the insured replaces the policy or causes its cancellation if the insured does so within 30 days after the date of the designation. The obligation is satisfied by paying to the claimant the full amount of a covered claim for benefits.

 (b) The association shall undertake to discharge the policy obligations of the impaired insurer, including the duty to defend

insureds under a liability policy, to the extent that the policy obligations are covered claims under this Act. In performing its statutory obligations, the association may also enforce any duty imposed on the insured party or beneficiary under the terms of any policy of insurance within the scope of this Act. In performing its statutory obligations under this Act, the association shall not be considered to be in the business of insurance, shall not be considered to have assumed or succeeded to any liabilities of the impaired insurer, and shall not be considered to otherwise stand in the shoes of the impaired insurer for any purpose, including the issue of whether the association is amenable to the personal jurisdiction of the courts of any other state.

(c) The association shall assess insurers amounts necessary to pay the obligations of the association under Subsection (a) of this section after an insolvency, the expenses of handling covered claims subsequent to an insolvency, and other expenses authorized by this Act. The assessments of each member insurer shall be in the proportion that the net direct written premiums of the member insurer for the calendar year preceding the assessment bears to the net direct written premiums of all member insurers for the calendar year preceding the assessment. Each member insurer shall be notified of the assessment not later than the 30th day before the date on which the assessment is due. A member insurer may not be assessed in any year an amount greater than two percent of that member insurer's net direct written premiums for the calendar year preceding the assessment. If the maximum assessment, with the other assets of the association, does not provide in any one year an amount sufficient to make all necessary payments, the funds available shall be prorated, and the unpaid portion shall be paid as soon thereafter as funds become available. The association shall pay claims in any order it considers reasonable, including the payment of claims as they are received from the claimants or in groups or categories of claims. The association may defer, in whole or in part, the assessment of any member insurer if the assessment would cause the member insurer's financial statement to reflect amounts of capital or surplus less than the minimum amounts required for a certificate of authority by any jurisdiction in which the member insurer is authorized to transact insurance; provided, however, that during the period of deferment, dividends may not be paid to shareholders or policyholders. Deferred assessments shall be paid when the payment will not reduce capital or surplus below required minimums. The payments shall be refunded to those companies receiving larger assessments by virtue of the deferment, or at the election of such a company, credited against future assessments.

(d) The association shall investigate and adjust, compromise, settle, and pay covered claims to the extent of the association's obligation and deny all other claims. The association may review settlements, releases, and judgments to which the impaired insurer or its insureds were parties to determine the extent to which those settlements, releases, and judgments may be properly contested. Any judgment taken by default or consent against an insured or the impaired insurer, and any settlement, release, or judgment entered into by the insured or the impaired insurer, is not binding on the association, and may not be considered as evidence of liability or of damages in connection with any claim brought against the association or any other party under this Act. Notwithstanding any other provision of this Act, a covered claim shall not include any claim filed with the guaranty association after the later of the final date for filing claims against the liquidator or receiver of an insolvent insurer or eighteen months after the order of liquidation.

(e) The association shall give notice as the commissioner directs under Section 10(c) of this Act.

(f) The association shall handle claims through its employees or through one or more insurers or other persons designated as servicing facilities. Designation of a servicing facility is subject to the approval of the commissioner, but such a designation may be declined by a member insurer.

(g) The association shall reimburse each servicing facility for obligations of the association paid by the facility and for expenses incurred by the facility while handling claims on behalf of the association and shall pay the other expenses of the association authorized by this Act.

(h) The association may:

(1) employ or retain persons as necessary to handle claims and perform other duties of the association;

(2) borrow funds necessary to implement this Act in accordance with the plan of operation;

(3) sue or be sued;

(4) negotiate and become a party to contracts as necessary to implement this Act, including lump-sum or structured compromise and settlement agreements with claimants who have claims for medical or indemnity benefits for a period of three years or more other than a settlement or lump-sum payment in violation of the Texas Workers' Compensation Act (Article 8308-1.01 et seq., Vernon's Texas Civil Statutes);

(5) perform other acts as necessary or proper to implement this Act; or

(6) refund to the member insurers in proportion to the contribution of each member insurer to the association that amount by which the assets of the association exceed the liabilities, if at the end of any calendar year the board of directors finds that the assets of the association exceed the liabilities of the association as estimated by the board of directors for the coming year.

(i) Repealed by Acts 1993, 73rd Leg., ch. 685, § 9.10, eff. Sept. 1, 1993.

(j) The board of directors may deposit all money collected by the association into the Texas Treasury Safekeeping Trust Company in accordance with procedures established by the comptroller. The funds deposited shall be accounted for separately

from all other funds by the comptroller to the association.

(k)(1) Notwithstanding Chapter 271, Acts of the 60th Legislature, Regular Session, 1967 (Article 6252-17, Vernon's **Texas** Civil Statutes), [FN1] the board may hold an open meeting by telephone conference call if immediate action is required and the convening at one location of a quorum of the board is not reasonable or practical.

(2) The meeting is subject to the notice requirements applicable to other meetings.

(3) The notice of the meeting must specify as the location of the meeting the location where meetings of the board are usually held.

(4) Each part of the meeting that is required to be open to the public shall be audible to the public at the location specified in the notice of the meeting as the location of the meeting and shall be tape recorded. The tape recording shall be made available to the public.

### Plan of operation

**Sec**. 9. (a) The association shall submit to the commissioner a plan of operation and any amendments necessary or suitable to ensure the fair, reasonable, and equitable administration of the association. The plan of operation and any amendments take effect on approval in writing by the commissioner.

(b) If the association fails to submit suitable amendments to the plan, the commissioner, after notice and hearing, shall adopt reasonable rules as necessary or advisable to implement this Act. Those rules shall continue in force until modified by the commissioner or superseded by a plan submitted by the association and approved by the commissioner.

(c) All member insurers shall comply with the plan of operation.

(d) The plan of operation must:

(1) establish the procedures under which the powers and duties of the association are performed;

(2) establish procedures for handling assets of the association;

(3) establish the amount and method of reimbursing members of the board of directors;

(4) provide for the establishment of a claims filing procedure that includes, but is not limited to, notice by the association to claimants, procedures for filing claims seeking recovery from the association, and a procedure for appealing the denial of claims by the association; and

(**5**) establish acceptable forms of proof of covered claims.

(e) A list of claims shall be submitted periodically to the association or similar organization in another state by the receiver.

(f) The plan of operation must:

(1) establish regular places and times for meetings of the board of directors;

(2) establish procedures for records to be kept of all financial transactions of the association, its agents, and the board of directors;

(3) provide that any member insurer aggrieved by any final action or decision of the association may appeal to the commissioner not later than the 30th day after the date of the action or decision;

(4) establish the procedures under which selections for the board of directors are submitted to the commissioner; and

(**5**) contain additional provisions as necessary or proper for the execution of the powers and duties of the association.

(g) The plan of operation may provide that any or all powers and duties of the association, except those under Section 8(c) and 8(h)(2) of this Act, are delegated by contract to a corporation, association, or other organization that performs or will perform functions similar to those of the association or its equivalent in two or more states. The corporation, association, or organization shall be reimbursed as a servicing facility would be reimbursed and shall be paid for the performance of any other functions of the association. A delegation under this subsection takes effect only with the approval of both the board of directors and the commissioner and may be made only to a corporation, association, or organization that extends protection not substantially less favorable and effective than that provided by this Act. A contract entered into under this subsection is subject to the performance standards imposed under Section 2(a), Article **21**.**28**, of this **code**.

### Duties and powers of commissioner

**Sec**. 10. (a) The commissioner shall notify the association of the existence of an impaired insurer not later than three days after the commissioner gives notice of the designation of impairment. The association is entitled to a copy of any complaint seeking an order of receivership with a finding of insolvency against a member company at the same time that the complaint is filed with a court of competent jurisdiction.

(b) On request of the board of directors, the commissioner shall provide the association with a statement of the net direct written premiums of each member insurer.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

(c) The commissioner may require that the association notify the insureds of the impaired insurer and any other interested parties of the designation of impairment and of their rights under this Act. The notification shall be by mail at the last known address, if available, but if sufficient information for notification by mail is not available, notice by publication in a newspaper of general circulation is sufficient.

(d) The commissioner shall suspend or revoke, after notice and hearing, the certificate of authority to transact insurance in this state of any member insurer that fails to pay an assessment when due or otherwise fails to comply with the plan of operation. As an alternative, the commissioner may assess a fine on any member insurer that fails to pay an assessment when due. The fine may not exceed the lesser of **five** percent of the unpaid assessment per month or $100 per month.

(e) The commissioner may revoke the designation of any servicing facility if the commissioner finds that claims are being handled unsatisfactorily.

(f) Any final action or order of the commissioner under this Act is subject to judicial review by a court of competent jurisdiction.

(g) Venue in a suit against the association or commissioner relating to any action or ruling of the association or commissioner made under this Act is in Travis County. The association or commissioner is not required to give an appeal bond in an appeal of a cause of action arising under this Act.

## Effect of paid claims

**Sec**. 11. (a) A person recovering under this Act is considered to have assigned to the association the person's right under the policy, and the person's rights to recover for the occurrence made the basis of the claim under this Act under any policy of insurance issued by an unimpaired insurer to the extent of the person's recovery from the association. The association may pursue any such claims to which it is subrogated under this provision in its own name or in the name of the person recovering under this Act. Each insured or claimant seeking the protection of this Act shall cooperate with the association to the same extent as that person would have been required to cooperate with the impaired insurer. The association does not have a cause of action against the insured of the impaired insurer for any sums it has paid out except those causes of action the impaired insurer would have had if the sums had been paid by the impaired insurer and except as provided in Subsection (b) of this section. In the case of an impaired insurer operating on a plan with assessment liability, payments of claims of the association do not reduce the liability of the insureds to the receiver or statutory successor for unpaid assessments.

(b) The association is entitled to recover from the following persons the amount of any covered claim paid on behalf of that person under this Act:

(1) any insured, other than an insured who is exempt from federal income tax under Section 501(a) of the Internal Revenue **Code** of 1986 (26 U.S.C. Section 501(a)) by being described by Section 501(c)(3) of that **code**, whose net worth on December 31 of the year next preceding the date the insurer becomes an impaired insurer exceeds $50 million and whose liability obligations to other persons under a policy or contract of insurance written, issued, and placed in force after January 1, 1992, are satisfied in whole or in part by payments made under this Act; and

(2) any person who is an affiliate of the impaired insurer and whose liability obligations to other persons are satisfied in whole or in part by payments made under this Act.

(c) The receiver or statutory successor of an impaired insurer is bound by settlements of covered claims by the association or a similar organization in another state. The court having jurisdiction shall grant those claims priority equal to that which the claimant would have been entitled to in the absence of this Act against the assets of the impaired insurer. The expenses of the association or similar organization in handling claims shall be accorded the same priority as the receiver's expenses.

(d) The association shall file periodically with the receiver of the impaired insurer statements of the covered claims paid by the association and estimates of anticipated claims on the association that shall preserve the rights of the association against the assets of the impaired insurer.

## Nonduplication of recovery

**Sec**. 12. (a) A person who has a claim against an insurer under any provision in an insurance policy other than a policy of an impaired insurer that is also a covered claim shall exhaust first the person's rights under the policy, including any claim for indemnity or medical benefits under any workers' compensation, health, disability, uninsured motorist, personal injury protection, medical payment, liability, or other policy, and the right to defense under the policy. The association shall have a credit or setoff against any amount of benefits which would otherwise be payable by the association to the claimant under this Act, in the amount of the claimant's recovery under any policy issued by an unimpaired insurer. Subject to the provisions of Subsection (a-1) below, the association's credit or setoff under this section shall be deducted from damages incurred by the claimant, and the remaining sum shall be the maximum amount payable by the association, except that the association's liability shall not exceed $100,000

or the limits of the policy under which the claim is made, whichever is less.

(a-1) Notwithstanding Subsection (a) of this section, if a claimant is seeking recovery of policy benefits that, but for the insolvency of the impaired insurer, would be subject to lien or subrogation by a workers' compensation insurer, health insurer or any other insurer, whether impaired or not, then the association's credit or offset shall be deducted from the damages incurred by the claimant or the limits of the policy under which the claim is made, whichever is less. In no event shall a claimant's recovery under this Act result in a total recovery to the claimant that is greater than that which would have resulted but for the insolvency of the impaired insurer. Subject to Section 5(8) of this Act, a claimant's recovery under this Act may not result in a recovery to the claimant that is less than that which would have resulted but for the insolvency of the impaired insurer.

(b) A person who has a claim that may be recovered under more than one insurance guaranty association or its equivalent shall seek recovery first from the association of the place of residence of the insured, except that if it is a first-party claim for damage to property with a permanent location, the person shall seek recovery first from the association of the location of the property, and if it is a workers' compensation claim the person shall seek recovery first from the association of the residence of the claimant. The association shall have a credit or setoff against any amount of benefits under this Act, in the amount of the claimant's recovery from the guaranty association or equivalent. Subject to the provisions of Subsection (b-1) below, the association's credit or setoff under this Section shall be deducted from the damages incurred by the claimant, and the remaining sum shall be the maximum amount payable by the association, except that the association's liability shall not exceed $100,000.

(b-1) Notwithstanding Subsection (b) of this section, if a claimant is seeking recovery of policy benefits that, but for the insolvency of the impaired insurer, would be subject to lien or subrogation by a workers' compensation insurer, health insurer or any other insurer, whether impaired or not, then the association's credit or offset shall be deducted from the damages incurred by the claimant or the limits of the policy under which the claim is made, whichever is less. In no event shall a claimant's recovery under this Act result in a total recovery to the claimant that is greater than that which would have resulted but for the insolvency of the impaired insurer. Subject to Section 5(8) of this Act, a claimant's recovery under this Act shall not result in a recovery to the claimant that is less than that which would have resulted but for the insolvency of the impaired insurer.

### Financial condition of member insurers; prevention of insolvencies

Sec. 13. (a) The association shall have access to the books and records of a member insurer in receivership, in order to make a determination of the extent of the impact on the association in the event such member becomes impaired. The association shall have the authority to perform or cause to be performed an actuarial and operational analysis of the member insurer and prepare a report on matters relating to the impact or potential impact on the association in the event of impairment. Such reports shall not be public documents.

(b) At the conclusion of any domestic insurer insolvency in which the association was obligated to pay covered claims, the board of directors may prepare a report on the history and causes of the insolvency, based on the information available to the association, and may submit the report to the commissioner.

(c) There shall be no liability on the part of, and no cause of action of any nature shall arise against the association or its agents or employees, the board of directors, member insurers, or the commissioner or the commissioner's authorized representative for any statement made in good faith by them in any report or recommendation made under this section.

### Examination of the association

Sec. 14. Not later than April 30 of each year, the association shall submit an audited financial statement to the state auditor for the preceding calendar year in a form approved by the state auditor's office.

### Tax exemption

Sec. 15. The association is exempt from payment of all fees and all taxes levied by this state or any of its subdivisions except taxes levied on real or personal property.

### Immunity; attorney general representation

Sec. 16. (a) There is no liability on the part of, and no cause of action of any nature arises against, any member insurer, the association or its agents or employees, the board of directors, receiver, special deputy receiver or its agents or employees, or the commissioner or the commissioner's representatives for any good faith action or failure to act in the performance of powers and duties under this Act.

(b) The attorney general shall defend any action to which Subsection (a) applies that is brought against a member insurer or its agents or employees, the association or its agents or employees, members of the association's board of directors, a special deputy receiver to its agents or employees, or the commissioner or the commissioner's representatives. This subsection continues to apply to an action instituted after the defendant's service with the guaranty association, commissioner, or department has terminated. This subsection does not require the attorney general to defend any person or entity with respect to an issue other than the applicability or effect of the immunity created by Subsection (a). The attorney general is not required to defend any member insurer of the association or its agents or employees, the association or its agents or employees, members of the association's board of directors, a special deputy receiver or its agents or employees with respect to any actions filed regarding the disposition of a claim filed with the guaranty association under this Act or to an issue other than the applicability or effect of the immunity created by Subsection (a). The association may contract with the attorney general under the Interagency Cooperation Act (Article 4413(32), Vernon's **Texas** Civil Statutes) to provide legal services not covered under this subsection.

Stay of proceedings

**Sec**. 17. All proceedings in which an impaired insurer is a party or is obligated to defend a party in any court in this state, except proceedings directly related to the receivership or instituted by the receiver, shall be stayed for six months and any additional time thereafter as may be determined by the court from the date of the designation of impairment or an ancillary proceeding is instituted in the state, whichever is later, to permit proper defense by the receiver or the association of all pending causes of action. A deadline imposed under the **Texas** Rules of Civil Procedure or the **Texas** Rules of Appellate Procedure is tolled during the stay. The court in which the delinquency proceeding is pending has exclusive jurisdiction regarding the application, enforcement, and extension of the stay. As to any covered claims arising from a judgment under any decision, verdict, or finding based on the default of the impaired insurer or its failure to defend an insured, the association either on its own behalf or on behalf of the insured shall be entitled, upon application, to have the judgment, order, decision, verdict, or finding set aside by the same court or administrator that made the judgment, order, decision, verdict, or finding and shall be permitted to defend the claim on the merits. The receiver or statutory successor of an impaired insurer covered by this Act shall permit access by the board or its authorized representative to records of the impaired insurer as are necessary for the board in carrying out its functions under this Act with regard to covered claims. In addition, the receiver or statutory successor shall provide the board or its representative with copies of the records on request of the board and at the expense of the board.

Assessments

**Sec**. 18. (a) If the commissioner determines that an insurer has become an impaired insurer, the association shall promptly estimate the amount of additional funds, by lines of business, needed to supplement the assets of the impaired insurer immediately available to pay covered claims. The board shall make additional funds available as the actual need arises for each impaired insurer.

(b) If the board of directors determines that additional funds are needed in any of the three accounts, it shall make assessments as necessary to produce the necessary funds. The association, in determining the proportionate amount to be paid by individual insurers under an assessment, shall take into consideration the lines of business written by the impaired insurer and shall assess individual insurers in proportion to the ratio that the total net direct written premium collected in this state by the insurer for those lines of business bears to the total net direct written premium collected by all insurers, other than impaired insurers, in this state for those lines of business. The association shall determine the total net direct written premium of an individual insurer and for all insurers in the state from the insurers' annual statements for the year preceding assessment. Except as otherwise provided by this subsection, assessments under this subsection during a calendar year may be made up to, but not in excess of, two percent of each insurer's net direct written premium for the preceding calendar year in the lines of business for which the assessments are being made. In the event of a natural disaster or other catastrophic event, the association may apply to the governor, in the manner prescribed by the plan of operation, for authority to assess each member insurer that writes insurance coverage, other than motor vehicle coverage or workers' compensation coverage, an additional amount not to exceed two percent of the insurer's net direct written premiums for the preceding calendar year. If the maximum assessment in any calendar year does not provide an amount sufficient for payment of covered claims of impaired insurers, assessments may be made in the next and successive calendar years.

(c) It shall be the duty of each insurer to pay the amount of an assessment under Subsection (b) of this section to the association not later than the 30th day after the association gives notice of the assessment.

(d) Assessments may be collected on behalf of the association by the commissioner through suits brought for that purpose. Venue for those suits is in Travis County. Either party to the action may appeal to the appellate court having jurisdiction over the cause, the appeal shall be at once returnable to the appellate court having jurisdiction over the cause, and the action so appealed shall

have precedence in the appellate court over all causes of a different character pending before the court. The commissioner is not required to give an appeal bond in any cause arising under this subsection.

(e) An insurer designated as an impaired insurer by the commissioner is exempt from assessment from and after the date of the designation and until the commissioner determines that the insurer is no longer an impaired insurer.

(f) Funds advanced by the association under this Act shall not become assets of the impaired insurer but are considered a special fund loaned to the impaired insurer for payment of covered claims. That loan is repayable to the extent available from the funds of the insurer.

(g) Income from the investment of any of the funds of the association may be transferred to the administrative account authorized under this Act. The funds in the account may be used by the association for the purpose of meeting administrative costs and other general expenses of the association. On notification by the association of the amount of any additional funds needed for the administrative account, the association shall assess member insurers to obtain the needed funds in the manner set out in this section. The commissioner shall consider the net direct written premium collected in this state for all lines of business covered by this Act. An assessment for administrative expenses incurred by a supervisor or conservator appointed by the commissioner or a receiver appointed by a court of competent jurisdiction for a nonmember of the association or unauthorized insurer operating in this state may not exceed $1,000,000 each calendar year.

(h) Expired.

### Purpose of assessment

Sec. 19. (a) The amounts provided under assessments made under this Act are in addition to the marshaling of assets by the receiver under Article 21.28 of this code for the purpose of making payments on behalf of an impaired insurer.

(b) This section does not require the receiver to exhaust the assets of the impaired insurer before an assessment is made or before funds derived from an assessment may be used to pay covered claims.

### Accounting for and repayment of assessments

Sec. 20. (a) On receipt from an insurer of payment of an assessment or partial assessment required by the association under Section 18(b) of this Act, the association shall provide the insurer with a participation receipt, which shall create a liability against the account for the line or lines of business for which the assessment was made.

(b) The account from which an advance is made to an impaired insurer for the payment of covered claims shall be regarded as a general creditor of the impaired insurer for the amount of funds so advanced; provided, however, that with reference to the remaining balance of any advances not expended in payment of covered claims, the claim of the account has preference over other general creditors. The association of any impaired insurer shall adopt accounting procedures reflecting the expenditure and use of all funds and shall make a final report of the expenditure and use of the funds to the commissioner, which final report shall set forth the remaining balance, if any, from the moneys advanced. The association shall also make any interim reports concerning such accounting as may be required by the commissioner or requested by the conservator. On completion of the final report, the association shall, as soon thereafter as is practicable, refund by line of business the remaining balance of those advances to the accounts maintained by the association.

(c) If the association at any time determines that there exist moneys in the account for any line of business in excess of those reasonably necessary for efficient future operation under the terms of this Act, it shall cause those excess moneys to be returned pro rata to the holders of any participation receipts on which there is a balance outstanding after deducting any credits taken against premium taxes as authorized in Section 21 of this Act, which receipts were issued for an assessment on the same line of business as that for which the excess moneys are found to exist. If after such a distribution the association finds that an excess amount still exists in the fund, or if there are no such participation receipts on which there is an outstanding balance, it shall cause the excess amount to be deposited with the comptroller to the credit of the general revenue fund.

### Recognition of assessments in premium tax offset; assignment of credit

Sec. 21. (a) One hundred percent of any assessment paid by an insurer under this Act shall be allowed to that insurer as a credit against its premium tax under Article 4.10 of this code. The tax credit referred to in this section shall be allowed at a rate of 10 percent per year for 10 successive years following the date of assessment and, at the option of the insurer, may be taken over an additional number of years. The balance of any tax credit not claimed in a particular year may be reflected in the books and records of the insurer as an admitted asset of the insurer for all purposes, including exhibition in annual statements under Article 6.12 of this code.

(b) Available credit against premium tax allowed under Subsection (a) of this section may be transferred or assigned among or between insurers if:

(1) a merger, acquisition, or total assumption of reinsurance among or between the insurers occurs; or

(2) the commissioner by order approves the transfer or assignment.

### Release from receivership

**Sec**. 22. An impaired insurer placed in receivership for which advances have been made under this Act may not be authorized, on release from receivership, to issue new or renewal insurance policies until the impaired insurer has repaid in full to the association the funds advanced by it. However, the commissioner may, on application of the association and after hearing, permit the issuance of new policies in accordance with a plan of operations by the released insurer for repayment of advances. The commissioner, in approving the plan, may place restrictions on the issuance of new or renewal policies as the commissioner considers necessary to the implementation of the plan.

### Rules and regulations

**Sec**. 23. The State Board of Insurance is authorized and directed to issue such reasonable rules and regulations as may be necessary to carry out the various purposes and provisions of this article, and in augmentation thereof.

**Sec**. 24. Blank.

### Controlling law

**Sec**. 25. (a) Except as provided in Subsection (b) of this section, if a conflict exists between this Act and any other statutory provision relating to the association, this Act shall control.

(b) This section does not apply to a conflict between this Act and:

(1) the **Texas** Workers' Compensation Act (Article 8308-1.01, et seq., Vernon's **Texas** Civil Statutes);

(2) Subchapter D, Chapter **5**, of this **code**; [FN2] or

(3) Article **5**.76-2, **5**.76-3, **5**.76-4, or **5**.76-**5** of this **code**.

### Coverage for Workers' Compensation Insurance Policies Issued by **Texas** Workers' Compensation Insurance Facility

**Sec**. 26. (a) Notwithstanding any other provision of this article, this article applies to each policy of insurance issued under Article **5**.76 of this **code** or Article **5**.76-2 of this **code**, as that article existed before its repeal.

(b) Notwithstanding any other provision of this article, after the conversion of the **Texas** workers' compensation insurance facility to a stock insurance company, that converted facility shall be considered an impaired insurer for purposes of this article if any of the actions described by Section **5**(9)(A) or (B) of this article occur to the converted facility.

(c) A claim under such an insurance policy is a covered claim for purposes of this article if the claim satisfies the definition under Section **5**(8) of this article, whether or not the converted facility:

(1) issued or assumed the policy; or

(2) was licensed to do business in this state at the time:

(A) the policy was written; or

(B) the converted facility became an impaired insurer.

(d) If a conflict exists between this section and any other statute relating to the **Texas** workers' compensation insurance facility or the **Texas** Property and Casualty Insurance Guaranty Association, this section controls.

### Immunity

**Sec**. 27. There is no liability on the part of, and a cause of action does not arise against, any member insurer of the association, the association, an agent or employee of the association, a member of the board of directors of the association, or the commissioner or the commissioner's representative for any act or omission in the performance of any activity related to the negotiations relating to the privatization of the **Texas** workers' compensation insurance facility. This section applies to each activity undertaken by such a person or entity, regardless of the date of the act or omission.

### CREDIT(S)

# TAB 2

CAL. INS. CODE §§ 1063.1(c)(1), 1063.2(b)



West's Ann.Cal.Ins.Code § 1063

WEST'S ANNOTATED CALIFORNIA CODES
INSURANCE CODE
DIVISION 1. GENERAL RULES GOVERNING INSURANCE
PART 2. THE BUSINESS OF INSURANCE
CHAPTER 1. GENERAL REGULATIONS
ARTICLE 14.2. CALIFORNIA INSURANCE GUARANTEE ASSOCIATION
Copr. (C) West Group 2002. All rights reserved.

§ 1063. Establishment of the California Insurance Guarantee Association; powers and duties; audit and examination

(a) Within 60 days after the original effective date of this article, all insurers, including reciprocal insurers, admitted to transact insurance in this state of any or all of the following classes only in accordance with the provisions of Chapter 1 (commencing with Section 100) of Part 1 of this division: fire (see Section 102), marine (see Section 103), plate glass (see Section 107), liability (see Section 108), workers' compensation (see Section 109), common carrier liability (see Section 110), boiler and machinery (see Section 111), burglary (see Section 112), sprinkler (see Section 114), team and vehicle (see Section 115), automobile (see Section 116), aircraft (see Section 118), and miscellaneous (see Section 120), shall establish the California Insurance Guarantee Association (the association); provided, however, this article shall not apply to the following classes or kinds of insurance: life and annuity (see Section 101), title (see Section 104), fidelity or surety including fidelity or surety bonds, or any other bonding obligations (see Section 105), disability or health (see Section 106), credit (see Section 113), mortgage (see Section 117), mortgage guaranty, insolvency or legal (see Section 119), financial guaranty or other forms of insurance offering protection against investment risks (see Section 124), the ocean marine portion of any marine insurance or ocean marine coverage under any insurance policy including the following: the Jones Act (46 U.S.C. Sec. 688), the Longshore and Harbor Workers' Compensation Act (33 U.S.C. Sec. 901 et seq.), or any other similar federal statutory enactment, or any endorsement or policy affording protection and indemnity coverage, or reinsurance as defined in Section 620, or fraternal fire insurance written by associations organized and operating under Sections 9080 to 9103, inclusive. Any insurer admitted to transact only those classes or kinds of insurance excluded from this article shall not be a member insurer of the association. Each such insurer, including the State Compensation Insurance Fund, as a condition of its authority to transact insurance in this state, shall participate in the association whether established voluntarily or by order of the commissioner after the elapse of 60 days following the original effective date of this article in accordance with rules to be established as provided in this article. It shall be the purpose of the association to provide for each member insurer insolvency insurance as defined in Section 119.5.

(b) The association shall be managed by a board of governors, composed of nine member insurers, each of which shall be appointed by the commissioner to serve initially for terms of one, two, or three years and thereafter for three-year terms so that three terms shall expire each year on December 31, and shall continue in office until his or her successor shall be appointed and qualified. At least five members of the board shall be domestic insurers. At least three such members shall be stock insurers, and at least three shall be nonstock insurers. The nine members shall be representative, as nearly as possible, of the classes of insurance and of the kinds of insurers covered by this article. In case of a vacancy for any reason on the board, the commissioner shall appoint a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

member insurer to fill the unexpired term.

(c) The association shall adopt a plan of operations, and any amendments thereto, not inconsistent with the provisions of this article, necessary to assure the fair, reasonable, and equitable manner of administering the association, and to provide for other matters as are necessary or advisable to implement the provisions of this article. The plan of operations and any amendments thereto shall be subject to prior written approval by the commissioner. All members of the association shall adhere to the plan of operation.

(d) If for any reason the association fails to adopt a suitable plan of operation within 90 days following the original effective date of this article, or if at any time thereafter the association fails to adopt suitable amendments to the plan of operation, the commissioner shall after hearing adopt and promulgate reasonable rules as are necessary or advisable to effectuate the provisions of this chapter. These rules shall continue in force until modified by the commissioner after hearing or superseded by a plan of operation, adopted by the association and approved by the commissioner.

(e) In accordance with its plan of operation, the association may designate one or more of its members as a servicing facility, but a member may decline this designation. Each servicing facility shall be reimbursed by the association for all reasonable expenses it incurs and for all payments it makes on behalf of the association. Each servicing facility shall have authority to perform any functions of the association that the board of governors lawfully may delegate to it and to do so on behalf of and in the name of the association. The designation of servicing facilities shall be subject to the approval of the commissioner.

(f) The association shall have authority to borrow funds when necessary to effectuate the provisions of this article.

(g) The association, either in its own name or through servicing facilities, may be sued and may use the courts to assert or defend any rights the association may have by virtue of this article as reasonably necessary to fully effectuate the provisions thereof.

(h) The association shall have the right to intervene as a party in any proceeding instituted pursuant to Section 1016 wherein liquidation of a member insurer as defined in Section 1063.1 is sought.

(i)(1) The association shall have an annual audit of its financial condition conducted by an independent certified public accountant. The audit shall be conducted, to the extent possible, in accordance with generally accepted auditing standards (GAAS) and the report of the audit shall be submitted to the commissioner.

(2) The association shall annually audit at least one-third of the service companies retained by the association to adjust claims of insolvent insurers. The audits shall (A) assure that all covered claims are being investigated, adjusted, and paid in accordance with customary industry standards and practices and all applicable statutes, rules and regulations, and (B) examine the management and supervisory systems overseeing the claims functions. The audits shall be conducted by the association or an independent auditor, provided that the three largest service companies, as measured by the number of claims processed for the association during the previous three fiscal years, shall be audited by an independent auditor at least once every three years. The Association shall implement systems to retain independent auditing firms for the purpose of this paragraph, provided that no one firm is designated or utilized as an exclusive provider. Audits conducted pursuant to this paragraph shall be submitted annually to the commissioner for review.

(j) The commissioner shall examine the association to the same extent as, and in accordance with, the requirements of Article 4 (commencing with Section 730) of Chapter 1 of Part 2 of Division 2, which sets forth the examination requirements applicable to admitted insurers. A copy of the examination report shall be filed with the Chairpersons of the Senate and Assembly Committees on Insurance no later than December 31 of the year the report is completed.

## CREDIT(S)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



West's Ann.Cal.Ins.Code § 1063.1

WEST'S ANNOTATED CALIFORNIA CODES
INSURANCE CODE
DIVISION 1. GENERAL RULES GOVERNING INSURANCE
PART 2. THE BUSINESS OF INSURANCE
CHAPTER 1. GENERAL REGULATIONS
ARTICLE 14.2. CALIFORNIA INSURANCE GUARANTEE ASSOCIATION
Copr. (C) West Group 2002. All rights reserved.

§ 1063.1. Definitions

As used in this article:

(a) "Member insurer" means an insurer required to be a member of the association in accordance with subdivision (a) of Section 1063, except and to the extent that the insurer is participating in an insolvency program adopted by the United States government.

(b) "Insolvent insurer" means a member insurer against which an order of liquidation or receivership with a finding of insolvency has been entered by a court of competent jurisdiction.

(c)(1) "Covered claims" means the obligations of an insolvent insurer, including the obligation for unearned premiums, (i) imposed by law and within the coverage of an insurance policy of the insolvent insurer; (ii) which were unpaid by the insolvent insurer; (iii) which are presented as a claim to the liquidator in this state or to the association on or before the last date fixed for the filing of claims in the domiciliary liquidating proceedings; (iv) which were incurred prior to the date coverage under the policy terminated and prior to, on, or within 30 days after the date the liquidator was appointed; (v) for which the assets of the insolvent insurer are insufficient to discharge in full; (vi) in the case of a policy of workers' compensation insurance, to provide workers' compensation benefits under the workers' compensation law of this state; and (vii) in the case of other classes of insurance if the claimant or insured is a resident of this state at the time of the insured occurrence, or the property from which the claim arises is permanently located in this state.

(2) "Covered claims" also include the obligations assumed by an assuming insurer from a ceding insurer where the assuming insurer subsequently becomes an insolvent insurer if, at the time of the insolvency of the assuming insurer, the ceding insurer is no longer admitted to transact business in this state. Both the assuming insurer and the ceding insurer shall have been member insurers at the time the assumption was made. "Covered claims" under this paragraph shall be required to satisfy the requirements of subparagraphs (i) to (vii), inclusive, of paragraph (1), except for the requirement that the claims be against policies of the insolvent insurer. The association shall have a right to recover any deposit, bond, or other assets that may have been required to be posted by the ceding company to the extent of covered claim payments and shall be subrogated to any rights the policyholders may have against the ceding insurer.

(3) "Covered claims" does not include obligations arising from the following:

(i) Life, annuity, health, or disability insurance.

(ii) Mortgage guaranty, financial guaranty, or other forms of insurance offering protection against investment risks.

(iii) Fidelity or surety insurance including fidelity or surety bonds, or any other bonding obligations.

(iv) Credit insurance.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(v) Title insurance.

(vi) Ocean marine insurance or ocean marine coverage under any insurance policy including claims arising from the following: the Jones Act (46 U.S.C.A. Sec. 688), the Longshore and Harbor Workers' Compensation Act (33 U.S.C.A. Sec. 901 et seq.), or any other similar federal statutory enactment, or any endorsement or policy affording protection and indemnity coverage.

(vii) Any claims servicing agreement or insurance policy providing retroactive insurance of a known loss or losses, except a special excess workers' compensation policy issued pursuant to subdivision (c) of Section 3702.8 of the Labor Code that covers all or any part of workers' compensation liabilities of an employer that is issued, or was previously issued, a certificate of consent to self-insure pursuant to subdivision (b) of Section 3700 of the Labor Code.

(4) "Covered claims" does not include any obligations of the insolvent insurer arising out of any reinsurance contracts, nor any obligations incurred after the expiration date of the insurance policy or after the insurance policy has been replaced by the insured or canceled at the insured's request, or after the insurance policy has been canceled by the association as provided in this chapter, or after the insurance policy has been canceled by the liquidator, nor any obligations to any state or to the federal government.

(5) "Covered claims" does not include any obligations to insurers, insurance pools, or underwriting associations, nor their claims for contribution, indemnity, or subrogation, equitable or otherwise, except as otherwise provided in this chapter.

An insurer, insurance pool, or underwriting association may not maintain, in its own name or in the name of its insured, any claim or legal action against the insured of the insolvent insurer for contribution, indemnity or by way of subrogation, except insofar as, and to the extent only, that the claim exceeds the policy limits of the insolvent insurer's policy. In those claims or legal actions, the insured of the insolvent insurer is entitled to a credit or setoff in the amount of the policy limits of the insolvent insurer's policy, or in the amount of the limits remaining, where those limits have been diminished by the payment of other claims.

(6) "Covered claims," except in cases involving a claim for workers' compensation benefits or for unearned premiums, does not include any claim in an amount of one hundred dollars ($100) or less, nor that portion of any claim that is in excess of any applicable limits provided in the insurance policy issued by the insolvent insurer.

(7) "Covered claims" does not include that portion of any claim, other than a claim for workers' compensation benefits, that is in excess of five hundred thousand dollars ($500,000).

(8) "Covered claims" does not include any amount awarded as punitive or exemplary damages.

(9) "Covered claims" does not include (i) any claim to the extent it is covered by any other insurance of a class covered by this article available to the claimant or insured nor (ii) any claim by any person other than the original claimant under the insurance policy in his or her own name, his or her assignee as the person entitled thereto under a premium finance agreement as defined in Section 673 and entered into prior to insolvency, his or her executor, administrator, guardian or other personal representative or trustee in bankruptcy and does not include any claim asserted by an assignee or one claiming by right of subrogation, except as otherwise provided in this chapter.

(10) "Covered claims" does not include any obligations arising out of the issuance of an insurance policy written by the separate division of the State Compensation Insurance Fund pursuant to Sections 11802 and 11803.

(11) "Covered claims" does not include any obligations of the insolvent insurer arising from any policy or contract of insurance issued or renewed prior to the insolvent insurer's admission to transact insurance in the State of California.

(12) "Covered claims" does not include surplus deposits of subscribers as defined in Section 1374.1.

(d) "Admitted to transact insurance in this state" means an insurer possessing a valid certificate of authority issued by the department.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(e) "Affiliate" means a person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with an insolvent insurer on December 31 of the year next preceding the date the insurer becomes an insolvent insurer.

(f) "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise, unless the power is the result of an official position with or corporate office held by the person. Control is presumed to exist if any person, directly or indirectly, owns, controls, holds with the power to vote, or holds proxies representing, 10 percent or more of the voting securities of any other person. This presumption may be rebutted by showing that control does not in fact exist.

(g) "Claimant" means any insured making a first party claim or any person instituting a liability claim; provided that no person who is an affiliate of the insolvent insurer may be a claimant.

(h) "Ocean marine insurance" includes marine insurance as defined in Section 103, except for inland marine insurance, as well as any other form of insurance, regardless of the name, label, or marketing designation of the insurance policy, that insures against maritime perils or risks and other related perils or risks, which are usually insured against by traditional marine insurance such as hull and machinery, marine builders' risks, and marine protection and indemnity. Those perils and risks insured against include, without limitation, loss, damage, or expense or legal liability of the insured arising out of or incident to ownership, operation, chartering, maintenance, use, repair, or construction of any vessel, craft or instrumentality in use in ocean or inland waterways, including liability of the insured for personal injury, illness, or death for loss or damage to the property of the insured or another person.

(i) "Unearned premium" means that portion of a premium that had not been earned because of the cancellation of the insolvent insurer's policy and is that premium remaining for the unexpired term of the insolvent insurer's policy. "Unearned premium" does not include any amount sought as return of a premium under any policy providing retroactive insurance of a known loss or return of a premium under any retrospectively rated policy or a policy subject to a contingent surcharge or any policy in which the final determination of the premium cost is computed after expiration of the policy and is calculated on the basis of actual loss experience during the policy period.

## CREDIT(S)

### 1993 Main Volume

(Added by Stats.1978, c. 507, p. 1651, § 2, eff. Aug. 21, 1978. Amended by Stats.1979, c. 384, p. 1447, § 3; Stats.1981, c. 1154, p. 4612, § 1; Stats.1983, c. 308, § 1; Stats.1984, c. 564, § 1; Stats.1987, c. 833, § 1; Stats.1989, c. 1258, § 1; Stats.1991, c. 537 (S.B.1104), § 1; Stats.1992, c. 227 (S.B.1581), § 1.)

### 2002 Electronic Pocket Part Update

(Amended by Stats.1994, c. 6 (A.B.1667), § 2, eff. Feb. 10, 1994; Stats.1997, c. 372 (A.B.1148), § 1; Stats.1997, c. 497 (S.B.1277), § 2.5; Stats.1999, c. 721 (A.B.1309), § 5.)

## HISTORICAL AND STATUTORY NOTES

### 2CAQ

1994 Legislation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



West's Ann.Cal.Ins.Code § 1063.2

WEST'S ANNOTATED CALIFORNIA CODES
INSURANCE CODE
DIVISION 1. GENERAL RULES GOVERNING INSURANCE
PART 2. THE BUSINESS OF INSURANCE
CHAPTER 1. GENERAL REGULATIONS
ARTICLE 14.2. CALIFORNIA INSURANCE GUARANTEE ASSOCIATION
Copr. (C) West Group 2002. All rights reserved.

§ 1063.2. Covered claims; duties; priority of claims

(a) The association shall pay and discharge covered claims and in connection therewith pay for or furnish loss adjustment services and defenses of claimants when required by policy provisions. It may do so either directly by itself or through a servicing facility or through a contract for reinsurance and assumption of liabilities by one or more member insurers or through a contract with the liquidator, upon terms satisfactory to the association and to the liquidator, under which payments on covered claims would be made by the liquidator using funds provided by the association.

(b) The association shall be a party in interest in all proceedings involving a covered claim, and shall have the same rights as the insolvent insurer would have had if not in liquidation, including, but not limited to, the right to: (1) appear, defend, and appeal a claim in a court of competent jurisdiction; (2) receive notice of, investigate, adjust, compromise, settle, and pay a covered claim; and (3) investigate, handle, and deny a noncovered claim. The association shall have no cause of action against the insureds of the insolvent insurer for any sums it has paid out, except as provided by this article.

(c)(1) If damages against uninsured motorists are recoverable by the claimant from his or her own insurer, the applicable limits of the uninsured motorists coverage shall be a credit against a covered claim payable under this article. Any person having a claim that may be recovered under more than one insurance guaranty association or its equivalent shall seek recovery first from the association of the place of residence of the insured, except that if it is a first-party claim for damage to property with a permanent location, he or she shall seek recovery first from the association of the permanent location of the property, and if it is a workers' compensation claim, he or she shall seek recovery first from the association of the residence of the claimant. Any recovery under this article shall be reduced by the amount of recovery from any other insurance guaranty association or its equivalent. A member insurer may recover in subrogation from the association only one-half of any amount paid by such insurer under uninsured motorist coverage for bodily injury or wrongful death (and nothing for a payment for anything else), in those cases where the injured person insured by such an insurer has proceeded under his or her uninsured motorist coverage on the ground that the tort feasor is uninsured as a result of the insolvency of his or her liability insurer (an insolvent insurer as defined in this article), provided that such member insurer shall waive all rights of subrogation against such tortfeasor. Any amount paid a claimant in excess of the amount authorized by this section may be recovered by action brought by the association.

(2) Any claimant having collision coverage on a loss which is covered by the insolvent company's liability policy shall first proceed against his or her collision carrier. Neither that claimant nor the collision carrier, if it is a member of the association, shall have the right to sue or continue a suit against the insured of the insolvent insurance company for such collision damage.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(d) The association shall have the right to recover from any person who is an affiliate of the insolvent insurer and whose liability obligations to other persons are satisfied in whole or in part by payments made under this article the amount of any covered claim and allocated claims expense paid on behalf of that person pursuant to this article.

(e) Any person having a claim or legal right of recovery under any governmental insurance or guaranty program which is also a covered claim, shall be required to first exhaust his or her right under the program. Any amount payable on a covered claim shall be reduced by the amount of any recovery under the program.

(f) "Covered claims" for unearned premium by lenders under insurance premium finance agreements as defined in Section 673 shall be computed as of the earliest cancellation date of the policy pursuant to Section 673 or subdivision (g) of this section.

(g) "Covered claims" shall not include any judgments against or obligations or liabilities of the insolvent insurer or the commissioner, as liquidator, or otherwise resulting from alleged or proven torts, nor shall any default judgment or stipulated judgment against the insolvent insurer, or against the insured of the insolvent insurer, be binding against the association.

(h) "Covered claims" shall not include any loss adjustment expenses, including adjustment fees and expenses, attorney fees and expenses, court costs, interest, and bond premiums, incurred prior to the appointment of a liquidator.

## CREDIT(S)

### 1993 Main Volume

(Added by Stats.1969, c. 1347, p. 2699, § 3, eff. Sept. 2, 1969. Amended by Stats.1970, c. 1205, p. 2121, § 4; Stats.1971, c. 436, § 2; Stats.1981, c. 1154, p. 4614, § 2; Stats.1983, c. 308, § 2; Stats.1984, c. 433, § 1; Stats.1987, c. 833, § 2; Stats.1991, c. 537 (S.B.1104), § 3; Stats.1992, c. 427 (A.B. 3355), § 113; Stats.1992, c. 227 (S.B.1581), § 2.)

### 2002 Electronic Pocket Part Update

(Amended by Stats.1994, c. 6 (A.B.1667), § 3, eff. Feb. 10, 1994.)

## HISTORICAL AND STATUTORY NOTES

### 2CAQ

1994 Legislation

The 1994 amendment, in subd. (c), substituted "permanent location" for "location" following "shall seek recovery first from the association of the"; deleted subds. (f) and (g); redesignated as subds. (f) to (h) former subds. (h) to (j); and made other, nonsubstantive changes.

Legislative intent relating to Stats.1994, c. 6 (A.B.1667), see Historical and Statutory Notes under Insurance Code § 1063.

### 1993 Main Volume

As originally added in 1969, the last sentence of subd. (c) read as follows: "A member insurer may recover from

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 3
36 OKLA. STAT. ANN. §§ 2004(6), 2004(8), 2007(A)(2)

36 Okl.St.Ann. § 2004
**OKLAHOMA** STATUTES ANNOTATED
TITLE 36. INSURANCE
CHAPTER 1. INSURANCE CODE
ARTICLE 20A. **PROPERTY** AND **CASUALTY** INSURANCE GUARANTY ASSOCIATION ACT

§ 2004. Definitions

As used in the **Oklahoma Property** and **Casualty** Insurance Guaranty Association Act: [FN1]

1. "Affiliate" means a person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with an insolvent insurer on December 31 of the year next preceding the date the insurer becomes an insolvent insurer;

2. "Association" means the **Oklahoma Property** and **Casualty** Insurance Guaranty Association;

3. "Claimant" means any insured making a first-party claim or any person instituting a liability claim; provided that no person who is an affiliate of the insolvent insurer may be a claimant;

4. "Commissioner" means the Commissioner of Insurance;

5. "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract other than a commercial contract for goods or nonmanagement services, or otherwise, unless the power is the result of an official position with or corporate office held by the person. Control shall be presumed to exist if any person, directly or indirectly, owns, controls, holds with the power to vote, or holds proxies representing ten percent (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing that control does not exist in fact;

6. "Covered claim" means an unpaid claim of an insured or third party liability claimant, including one of unearned premiums, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this act applies issued by an insurer, if such insurer becomes an insolvent insurer after the effective date of this act [FN2] and (a) the claimant or insured is a resident of this state at the time of the insured event, provided that for entities other than an individual, the residence of a claimant or insured is the state in which its principal place of business is located at the time of the insured event; or (b) the **property** from which the claim arises is permanently located in this state. "Covered claim" shall not include any amount awarded as punitive or exemplary damages; sought as a return of premium under any retrospective rating plan; or due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise; provided, that a claim for any such amount, asserted against a person insured under a policy issued by an insurer which has become an insolvent insurer, which, if it were not a claim by or for the benefit of a reinsurer, insurer, insurance pool or underwriting association, would be a "covered claim" may be filed directly with the receiver of the insolvent insurer, but in no event may any such claim be asserted in any legal action against the insured of such insolvent insurer. "Covered claim" shall not include supplementary payment obligations including, but not limited to, adjustment fees and expenses, attorneys' fees and expenses, court costs, interest and bond premiums incurred prior to the determination that an insurer is an insolvent insurer under this act. [FN3] "Covered claim" shall also mean the claim of an agent for amounts of unearned premiums advanced or paid by such agent on behalf of a policyholder, however, payment of such covered claims for unearned premiums advanced after the effective date of this section shall be made jointly to such agent and policyholder unless an unconditional written assignment has been executed by the policyholder to the agent;

7. "Director" means any one of the directors of the Association created herein;

8. "Insolvent insurer" means an insurer licensed by the Commissioner to transact insurance in this state either at the time the policy was issued or when the insured event occurred and determined to be insolvent and ordered liquidated by a court of competent jurisdiction;

9. "Member insurer" means any person who (a) writes any kind of insurance to which this act applies, including the exchange of reciprocal or interinsurance contracts and (b) is licensed by the Commissioner to transact insurance in this state, except those insurers enumerated in Section 110 of Title 36 of the **Oklahoma** Statutes;

10. "Net direct written premiums" means direct gross premiums written in this state on insurance policies to which this act applies, less return premiums thereon and dividends paid or credited to policyholders on such direct business. "Net direct written premiums" does not include premiums on contracts between insurers or reinsurers; and

11. "Person" means an individual, company, insurer, association, organization, society, reciprocal or interinsurance, exchange partnership, syndicate, business trust, corporation, Lloyds association, voluntary association or entity and association, group or department of underwriters.

CREDIT(S)

1999 Main Volume

Laws 1980, c. 362, § 4, emerg. eff. June 27, 1980; Laws 1986, c. 251, § 30, emerg. eff. June 13, 1986; Laws 1988, c. 252, § 3, eff. Nov. 1, 1988.

[FN1] Title 36, § 2001 et seq.

[FN2] O.S.L.1980, c. 362, emergency effective June 27, 1980.

[FN3] Section 2001 et seq. of this title.

<<ARTICLE 20A. **PROPERTY** AND **CASUALTY** INSURANCE GUARANTY ASSOCIATION ACT>>

<Article designated by Laws 1980, c. 362, § 20>

NOTES OF DECISIONS

Covered claim 1

1. Covered claim

Uninsured motorist insurer was allowed to maintain a claim against tort-feasor only for damage above the limits of the policy insolvent insurer had issued to tort-feasor. Welch v. Armer, **Okla**., 776 P.2d 847 (1989).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.


36 Okl.St.Ann. § 2007

OKLAHOMA STATUTES ANNOTATED
TITLE 36. INSURANCE
CHAPTER 1. INSURANCE CODE
ARTICLE 20A. PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION ACT
Copr. (C) West Group 2001. All rights reserved.

§ 2007. Powers and duties of Association

A. The Association shall:

1. Be obligated to pay the covered claims existing prior to the determination of insolvency if the claims arise within thirty (30) days after the determination of insolvency, or before the policy expiration date if less than thirty (30) days after the determination, or before the insured replaces the policy or causes its cancellation, if he does so within thirty (30) days of the determination. Such obligation shall be satisfied by paying to the claimant an amount as follows:

   a. the full amount of a covered claim for benefits under a workers' compensation insurance coverage,

   b. an amount not exceeding Ten Thousand Dollars ($10,000.00) per policy for a covered claim for the return of unearned premium, and

   c. an amount not exceeding One Hundred Fifty Thousand Dollars ($150,000.00) per claimant for all other covered claims.

In no event shall the Association be obligated to pay a claimant an amount in excess of the obligation of the insolvent insurer under the policy or coverage from which the claim arises or in excess of the limits of the Association's obligation existing on the date on which the order of liquidation is filed with the court clerk;

2. Be deemed the insurer to the extent of the obligations on covered claims and to that extent shall have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent;

3. Allocate claims paid and expenses incurred among the three accounts set out in Section 2005 of this title separately, and assess member insurers separately for each account amounts necessary to pay the obligations of the Association under this section subsequent to a member insurer becoming an insolvent insurer, the expenses of handling covered claims subsequent to an insolvency, the cost of examinations under Section 2013 of this title, and other expenses authorized by the Oklahoma Property and Casualty Insurance Guaranty Association Act, Sections 2001 et seq. of this title. The assessments of each member insurer shall be in the proportion that the net direct written premiums of the member insurer for the calendar year preceding the assessment on the kinds of insurance in the account bear to the net direct written premiums of all participating insurers for the calendar year preceding the assessment on the kinds of insurance in the account. Each member insurer shall be notified in writing of the assessment not later than thirty (30) days before it is due. No member insurer may be assessed in any year an amount greater than two percent (2%) of the net direct written premiums of that member or one percent (1%) of that member insurer's surplus as regards policyholders for the calendar year preceding the assessment on the kinds of insurance in the account, whichever is less. If the maximum assessment, together with the other assets of the Association, does not provide in any one (1) year in any account an amount sufficient to make all necessary payments from that account, the funds available may be prorated and the unpaid portion shall be paid as soon thereafter as funds become available. The Association shall pay claims in any order which it deems reasonable, including the payment of claims as the claims are received from the claimants or in groups or cat-

egories of claims. The Association may exempt or defer, in whole or in part, the assessment of any member insurer, if the assessment would cause the member insurer's financial statement to reflect amounts of capital or surplus less than the minimum amounts required for a certificate of authority by any jurisdiction in which the member insurer is authorized to transact insurance. During the period of deferment, no dividends shall be paid to shareholders or policyholders. Deferred assessments shall be paid when such payments will not reduce capital or surplus below required minimums. Such payments may be refunded to those companies receiving larger assessments by virtue of such deferment, or, at the election of any such company credited against future assessments. Each member insurer serving as a servicing facility may set off against any assessment authorized payments made on covered claims and expenses incurred in the payment of such covered claims by such member insurer if they are chargeable to the account for which the assessment is made;

4. Investigate claims brought against the Association and adjust, compromise, settle and pay covered claims to the extent of the obligation of the Association and deny all other claims and may review settlements, releases and judgments on covered claims to which the insolvent insurer or its insureds were parties to determine the extent to which such settlements, releases and judgments may be properly contested;

5. Notify such persons as the Commissioner directs as provided for in Section 2009 of this title;

6. Handle claims through employees or through one or more insurers or other persons incorporated and resident in the State of Oklahoma designated as servicing facilities. Designation of a servicing facility is subject to approval of the Commissioner, but such designation may be declined by a member insurer;

7. Reimburse each servicing facility for obligations of the Association paid by the facility and for reasonable expenses incurred by the facility while handling claims on behalf of the Association and pay the other expenses of the Association authorized by the Oklahoma Property and Casualty Insurance Guaranty Association Act; and

8. Have standing to appear before any court of this state which has jurisdiction over an impaired or insolvent insurer for whom the Association is or may become obligated pursuant to the provisions of the Oklahoma Property and Casualty Insurance Guaranty Association Act. Such standing shall extend to all matters germane to the powers and duties of the Association including, but not limited to, proposals for rehabilitation, acquisition, merger, reinsuring, or guaranteeing the covered policies of the impaired or insolvent insurer, and the determination of covered policies and contractual obligations of the impaired or insolvent insurer.

B. The Association may:

1. Employ or retain such persons as are necessary to handle claims and perform other duties of the Association;

2. Borrow funds necessary to effect the purposes of the Oklahoma Property and Casualty Insurance Guaranty Association Act in accordance with the plan of operation;

3. Sue or be sued;

4. Negotiate and become a party to such contracts as are necessary to carry out the purpose of the Oklahoma Property and Casualty Insurance Guaranty Association Act;

5. Refund to member insurers in proportion to the contribution of each member insurer that amount by which the assets of the Association exceed its liabilities, if at the end of any calendar year the board of directors finds that the assets of the Association exceed the liabilities as estimated by the board of directors for the coming year;

6. Lend monies to an insurer declared to be impaired by the Commissioner. The Association, with approval of the Commissioner, shall approve the amount, length and terms of the loan. "Impaired Insurer" for purposes of this paragraph shall mean an insurer potentially unable to fulfill its contractual obligations, but shall not mean an insolvent insurer;

7. Perform such other acts as are necessary or proper to effectuate the purpose of the Oklahoma Property and Casualty Insurance Guaranty Association Act; and

8. Intervene as a party in interest in any supervision, conservation, liquidation, rehabilitation, impairment or receivership in which policyholders interests and interests of the Association may be or are affected.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


36 Okl.St.Ann. § 2010

OKLAHOMA STATUTES ANNOTATED
TITLE 36. INSURANCE
CHAPTER 1. INSURANCE CODE
ARTICLE 20A. PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION ACT
Copr. (C) West Group 2001. All rights reserved.

§ 2010. Payment of covered claims—Recovery from certain persons—Priority of claims

A. Any person recovering under this act [FN1] shall be deemed to have assigned his rights under the policy to the Association to the extent of his recovery from the Association. Every insurer or claimant seeking the protection of this act shall cooperate with the Association to the same extent as such person would have been required to cooperate with the insolvent insurer. In the case of an insolvent insurer operating on a plan with assessment liability, payment of covered claims by the Association shall not operate to reduce the liability of insured to the receiver, liquidator or statutory successor for unpaid assessments.

B. The Association shall have the right to recover from the following persons the amount of any "covered claim" paid on behalf of such person pursuant to the provisions of the Oklahoma Property and Casualty Insurance Guaranty Association Act: [FN1]

1. Any insured whose net worth on December 31 of the year next preceding the date the insurer becomes an insolvent insurer exceeds Fifty Million Dollars ($50,000,000.00) and whose liability obligations to other persons are satisfied in whole or in part by payments made pursuant to the provisions of the Oklahoma Property and Casualty Insurance Guaranty Association Act; and

2. Any person who is an affiliate of the insolvent insurer and whose liability obligations to other persons are satisfied in whole or in part by payments made pursuant to the provisions of the Oklahoma Property and Casualty Insurance Guaranty Association Act.

C. The receiver, liquidator or statutory successor of an insolvent insurer shall be bound by settlements of covered claims by the Association or a similar organization in another state. The Association shall have a priority over general creditors of the insolvent insurer against the assets of the insolvent insurer equal to the amount of covered claims paid by the Association pursuant to this act. The expenses of the Association in handling claims shall be accorded the same priority as the liquidator's expenses. No other priority under the provisions of this section unless the laws of such other state grant a similar priority to the Association, in which case such other association or similar organization of another state shall have a priority against the assets of the insolvent insurer equal to that given to the Association by such other state.

CREDIT(S)

1999 Main Volume

Laws 1980, c. 362, § 10, emerg. eff. June 27, 1980; Laws 1986, c. 251, § 33, eff. Nov. 1, 1986.

[FN1] Title 36, § 2001 et seq.

HISTORICAL AND STATUTORY NOTES

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

1999 Main Volume

The 1986 amendment, in subsection A, in the last sentence, inserted "of" following "payment"; inserted subsection B; and redesignated former subsection B as subsection C.

LIBRARY REFERENCES

1999 Main Volume

Insurance ⚷1486 to 1512.
WESTLAW Topic No. 217.
C.J.S. Insurance §§ 41, 147 to 153, 156.

NOTES OF DECISIONS

Construction and application 1

1. Construction and application

Claims by policyholder of insolvent insurer were entitled to equal priority to claims of property and Casualty Insurance Guaranty Association, for payments to persons recovering under Property and Casualty Insurance Guaranty Act who were deemed to have assigned their rights under the policy to the Association. State ex rel. Grimes v. Oklahoma Property and Cas. Ins. Guar. Ass'n, Okla.App. Div. 1, 796 P.2d 352 (1990).

36 Okl. St. Ann. § 2010
OK ST T. 36 § 2010

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 4

The Policy WC1-1945251

# WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY
## INFORMATION PAGE

**LEGION**
INSURANCE COMPANY

**Policy No.**
WC1-1945251

**NCCI Co. No**
10901

**1. INSURED:**
The Insured/Mailing address

Hill Brothers Transportation Inc
(See GU207B)
7850 I Street
Omaha, NE 68127

**Renewal of Policy No.**
NEW

☐ Individual  ☐ Partnership
☒ Corporation or _____

Other workplaces not shown above:
See GU207C

Insured's I.D. No.(s). (if applicable)
F.E.I.N. # 47-0696479
Risk ID # 917168679

**2. POLICY PERIOD:** The policy period is from **09/01/2001** to **09/01/2002** 12:01 A.M. Standard Time, at the Insured's mailing address.

**3. COVERAGE:**

A. Workers Compensation Insurance: Part One of the policy applies to the Workers Compensation Law of the states listed here: Kansas, Nebraska, Oklahoma, Texas

B. Employers Liability Insurance: Part Two of the policy applies to work in each state listed in item 3.A. The limits of our liability under Part Two are:
- Bodily Injury by Accident $ 20,000,000 each accident
- Bodily Injury by Disease $ 20,000,000 policy limit
- Bodily Injury by Disease $ 20,000,000 each employee

C. Other States Insurance: Part Three of the policy applies to the states, if any, listed here:

D. This policy includes these endorsements and schedules:

See GU207A

**4. PREMIUM:** The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans. All information required below is subject to verification and change by audit.

| Classifications | Code No. | Premium Basis Total Estimated Annual Remuneration | Rates Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| Sic Code : 4212 | | | | |
| See WC 00 00 01 | | | | |

| If indicated below, interim adjustments of premium shall be made-- | |
|---|---|
| ☐ Semiannually; ☐ Quarterly; ☐ Monthly | Premium for Increased Limits Part Two, if applicable $ |
| | Total Premium Subject to the Experience Modification $ |
| | Premium Modified to Reflect Experience Mod. of $ |
| | Total Estimated Standard Premium $ |
| | Premium Discount, if applicable $ |
| | Expense Constant Charge $ |
| | Total Estimated Annual Premium $ |

Minimum Premium $ 750  Deposit Premium $ 42,317  Total Estimated Annual Premium $ 282,040

Name of Producer: Aon Risk Services, Inc.
Servicing Office: 11213 Davenport Street, Suite
PO Box 3307
Omaha, NE 68154-2604

156601

Countersigned By _____
Authorized Representative          Date

11/07/2001

810001 (Ed. 7-93) (1)

THIS INFORMATION PAGE WITH THE WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETES THE ABOVE NUMBERED POLICY.
COPYRIGHT 1987, NATIONAL COUNCIL ON COMPENSATION INSURANCE

WC 00 00 01 A

CIGA 206

## Legion Insurance Company

### Workers Compensation and Employer's Liability Insurance Policy Extension Schedule

Policy Num   WC1-1945251                         Insured:   Hill Brothers Transportation Inc

| Classifications | Code | Total Estimated Premium Basis Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| **KS-15** **1** **KS** | | | | |
| From    09/01/2001    To   05/01/2002 | | | | |
| TRUCKING – LONG DISTANCE HAULING & DRIVERS | 7229 | If ANY | 6.11 | 0 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 96,135 | 0.21 | 202 |
| TOTAL UNMODIFIED PREMIUM | | | | 202 |
| EXPERIENCE MODIFICATION | 9898 | | 1.25 | 51 |
| TOTAL MODIFIED PREMIUM | 9999 | | | 253 |
| LARGE DEDUCTIBLE (250,000) | 9962 | | 69.03600% | -175 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | | | 78 |

820001(01-88)

CIGA 207

Policy Num   WC1-1945251          Insured:  Hill Brothers Transportation Inc

| Classifications | Code | Total Estimated Premium Basis Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| KS-15 1 KS | | | | |
| From    05/01/2002    To   09/01/2002 | | | | |
| TRUCKING - LONG DISTANCE HAULING & DRIVERS | 7229 | If ANY | 6.11 | 0 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 48,865 | 0.21 | 103 |
| TOTAL UNMODIFIED PREMIUM | | | | 103 |
| EXPERIENCE MODIFICATION | 9898 | | 1.25 | 26 |
| TOTAL MODIFIED PREMIUM | 9999 | | | 129 |
| LARGE DEDUCTIBLE (250,000) | 9962 | | 69.03600% | -89 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | | | 40 |

820001(01-88)

CIGA 208

# Legion Insurance Company

## Workers Compensation and Employer's Liability Insurance Policy Extension Schedule

Policy Num  WC1-1945251                    Insured:  Hill Brothers Transportation Inc

| Classifications | Code | Total Estimated Premium Basis Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| NE-26 1 NE | | | | |
| From    09/01/2001    To   05/01/2002 | | | | |
| TRUCKING - LONG DISTANCE HAULING & DRIVERS | 7229 | 4,641,000 | 8.14 | 377,777 |
| AUTOMOBILE SERVICE OR REPAIR CENTER & DRIVERS | 8380 | 331,500 | 2.31 | 7,658 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 1,548,105 | 0.22 | 3,406 |
| SALESPERSONS, COLLECTORS OR MESSENGERS -OUTSIDE | 8742 | If ANY | 0.46 | 0 |
| TOTAL UNMODIFIED PREMIUM | | | | 388,841 |
| EXPERIENCE MODIFICATION | 9898 | | 1.25 | 97,210 |
| TOTAL MODIFIED PREMIUM | 9999 | | | 486,051 |
| LARGE DEDUCTIBLE (250,000) | 9962 | | 73.56209% | -357,549 |
| EXPENSE CONSTANT | 0900 | | | 180 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | | | 128,682 |

820001(01-88)

# Legion Insurance Company

## Workers Compensation and Employer's Liability Insurance Policy
## Extension Schedule

Policy Num   WC1-1945251

Insured:  Hill Brothers Transportation Inc

| Classifications | Code | Total Estimated Premium Basis Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| NE-26 1 NE | | | | |
| From   05/01/2002   To   09/01/2002 | | | | |
| TRUCKING - LONG DISTANCE HAULING & DRIVERS | 7229 | 2,359,000 | 10.16 | 239,674 |
| AUTOMOBILE SERVICE OR REPAIR CENTER & DRIVERS | 8380 | 168,500 | 2.88 | 4,853 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 786,895 | 0.27 | 2,125 |
| SALESPERSONS, COLLECTORS OR MESSENGERS -OUTSIDE | 8742 | If ANY | 0.57 | 0 |
| TOTAL UNMODIFIED PREMIUM | | | | 246,652 |
| EXPERIENCE MODIFICATION | 9898 | | 1.25 | 61,663 |
| TOTAL MODIFIED PREMIUM | 9999 | | | 308,315 |
| LARGE DEDUCTIBLE (250,000) | 9962 | | 73.56209% | -226,803 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | | | 81,512 |

820001(01-88)

Policy Num   WC1-1945251          Insured:  Hill Brothers Transportation Inc

| Classifications | Code | Total Estimated Premium Basis Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| OK-35 1 OK | | | | |
| From     09/01/2001     To  05/01/2002 | | | | |
| TRUCKING - LONG DISTANCE HAULING & DRIVERS | 7229 | 994,500 | 12.03 | 119,638 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | if ANY | 0.46 | 0 |
| TOTAL UNMODIFIED PREMIUM | | | | 119,638 |
| EXPERIENCE MODIFICATION | 9698 | | 1.25 | 29,910 |
| TOTAL MODIFIED PREMIUM | 9999 | | | 149,548 |
| LARGE DEDUCTIBLE (250,000) | 9962 | | 72.26400% | -108,069 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | | | 41,479 |

820001(01-88)

CIGA 211

# Legion Insurance Company

## Workers Compensation and Employer's Liability Insurance Policy
## Extension Schedule

Policy Num   WC1-1945251

Insured:   Hill Brothers Transportation Inc

| Classifications | Code | Total Estimated Premium Basis Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| OK-35 1 OK | | | | |
| From   05/01/2002   To   09/01/2002 | | | | |
| TRUCKING - LONG DISTANCE HAULING & DRIVERS | 7229 | 505,500 | 13.68 | 69,152 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | If ANY | 0.52 | 0 |
| TOTAL UNMODIFIED PREMIUM | | | | 69,152 |
| EXPERIENCE MODIFICATION | 9898 | | 1.25 | 17,288 |
| TOTAL MODIFIED PREMIUM | 9999 | | | 86,440 |
| LARGE DEDUCTIBLE (250,000) | 9962 | | 72.26400% | -62,465 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | | | 23,975 |

820001(01-88)

# Legion Insurance Company

## Workers Compensation and Employer's Liability Insurance Policy
## Extension Schedule

Policy Num   WC1-1945251                Insured:  Hill Brothers Transportation Inc

| Classifications | Code | Total Estimated Premium Basis Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| TX-42 1 TX | | | | |
| From     09/01/2001     To   05/01/2002 | | | | |
| AUTOMOBILE TOWING COMPANIES-NO OTHER OPERATIONS AND DRIVERS | 7219 | 66,300 | 15.38 | 10,197 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 53,040 | 0.52 | 276 |
| AIRCRAFT PAINTING & DRIVERS | 8391 | If ANY | 4.54 | 0 |
| SALESPERSONS, COLLECTORS OR MESSENGERS-OUTSIDE | 8742 | 46,410 | 0.98 | 455 |
| EMPLOYER'S LIABILITY 20,000/20,000/20,000 | 9816 | | 6.2% | 672 |
| TOTAL UNMODIFIED PREMIUM | | | | 11,600 |
| EXPERIENCE MODIFICATION | 9898 | | 1.25 | 2,900 |
| TOTAL MODIFIED PREMIUM | 9999 | | | 14,500 |
| LARGE DEDUCTIBLE (250,000) | 9962 | | 71.31000% | -10,340 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | | | 4,160 |

820001(01-88)

CIGA 213

# Legion Insurance Company

## Workers Compensation and Employer's Liability Insurance Policy
## Extension Schedule

Policy Num    WC1-1945251                    Insured:   Hill Brothers Transportation Inc

| Classifications | Code | Total Estimated Premium Basis Annual Remuneration | Rate per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|
| TX-42 1 TX | | | | |
| From    05/01/2002    To   09/01/2002 | | | | |
| AUTOMOBILE TOWING COMPANIES-NO OTHER OPERATIONS AND DRIVERS | 7219 | 33,700 | 15.38 | 5,183 |
| CLERICAL OFFICE EMPLOYEES NOC | 8810 | 26,960 | 0.52 | 140 |
| AIRCRAFT PAINTING & DRIVERS | 8391 | If ANY | 4.54 | 0 |
| SALESPERSONS, COLLECTORS OR MESSENGERS-OUTSIDE | 8742 | 23,590 | 0.98 | 231 |
| EMPLOYER'S LIABILITY 20,000/20,000/20,000 | 9816 | | 6.2% | 342 |
| TOTAL UNMODIFIED PREMIUM | | | | 5,896 |
| EXPERIENCE MODIFICATION | 9898 | | 1.25 | 1,474 |
| TOTAL MODIFIED PREMIUM | 9999 | | | 7,370 |
| LARGE DEDUCTIBLE (250,000) | 9962 | | 71.31000% | -5,256 |
| TOTAL ESTIMATED ANNUAL PREMIUM | | | | 2,114 |

820001(01-88)

CIGA 214

The Attaching Clause need be completed only when this endorsement is issued subsequent to the preparation of the policy.)

GU 207
(Ed. 6-78)

## ENDORSEMENT

This endorsement, effective on    09/01/2001     at 12:01 A.M. standard time, forms a part of

Policy No.     WC1-1945251     of the     Legion Insurance Company
                                                 (NAME OF INSURANCE COMPANY)

Issued to     Hill Brothers Transportation Inc

By

_____
Authorized Representative

# INSTALLMENT SCHEDULE

| Date Due | Premium | Total |
|---|---|---|
| 09/01/2001 | 42,317.00 | 42,317.00 |
| 10/01/2001 | 21,793.00 | 21,793.00 |
| 11/01/2001 | 21,793.00 | 21,793.00 |
| 12/01/2001 | 21,793.00 | 21,793.00 |
| 01/01/2002 | 21,793.00 | 21,793.00 |
| 02/01/2002 | 21,793.00 | 21,793.00 |
| 03/01/2002 | 21,793.00 | 21,793.00 |
| 04/01/2002 | 21,793.00 | 21,793.00 |
| 05/01/2002 | 21,793.00 | 21,793.00 |
| 06/01/2002 | 21,793.00 | 21,793.00 |
| 07/01/2002 | 21,793.00 | 21,793.00 |
| 08/01/2002 | 21,793.00 | 21,793.00 |
| Totals | 282,040.00 | 282,040.00 |

CIGA 215

# WORKERS COMPENSATION AND
# EMPLOYERS LIABILITY INSURANCE POLICY

## PLEASE READ THE POLICY CAREFULLY.

### QUICK REFERENCE

BEGINNING ON PAGE

**INFORMATION PAGE**

**GENERAL SECTION**............................................. 1
  A.   The Policy........................................... 1
  B.   Who Is Insured.................................. 1
  C.   Workers Compensation Law............. 1
  D.   State................................................... 1
  E.   Locations........................................... 1

**PART ONE—WORKERS COMPENSATION INSURANCE** 1
  A.   How This Insurance Applies............. 1
  B.   We Will Pay........................................ 1
  C.   We Will Defend.................................. 1
  D.   We Will Also Pay............................... 1
  E.   Other Insurance................................ 1
  F.   Payments You Must Make................. 2
  G.   Recovery From Others...................... 2
  H.   Statutory Provisions......................... 2

**PART TWO—EMPLOYERS LIABILITY INSURANCE**....... 2
  A.   How This Insurance Applies............. 2
  B.   We Will Pay........................................ 2
  C.   Exclusions.......................................... 3
  D.   We Will Defend.................................. 3
  E.   We Will Also Pay............................... 3
  F.   Other Insurance................................ 3
  G.   Limits Of Liability............................. 3

BEGINNING ON PAGE

**PART TWO—EMPLOYERS LIABILITY INSURANCE**........4
(Cont'd.)
  H.   Recovery From Others...................... 4
  I.   Actions Against Us............................ 4

**PART THREE—OTHER STATES INSURANCE**.............. 4
  A.   How This Insurance Applies............. 4
  B.   Notice................................................ 4

**PART FOUR—YOUR DUTIES IF INJURY OCCURS**........ 4

**PART FIVE—PREMIUM**......................................... 4
  A.   Our Manuals:..................................... 4
  B.   Classifications................................... 4
  C.   Remuneration.................................... 4
  D.   Premium Payments............................ 5
  E.   Final Premium................................... 5
  F.   Records.............................................. 5
  G.   Audit.................................................. 5

**PART SIX—CONDITIONS**...................................... 5
  A.   Inspection.......................................... 5
  B.   Long Term Policy.............................. 5
  C.   Transfer Of Your Rights And Duties 5
  D.   Cancelation....................................... 5
  E.   Sole Representative........................... 5

**IMPORTANT:**

This Quick Reference is not part of the Workers Compensation and Employers Liability Insurance Policy and does not provide coverage. Refer to the Workers Compensation and Employers Liability Insurance Policy itself for actual contractual provisions.



Copyright 1991 National Council on Compensation Insurance.

WC 00 00 00 A
(Ed. 4-92)

# WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

In return for the payment of the premium and subject to all terms of this policy, we agree with you as follows:

## GENERAL SECTION

### A. The Policy

This policy includes at its effective date the Information Page and all endorsements and schedules listed there. It is a contract of insurance between you (the employer named in Item 1 of the Information Page) and us (the insurer named on the Information Page). The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.

### B. Who Is Insured

You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees.

### C. Workers Compensation Law

Workers Compensation Law means the workers or workmen's compensation law and occupational disease law of each state or territory named in Item 3.A. of the Information Page. It includes any amendments to that law which are in effect during the policy period. It does not include any federal workers or workmen's compensation law, any federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

### D. State

State means any state of the United States of America, and the District of Columbia.

### E. Locations

This policy covers all of your workplaces listed in Items 1 or 4 of the Information Page; and it covers all other workplaces in Item 3.A. states unless you have other insurance or are self-insured for such workplaces.

## PART ONE—WORKERS COMPENSATION INSURANCE

### A. How This Insurance Applies

This workers compensation insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. Bodily injury by accident must occur during the policy period.

2. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

### B. We Will Pay

We will pay promptly when due the benefits required of you by the workers compensation law.

### C. We Will Defend

We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance. We have the right to investigate and settle these claims, proceedings or suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

### D. We Will Also Pay

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend:

1. reasonable expenses incurred at our request, but not loss of earnings;

2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the amount payable under this insurance;

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

### E. Other Insurance

We will not pay more than our share of benefits and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that may apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance will be equal until the loss is paid.

CIGA 217

**F. Payments You Must Make**

You are responsible for any payments in excess of the benefits regularly provided by the workers compensation law including those required because:

1. of your serious and willful misconduct;

2. you knowingly employ an employee in violation of law;

3. you fail to comply with a health or safety law or regulation; or

4. you discharge, coerce or otherwise discriminate against any employee in violation of the workers compensation law.

If we make any payments in excess of the benefits regularly provided by the workers compensation law on your behalf, you will reimburse us promptly.

**G. Recovery From Others**

We have your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

**H. Statutory Provisions**

These statements apply where they are required by law.

1. As between an injured worker and us, we have notice of the injury when you have notice.

2. Your default or the bankruptcy or insolvency of you or your estate will not relieve us of our duties under this insurance after an injury occurs.

3. We are directly and primarily liable to any person entitled to the benefits payable by this insurance. Those persons may enforce our duties; so may an agency authorized by law. Enforcement may be against us or against you and us.

4. Jurisdiction over you is jurisdiction over us for purposes of the workers compensation law. We are bound by decisions against you under that law, subject to the provisions of this policy that are not in conflict with that law.

5. This insurance conforms to the parts of the workers compensation law that apply to:

   a. benefits payable by this insurance;

   b. special taxes, payments into security or other special funds, and assessments payable by us under that law.

6. Terms of this insurance that conflict with the workers compensation law are changed by this statement to conform to that law.

Nothing in these paragraphs relieves you of your duties under this policy.

## PART TWO—EMPLOYERS LIABILITY INSURANCE

**A. How This Insurance Applies**

This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must arise out of and in the course of the injured employee's employment by you.

2. The employment must be necessary or incidental to your work in a state or territory listed in Item 3.A. of the Information Page.

3. Bodily injury by accident must occur during the policy period.

4. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

5. If you are sued, the original suit and any related legal actions for damages for bodily injury by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.

**B. We Will Pay**

We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.

The damages we will pay, where recovery is permitted by law, include damages:

1. for which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third party as a result of injury to your employee;

2. for care and loss of services; and

3. for consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee;

provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you; and

4. because of bodily injury to your employee that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

CIGA 218

## C. Exclusions

This insurance does not cover:

1. liability assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner;

2. punitive or exemplary damages because of bodily injury to an employee employed in violation of law;

3. bodily injury to an employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your executive officers;

4. any obligation imposed by a workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;

5. bodily injury intentionally caused or aggravated by you;

6. bodily injury occurring outside the United States of America, its territories or possessions, and Canada. This exclusion does not apply to bodily injury to a citizen or resident of the United States of America or Canada who is temporarily outside these countries;

7. damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions;

8. bodily injury to any person in work subject to the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950), the Nonappropriated Fund Instrumentalities Act (5 USC Sections 8171-8173), the Outer Continental Shelf Lands Act (43 USC Sections 1331-1356), the Defense Base Act (42 USC Sections 1651-1654), the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942), any other federal workers or workmen's compensation law or other federal occupational disease law, or any amendments to these laws;

9. bodily injury to any person in work subject to the Federal Employers' Liability Act (45 USC Sections 51-60), any other federal laws obligating an employer to pay damages to an employee due to bodily injury arising out of or in the course of employment, or any amendments to those laws;

10. bodily injury to a master or member of the crew of any vessel;

11. fines or penalties imposed for violation of federal or state law; and

12. damages payable under the Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872) and under any other federal law awarding damages for violation of those laws or regulations issued thereunder, and any amendments to those laws.

## D. We Will Defend

We have the right and duty to defend, at our expense, any claim, proceeding or suit against you for damages payable by this insurance. We have the right to investigate and settle these claims, proceedings and suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance. We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.

## E. We Will Also Pay

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding, or suit we defend:

1. reasonable expenses incurred at our request, but not loss of earnings;

2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the limit of our liability under this insurance;

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

## F. Other Insurance

We will not pay more than our share of damages and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

## G. Limits of Liability

Our liability to pay for damages is limited. Our limits of liability are shown in Item 3.B. of the Information Page. They apply as explained below.

1. Bodily Injury by Accident. The limit shown for "bodily injury by accident—each accident" is the most we will pay for all damages covered by this insurance because of bodily injury to one or more employees in any one accident.

A disease is not bodily injury by accident unless it results directly from bodily injury by accident.

Page 3

CIGA 219

2. Bodily Injury by Disease. The limit shown for "bodily injury by disease—policy limit" is the most we will pay for all damages covered by this insurance and arising out of bodily injury by disease, regardless of the number of employees who sustain bodily injury by disease. The limit shown for "bodily injury by disease—each employee" is the most we will pay for all damages because of bodily injury by disease to any one employee.

Bodily injury by disease does not include disease that results directly from a bodily injury by accident.

3. We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

H. Recovery From Others

We have your rights to recover our payment from anyone liable for an injury covered by this insurance. You will do everything necessary to protect those rights for us and to help us enforce them.

I. Actions Against Us

There will be no right of action against us under this insurance unless:

1. You have complied with all the terms of this policy; and

2. The amount you owe has been determined with our consent or by actual trial and final judgment

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability. The bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this Part.

## PART THREE—OTHER STATES INSURANCE

A. How This Insurance Applies

1. This other states insurance applies only if one or more states are shown in Item 3.C. of the Information Page.

2. If you begin work in any one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as though that state were listed in Item 3.A. of the Information Page.

3. We will reimburse you for the benefits required by the workers compensation law of that state if we are not permitted to pay the benefits directly to persons entitled to them.

4. If you have work on the effective date of this policy in any state not listed in Item 3.A. of the Information Page, coverage will not be afforded for that state unless we are notified within thirty days.

B. Notice

Tell us at once if you begin work in any state listed in Item 3.C. of the Information Page.

## PART FOUR—YOUR DUTIES IF INJURY OCCURS

Tell us at once if injury occurs that may be covered by this policy. Your other duties are listed here.

1. Provide for immediate medical and other services required by the workers compensation law.

2. Give us or our agent the names and addresses of the injured persons and of witnesses, and other information we may need.

3. Promptly give us all notices, demands and legal papers related to the injury, claim, proceeding or suit

4. Cooperate with us and assist us, as we may request in the investigation, settlement or defense of any claim, proceeding or suit.

5. Do nothing after an injury occurs that would interfere with our right to recover from others.

6. Do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

## PART FIVE—PREMIUM

A. Our Manuals

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

B. Classifications

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

C. Remuneration

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

Page 4

1. all your officers and employees engaged in work covered by this policy; and

2. all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2. will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

D. Premium Payments

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.

E. Final Premium

The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise:

1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short rate cancelation table and procedure. Final premium will not be less than the minimum premium.

F. Records

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

G. Audit

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

PART SIX—CONDITIONS

A. Inspection

We have the right, but are not obliged to inspect your workplaces at any time. Our inspections are not safety inspections. They relate only to the insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards. Insurance rate service organizations have the same rights we have under this provision.

B. Long Term Policy

If the policy period is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force.

C. Transfer Of Your Rights And Duties

Your rights or duties under this policy may not be transferred without our written consent.

If you die and we receive notice within thirty days after

your death, we will cover your legal representative as insured.

D. Cancelation

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancelation is to take effect.

2. We may cancel this policy. We must mail or deliver to you not less than ten days advance written notice stating when the cancelation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancelation notice.

4. Any of these provisions that conflict with a law that controls the cancelation of the insurance in this policy is changed by this statement to comply with the law.

E. Sole Representative

The insured first named in Item 1 of the Information Page will act on behalf of all insureds to change this policy, receive return premium, and give or receive notice of cancelation.

CIGA 221

The Attaching Clause need be completed only when this endorsement is issued subsequent to the preparation of the policy.)

GU 207A
(Ed. 6-78)

## ENDORSEMENT

This endorsement, effective on 09/01/2001 at 12:01 A.M. standard time, forms a part of

Policy No. WC1-1945251 of the Legion Insurance Company

**(NAME OF INSURANCE COMPANY)**

Issued to Hill Brothers Transportation Inc

By

_____

Authorized Representative

# SCHEDULE OF ENDORSEMENTS

| | | |
|---|---|---|
| WC000001A | Declaration | |
| WC000001 | Extension Schedule | |
| WC000000A | Conditions | |
| GU207 | Installment Schedule | |
| GU207A | Schedule of Endorsements | |
| GU207B | Schedule of Named Insureds | |
| GU207C | Schedule of Locations | |
| WC000402 | Anniversary Rating Date Endorsement | (N/A TX) |
| WC000403 | Experience Rating Modification Factor Endorsement | (N/A NE,TX) |
| WC000414 | Notification of Change in Ownership Endorsement | (N/A TX) |
| WC150401 | Kansas Final Premium Endorsement | |
| WC150601A | Kansas Cancelation and Nonrenewal Endorsement | |
| WC260401 | Nebraska Experience Rating Modification Endorsement | |
| WC260601C | Nebraska Cancelation and Nonrenewal Endorsement | |
| WC350302 | Oklahoma Employers Liability Amended Coverage Endorsement | |
| WC350601A | Oklahoma Cancelation, Nonrenewal and Change Endorsement | |
| WC420301E | Texas Amendatory Endorsement | |
| WC420402A | Anniversary Rating Date Endorsement (TX) | |
| WC420403A | Texas Experience Rating Modification Factor Endorsement | |
| WC480603 | Foreign Coverage Endorsement | (N/A TX) |
| WC7738a | Notification to PolicyHolders of Accident Prevention | |
| 860025 | Deductible Endorsement - Kansas | |
| 860033 | Texas Negotiated Deductible Endorsement | |
| 860052 | Deductible Endorsement | |
| 860074 | Deductible Endorsement | |

GU 207A
(Ed. 6-78)

CIGA 222

The Attaching Clause need be completed only when this endorsement is issued subsequent to the preparation of the policy.)

**GU 207B**
**(Ed. 6-78)**

## ENDORSEMENT

This endorsement, effective on    09/01/2001    at 12:01 A.M. standard time, forms a part of

Policy No.    WC1-1945251    of the    Legion Insurance Company
**(NAME OF INSURANCE COMPANY)**

Issued to    Hill Brothers Transportation Inc

By

_____
Authorized Representative

## SCHEDULE OF NAMED INSUREDS/F.E.I.N.

| | |
|---|---|
| H. P. Inc | 47-0696478 |
| Hill Transport Services | 47-0754390 |
| Hill Bros Intermodal Logistics | 47-0778051 |
| Hill Bros Inc | 47-0789738 |
| H B T Land Company | 47-0741028 |
| Hill Truck Line | 93-0678329 |
| Holly's Omaha Transportation | 47-0737310 |
| H B Truck Sales Inc | 47-0821649 |

**GU 207B**
**(Ed. 6-78)**

CIGA 223

The Attaching Clause need be completed only when this endorsement is issued subsequent to the preparation of the policy.)

**GU 207C**
**(Ed. 6-78)**

## ENDORSEMENT

This endorsement, effective on      09/01/2001           at 12:01 A.M. standard time, forms a part of

Policy No.      WC1-1945251           of the           Legion Insurance Company
                                                        (NAME OF INSURANCE COMPANY)

Issued to      Hill Brothers Transportation Inc

By

_____
Authorized Representative

## SCHEDULE OF LOCATIONS

| Hill Brothers Transportation Inc | NO SPECIFIC LOCATION | NO SPECIFIC LOCATION | KS | 00099 |
|---|---|---|---|---|
| | 7850 I Street | Omaha | NE | 68127 |
| Hill Bros Transportation | 420 South 145th East Avenue | Tulsa | OK | 74108 |
| Hill Bros Transportation | 10341 Miller Road | Dallas | TX | 75238 |
| Hills Brothers Transportation | 2938 Oakland Ave | Garland | TX | 75041 |

**GU 207C**
**(Ed. 6-78)**

CIGA 224

WORKERS COMPENSATION AND EMPLU...RS LIABILITY INSURANCE POLICY

**WC 127**
(Ed. 4-84)

**WC 00 04 02**

## ANNIVERSARY RATING DATE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on       (DATE)       at 12:01 A.M. standard time, forms a part of

Policy No.    WC1-1945251     of the      **Legion Insurance Company**
(NAME OF INSURANCE COMPANY)

Issued to    Hill Brothers Transportation Inc

Premium $    Included

_____
Authorized Representative

The premium and rates for this policy, and the experience rating modification factor, if any, may change on your anniversary rating date shown in the Schedule.

### Schedule

| Anniversary Rating Date | (Month) | (Day) |
|---|---|---|
| | 05 | 01 |



Copyright, 1983 National Council on Compensation Insurance.

CIGA 225

WC 00 04 03

# EXPERIENCE RATING MODIFICATION FACTOR ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on                                          at 12:01 A.M. standard time, forms a part of

(DATE)

Policy No.  WC1-1945251                    Endorsement No.

of the                                                              Legion Insurance Company
                                                                   (NAME OF INSURANCE COMPANY)

Issued to    Hill Brothers Transportation Inc

Premium (if any) $  Included

_____
Authorized Representative

The premium for the policy will be adjusted by an experience rating modification factor. The factor was not available when the policy was issued. The factor, if any, shown on the information Page is an estimate. We will issue an endorsement to show the proper factor, if different from the factor shown, when it is calculated.



Copyright, 1983, 1994 National Council on Compensation Insurance, Inc.

WC 128
(4-84)

CIGA 226

**WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY**

## WC 00 04 14 (Ed. 7-90)
## NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on

(DATE)

at 12:01 A.M. standard time, forms a part of

Policy No. WC1-1945251    of the

Legion Insurance Company
(NAME OF INSURANCE COMPANY)

Issued to    Hill Brothers Transportation Inc

_____
Authorized Representative

Experience rating is mandatory for all eligible insureds. The experience rating modification factor, if any, applicable to this policy, may change if there is a change in your ownership or in that of one or more of the entities eligible to be combined with you for experience rating purposes. Change in ownership includes sales, purchases, other transfers, mergers, consolidations, dissolutions, formations of a new entity and other changes provided for in the applicable experience rating plan manual.

You must report any change in ownership to us in writing within 90 days of such change. Failure to report such changes within this period may result in revision of the experience rating modification factor used to determine your premium.



Copyright, 1990 National Council on Compensation Insurance

## WC 15 04 01

## KANSAS FINAL PREMIUM ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

*(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)*

This endorsement, effective on _____ at 12:01 A.M. standard time, forms a part of
(DATE).

Policy No.    WC1-1945251          Endorsement No.

of the                              Legion Insurance Company
                                    (NAME OF INSURANCE COMPANY)

Issued to    Hill Brothers Transportation Inc

_____
Authorized Representative

This endorsement changes how the final premium is determined. The change applies only to the premium charged because Kansas is shown in Item 3.A of the Information Page.

Kansas final premium will not be less than the highest minimum premium for the classifications covered by this policy unless there are two or more classifications covered and the highest rated classification has less than $500.00 payroll. When this occurs, the final premium will not be less than one-half of the sum of the two highest minimum premiums for any classification covered by the policy other than Clerical Office and Salespersons. When the highest rated classification has less than $500.00 payroll and Clerical Office and Salespersons classifications are the only classifications showing payrolls, the final premium will not be less than the minimum premium for the classification showing the highest payroll.



Copyright 1984 National Council on Compensation Insurance

## WC 15 06 01 A

## KANSAS CANCELATION AND NONRENEWAL ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on

(DATE)

at 12:01 A.M. standard time, forms a part of

Policy No.   WC1-1945251          .          of the

Legion Insurance Company
(NAME OF INSURANCE COMPANY)

Issued to     Hill Brothers Transportation Inc

_____
Authorized Representative

This endorsement applies only to the insurance provided by the policy because Kansas is shown in Item 3.A. of the Information Page.

The Cancelation Condition of the policy is replaced by these two Conditions:

**Cancelation**

1.  You may cancel this policy. You will mail or deliver advance written notice to us stating when the cancelation is to take effect.

2.  We may cancel this policy. If we cancel because you fail to pay all premium when due, we will mail or deliver to you not less than 10 days advance written notice stating when the cancelation is to take effect. If we cancel for any other reason, we will mail or deliver to you not less than 30 days advance written notice stating when the cancelation is to take effect. Mailing notice to you at your last known address will be sufficient to prove notice.

3.  If this policy has been in effect for 90 days or more, we may cancel only for one of the following reasons:

    a   . nonpayment of premium;
    b.    the policy was issued because of a material misrepresentation;
    c.    you violated any of the material terms and conditions of the policy;
    d.    there are unfavorable underwriting factors, specific to you, that were not present when the policy took effect;
    e.    the Commissioner has determined that our continuation of coverage could place us in a hazardous financial condition or in violation of the laws of Kansas; or
    f.    the Commissioner has determined that we no longer have adequate reinsurance to meet our needs.

4.  Our notice of cancelation will state our reasons for canceling

5.  The policy period will end on the day and hour stated in the cancelation notice.

**Nonrenewal**

1.  We may elect not to renew the policy. We will mail to you not less than 60 days advance written notice when the nonrenewal will take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

2.  Our notice of nonrenewal will state our reasons for not renewing.



Copyright 1988 National Council on Compensation Insurance.

WC 26 04 01 (Ed. 5-89)

# NEBRASKA EXPERIENCE RATING MODIFICATION ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on

(DATE)

at 12:01 A.M. standard time, forms a part of

Policy No.  WC1-1945251        of the

Legion Insurance Company
(NAME OF INSURANCE COMPANY)

Issued to    Hill Brothers Transportation Inc

_____
Authorized Representative

This endorsement applies only to the insurance provided by the policy because Nebraska is shown in Item 3.A. of the Information Page.

A. The premium for the policy will be adjusted by an experience rating modification factor. The factor was not available when the policy was issued. The factor shown on the Information Page is the most recent factor which was known at the time the policy was issued. We will issue an endorsement to show the proper factor, if different from the factor shown, when it is calculated.

B. If the ultimately determined experience modification factor applying to this policy is a decrease from that shown on the Information Page, it will be applied retroactively to the policy effective date or the anniversary rating date if different from the policy effective date.

C. If the factor is an increase over that shown on the Information Page, it will apply as follows:

1. Retroactively to the effective date of the policy or to the anniversary rating date if you or your agent are notified of the new experience modification no more than 30 days after the policy effective date or the anniversary rating date.

2. If neither you nor your agent receive notification of the increased experience modification prior to 31 days after the policy effective date or the anniversary rating date, then the increased modification shall apply only to premiums earned after the date that you or your agent are first notified of the new modification.

3. Section C.2. of this endorsement notwithstanding, the increase will be retroactive to the effective date of this policy when:

   a. The change in experience modification is the result of a revision in your classifications.

   b. The delay in the calculation of the experience modification is due to your failure to make available all your records for examination and audit for us or for a previous insurer.



Copyright 1990 National Council on Compensation Insurance

WC 26 06 01 C (Ed. 7-96)

# NEBRASKA CANCELATION AND NONRENEWAL ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on            at 12:01 A.M. standard time, forms a part of

(DATE)

Policy No.   WC1-1945251        Endorsement No.

of the                              Legion Insurance Company
                                    (NAME OF INSURANCE COMPANY)

Issued to   Hill Brothers Transportation Inc

Premium (if any) $                                 
                                     Authorized Representative

1. You may cancel this policy within the policy period by giving notice to us, fixing the date on which the cancelation is to be effective.

2. The notice, from you, is to be sent by certified mail.

3. We are required by Nebraska Law to give notice of your intent to cancel a policy to the Nebraska Workers' Compensation Court.

4. The cancelation shall not be effective until ten (10) days after we give notice to the Nebraska Workers' Compensation Court that the policy is being canceled. However, if you have secured insurance with another insurer, the cancelation will be effective as of the effective date of such other notice of coverage.

5. We may cancel or nonrenew this policy within the policy period by giving notice to you and to the Nebraska Workers' Compensation Court, fixing the date on which the cancelation or nonrenewal is to be effective.

6. The notice from us will contain a brief statement of the reasons for cancelation or nonrenewal and will be sent to you by certified mail.

7. The nonrenewal shall not be effective until thirty (30) days after the giving of notice to you and to the Nebraska Workers' Compensation Court.

8. The cancelation shall not be effective until thirty (30) days after the giving of notice to you and to the Nebraska Workers' Compensation Court, except the cancelation shall be effective ten (10) days after the giving of the notice if the cancelation is based on:

   a. nonpayment of premiums;

   b. failure of the insured to reimburse deductible losses as required under the policy; or

   c. failure of the insured, if covered pursuant to the Assigned Risk Plan, to comply with workplace safety laws found in Nebraska statutes.

9. All notices shall be provided in writing and shall be deemed given upon mailing by certified mail, except that we may give notice to the Nebraska Workers' Compensation Court by approved electronic means. Notice provided to the Nebraska Workers' Compensation Court by approved electronic means shall be deemed given upon receipt.



Copyright, 1996 National Council on Compensation Insurance, Inc.

WC 337c
(7-96)

CIGA 231

WC 35 03 02

# OKLAHOMA EMPLOYERS LIABILITY AMENDED COVERAGE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on _____ at 12:01 A.M. standard time, forms a part of
(DATE)

Policy No.   WC1-1945251                          Endorsement No.

of the                                            Legion Insurance Company
                                                  (NAME OF INSURANCE COMPANY)

Issued to    Hill Brothers Transportation Inc

Premium (if any) $                                _____
                                                  Authorized Representative

This endorsement applies only to the insurance provided by Part Two (Employers Liability Insurance) because Oklahoma is shown in Item 3.A. of the Information Page.

1.  Section B. We Will Pay is replaced by the following:

    B.  We Will Pay

        We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.

        The damages we will pay, where recovery is permitted by law, include damages:

        1.  for which you are liable to a third party by reason of a claim or suit against you by the third party to recover the damages claimed against such third party as a result of injury to your employee; and

        2.  for care and loss of services.



Copyright 1987 National Council on Compensation Insurance.

CIGA 232

WC 35 06 01 A

# OKLAHOMA CANCELATION, NONRENEWAL AND CHANGE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy.)

This endorsement, effective on

(DATE)

Policy No. WC1-1945251         of the

Issued to    Hill Brothers Transportation Inc

at 12:01 A.M. standard time, forms a part of

Legion Insurance Company
(NAME OF INSURANCE COMPANY)

_____
Authorized Representative

This endorsement applies to the insurance provided by the policy because Oklahoma is shown in Item 3.A. of the Information Page.

The Cancelation Condition in Part Six (Conditions) of the policy is amended by adding the following provision:

5. If this policy has been in effect for more than 45 business days or is a renewal policy, we may cancel only for one of the following reasons:

   a. Nonpayment of premium;

   b. Discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted under it;

   c. Discovery of willful or reckless acts or omissions by you which increase any hazard insured against;

   d. The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed.

   e. A violation of any local fire, health, safety, building or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increase any hazard insured against;

   f. A determination by the Insurance Commissioner that the continuation of the policy would place us in violation of the insurance laws of this state;

   g. Your conviction of a crime having as one of its necessary elements an act increasing any hazard insured against; or

   h. Loss of or substantial changes in applicable reinsurance.

Part 6 (Conditions) of the policy is amended by adding the following provisions:

F. Nonrenewal

If we elect not to renew this policy, we will mail or deliver written notice of nonrenewal to you at least 45 days before:

   a. The expiration date of this policy; or

   b. An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

Any notice of nonrenewal will be mailed or delivered to you at the last mailing address known to us.

If notice is mailed:

   a. It will be considered to have been given to you on the day it is mailed.

   b. Proof of mailing will be sufficient proof of notice.

If notice of nonrenewal is not mailed or delivered at least 45 days before the expiration date or an anniversary date of this policy, coverage will remain in effect, until 45 days after notice is given. Earned premium for such extended period of coverage will be calculated pro rata based on the rate applicable to the expiring policy.

We will not provide notice of nonrenewal if:

   a. We, or another company within the same insurance group, have offered to issue a renewal policy; or



Copyright 1990 National Council on Compensation Insurance.

WC 366a
(10-90)

CIGA 233

b. You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

If we have provided the required notice of nonrenewal as described above, and thereafter extend the policy for a period of 90 days or less, we will not provide an additional nonrenewal notice with respect to the period of extension.

G. **Notice of Premium or Coverage Changes Upon Renewal**

If we elect to renew this policy, we will give written notice of any premium increase, change in deductible, or reduction in limits or coverage, to you, at the last mailing address known to us.

Any such notice will be mailed or delivered to you at least 45 days before:

a. The expiration date of this policy; or

b. An anniversary date of this policy, if it is written for a term longer than one year or with no fixed expiration date.

If notice is mailed:

a. It will be considered to have been given to you on the day it is mailed.

b. Proof of mailing will be sufficient proof of notice.

If you accept the renewal, the premium increase or deductible, limits or coverage changes will be effective the day following the prior policy's expiration or anniversary date.

If notice is not mailed or delivered at least 45 days before the expiration date or anniversary date of this policy, the premium, deductible, limits and coverage in effect prior to the changes will remain in effect until the earlier of

a. 45 days after notice is given; or

b. The effective date of replacement coverage obtained by you.

If you then elect not to renew, any earned premium for the resulting extended period of coverage will be calculated pro rata at the lower of the new rates or rates applicable to the expiring policy.

We will not provide notice of the following:

a. Changes in a rate or plan filed with or approved by the State Board for Property and Casualty Rates which are applicable to an entire class of business; or

b. Changes which are based upon the altered nature or extent of the risk insured.

# TEXAS AMENDATORY ENDORSEMENT

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement Effective      Policy No. WC1-1945251      Endorsement No.

Insured   Hill Brothers Transportation Inc                       Premium $

Insurance Company   Legion Insurance Company

_____

Countersigned by

This endorsement applies only to the insurance provided by the policy because Texas is shown in Item 3.A. of the Information Page.

## GENERAL SECTION

**B. Who is Insured is amended to read:**

You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership or joint venture, and if you are one of its partners or members, you are insured, but only in your capacity as an employer of the partnership's or joint venture's employees.

**D. State is amended to read:**

State means any state or territory of the United States of America, and the District of Columbia.

## PART ONE—WORKERS' COMPENSATION INSURANCE

**E. Other Insurance is amended by adding this sentence:**

This section only applies if you have other insurance or are self-insured for the same loss.

**F. Payments You Must Make**

This section is amended by deleting the words "workers compensation" from number 4.

**H. Statutory Provisions**

This section is amended by deleting the words "after an injury occurs" from number 2.

## PART TWO—EMPLOYERS' LIABILITY INSURANCE

**C. Exclusions**

Sections 2 and 3 are amended to add:

This exclusion does not apply unless the violation of law caused or contributed to the bodily injury.

Section 6 is amended to read:

6. bodily injury occurring outside the United States of America, its territories or possessions, and Canada. This exclusion does not apply to bodily injury to a citizen or resident of the United States of America, Mexico or Canada who is temporarily outside these countries.

**D. We Will Defend**

This section is amended by deleting the last sentence.

## PART FOUR—YOUR DUTIES IF INJURY OCCURS

Number 6 of this part is amended to read:

6. Texas law allows you to make weekly payments to an injured employee in certain instances. Unless authorized by law, do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

## PART FIVE—PREMIUM

**A. Our Manuals is amended by adding the sentence:**

In this part, "our manuals" means manuals approved or prescribed by the Texas Department of Insurance.

**C. Remuneration**

Number 2 is amended to read:

2. All other persons engaged in work that would make us liable under Part One (Workers' Compensation In-



surance) of this policy. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured workers' compensation insurance.

E. **Final Premium**

Number 2 is amended to read:

2. If you cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

## PART SIX—CONDITIONS

A. **Inspection** is amended by adding this sentence:

Your failure to comply with the safety recommendations made as a result of an inspection may cause the policy to be cancelled by us.

C. **Transfer of Your Rights and Duties** is amended to read:

Your rights and duties under this policy may not be transferred without our written consent. If you die, coverage will be provided for your surviving spouse or your legal representative. This applies only with respect to their acting in the capacity as an employer and only for the workplaces listed in Items 1 and 4 on the Information Page.

D. **Cancellation** is amended to read:

1. You may cancel this policy. You must mail or deliver advance notice to us stating when the cancellation is to take effect.

2. We may cancel this policy. We may also decline to renew it. We must give you written notice of cancellation or nonrenewal. That notice will be sent certified mail or delivered to you in person. A copy of the written notice will be sent to the Texas Workers' Compensation Commission.

3. Notice of cancellation or nonrenewal must be sent to you not later than the 30th day before the date on which the cancellation or nonrenewal becomes effective, except that we may send the notice not later than the 10th day before the date on which the cancellation or nonrenewal becomes effective if we cancel or do not renew because of:

   a. Fraud in obtaining coverage;

   b. Failure to pay a premium when payment was due;

   c. An increase in the hazard that results from an action or omission and that would produce an increase in the rate, including an increase because of failure to comply with reasonable recommendations for loss control or to comply within a reasonable period with recommendations designed to reduce a hazard that is under your control;

   d. A determination by the Commissioner of Insurance that the continuation of the policy would place us in violation of the law, or would be hazardous to the interests of subscribers, creditors, or the general public.

4. If another insurance company notifies the Texas Workers' Compensation Commission that it is insuring you as an employer, such notice shall be a cancellation of this policy effective when the other policy starts.

## PART SEVEN—OUR DUTY TO YOU FOR CLAIM NOTIFICATION

A. **Claims Notification**

We are required to notify you of any claim that is filed against your policy. Thereafter, we shall notify you of any proposal to settle a claim or, on receipt of a written request from you, of any administrative or judicial proceeding relating to the resolution of a claim, including a benefit review conference conducted by the Texas Workers' Compensation Commission. You may, in writing, elect to waive this notification requirement.

We shall, on the written request from you, provide you with a list of claims charged against your policy, payments made and reserves established on each claim, and a statement explaining the effect of claims on your premium rates. We must furnish the requested information to you in writing no later than the 30th day after the date we receive your request. The information is considered to be provided on the date the information is received by the United States Postal Service or is personally delivered.

COMPLAINT NOTICE: SHOULD ANY DISPUTE ARISE ABOUT YOUR PREMIUM OR ABOUT A CLAIM THAT YOU HAVE FILED, CONTACT THE AGENT OR WRITE TO THE COMPANY THAT ISSUED THE POLICY. IF THE PROBLEM IS NOT RESOLVED, YOU MAY ALSO WRITE THE TEXAS DEPARTMENT OF INSURANCE, P.O. BOX 149091, AUSTIN, TEXAS 78714-9091, FAX #(512) 475-1771. THIS NOTICE OF COMPLAINT PROCEDURE IS FOR INFORMATION ONLY AND DOES NOT BECOME A PART OR CONDITION OF THIS POLICY.

WC 270m (3-97)

CIGA 236

**WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY**

WC 42 04 02 A (Ed. 3-97)

# TEXAS ANNIVERSARY RATING DATE ENDORSEMENT

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated. (The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

| | | |
|---|---|---|
| Endorsement Effective | Policy No. WC1-1945251 | Endorsement No. |
| Insured | Hill Brothers Transportation Inc | Premium $ Included |
| Insurance Company | Legion Insurance Company | |

_____
Countersigned by

The premium for this policy and the experience rating modification factor, if any, may change on your anniversary rating date shown in the Schedule.

**Schedule**

Anniversary Rating Date _____05_____ (Month)____01____ (Day)



CIGA 237

**WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY INSURANCE POLICY**

WC 42 04 03 A (Ed. 3-97)

## TEXAS EXPERIENCE RATING MODIFIER ENDORSEMENT

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement Effective        Policy No. WC1-1945251       Endorsement No.
Insured   Hill Brothers Transportation Inc                              Premium $

Insurance Company   Legion Insurance Company

_____
Countersigned by

The premium for the policy will be adjusted by an experience rating modifier, if any, which was not available when the policy was issued. We will issue an endorsement to show the proper factor when it is calculated.



WC 275a (3-97)
Page 1 of 1

CIGA 238

## FOREIGN COVERAGE ENDORSEMENT

### Section 1. Employees Covered

A. This coverage applies only to employees you hire within the limits of the United States of America while they are traveling or temporarily residing outside the United States of America, its territories or possessions, or Canada for a period no longer than ninety days.

B. This insurance does not apply to any employees you hire outside the limits of the United States of America.

### Section 2. How This Insurance Applies

This insurance applies only to bodily injury by accident or to bodily injury by disease. Bodily injury includes resulting death. Bodily injury includes any endemic disease.

A. An employee included in the group of employees described in Item 1 of the Schedule of this endorsement must sustain the bodily injury, and

B. The bodily injury must occur in the course of employment necessary or incidental to work in a state, country or subdivision of a country listed in Item 1 of the Schedule of this endorsement, and

C. Bodily injury by accident must occur during the policy period, or

D. The conditions of your workplace must cause or aggravate the bodily injury by disease. The employee's last day of last exposure to those conditions of your workplace must occur during the policy period.

### Section 3. Exclusions

This insurance does not cover:

A. Bodily injury arising from any direct or indirect consequence of war, invasion, act of foreign enemy, hostilities (whether war is declared or not), civil war, rebellion, revolution, insurrection or military or usurped power. No current or subsequent endorsement to this policy will override or waive this limitation.

B. Compensation or benefits imposed by any nonoccupational, disability benefits law, plan or any similar law or plan.

C. Bodily injury you intentionally cause or aggravate.

### Section 4. Voluntary Workers Compensation

This endorsement amends Section A. of Part One of the policy by adding the following coverage:

On your behalf, we will voluntarily pay an amount equal to the benefits you would be required to pay if you and the employees described in Item 1 of the Schedule were subject to the workers compensation law designated in Item 1 of the Schedule of this endorsement.

CIGA 239

## FOREIGN COVERAGE ENDORSEMENT

We will pay those amounts to the persons who would be entitled to them under the law. If this is not possible, we will reimburse you for amounts you are required to pay.

The following provisions apply to this insurance:

A. In no event will our liability under this section exceed the amount we or you would have been obligated to pay if the employment and injury had been subject to the workers compensation law designated in item 1 of the Schedule of this endorsement. The only exception to this is as provided for in Section 6-Excess Repatriation Expenses.

B. We have the option to request you to pay sums due directly to persons entitled to them on our behalf. We will reimburse you for these payments when you provide us with satisfactory proof of payment.

C. Before we are required to make any payment or reimburse you, the persons entitled or paid must:

(1) Release you and us in writing from all responsibility for the bodily injury or death.

(2) Transfer to us their right to recover from others who may be responsible for the injury or death to the extent of our payment or reimbursement.

(3) Cooperate with us and do everything necessary to enable us to enforce the right to recover from others.

If a person entitled to payment under this section refuses to accept voluntary payments offered, we may, at our discretion, withdraw the offer to pay compensation benefits. If this happens, we will notify you and the employee that we will no longer be bound by the provisions in this section.

D. Under this or any other policy we have issued to you, it is possible that the provisions of a workers compensation law, plan or any similar law or plan may hold you, or us legally liable for any injury where payments have been made or would otherwise be made under Section 4 of this endorsement. If this happens, we agree that we will make no further payments under Section 4 if Section 5 of this endorsement applies.

### Section 5. Legal Liability Under Workers Compensation Law

A. If benefits are payable under a workers compensation or occupational disease law of any state, country or subdivision of a country other than the United States of America, its territories or possessions, or Canada, we will reimburse you up to but not in excess of the cost of benefits which would have been payable under the workers compensation law of the state designated in item 1 of the Schedule of this endorsement.

B. We will not be liable for any loss for which you had other valid and collectible insurance.

C. We assume no obligation to defend any suit or proceeding against you outside of the United States of America, its territories or possessions, or Canada.

D. The coverage this Section 5 affords does not cover fines or penalties imposed on you for failure to comply with the requirements of any workers compensation or occupational disease law of any state, country or subdivision of a country.

CIGA 240

## FOREIGN COVERAGE ENDORSEMENT

### Section 6. Excess Repatriation Expenses

This section only applies to coverage provided for in Sections 4 and 5 of this endorsement.

Medical expenses include additional expenses of repatriation to the United States of America incurred as a result of bodily injury to employees. In the event an employee is injured, our liability is limited to the amount by which these expenses exceed the normal cost of returning the employee. In the event of an employee's death, our liability is limited to the amount by which the expenses of returning the body exceed the normal cost of returning an employee who is alive and in good health.

Our liability will never exceed the amount indicated in Item 2 of the Schedule of this endorsement for one covered employee or accident.

The policy does not afford coverage for repatriation expenses unless a specific limit of liability for each covered employee and accident appears in Item 2 of the Schedule of this endorsement.

### Section 7. Employers Liability

The following agreement replaces Section B of Part Two-Employers Liability of the policy:

### B. We Will Pay

We will pay on your behalf all sums which you become legally obligated to pay as damages because of bodily injury by accident or disease, including resulting death, sustained in any state or country or subdivision of a country other than the United States of America, its territories or possessions, or Canada by any of your employees arising out of and in the course of employment by you.

The following provisions apply to Section 7 of this endorsement:

A. We will reimburse you for all reasonable expenses you incur including attorneys' fees in defending any suit against you alleging injury and seeking damages on account of any insurance this section of this endorsement affords. We assume no obligation to defend any suit or any proceeding brought against you outside of the United States of America, its territories or possessions, or Canada.

B. The limit of our liability under Part Two will be in accordance with the following provisions:

The words "damages because of bodily injury by accident or disease, including death at any time resulting therefrom," in Part Two include damages for care and loss of services. These words also include damages for which you are liable because of suits or claims others bring against you to recover the damages obtained from such others because of bodily injury your employees sustain arising out of and in the course of their employment.

The limit of liability in Item 3 of the Schedule of this endorsement which applies to bodily injury by accident is the total limit of our liability for all damages because of bodily injury by accident including resulting death that one or more employees sustain.

The limit of liability in Item 3 of the Schedule of this endorsement which applies to bodily injury by disease is the total limit of our liability for all damages because of bodily injury by disease including resulting death that one or more employees sustain in any one state, country or subdivision of a country outside the United States, its territories or possessions, or Canada listed in Item 1 of the Schedule of this endorsement.

The limits of liability designated in this endorsement supersede and are not cumulative with any limit(s) of liability elsewhere in the policy. The inclusion of more than one insured does not increase the limits of our liability.

3 of 5

CIGA 241

## FOREIGN COVERAGE ENDORSEMENT

### Section 8. Premium

In addition to the provisions of Part V of the policy, the following provisions will apply to this endorsement:

A. We will compute the premium for this coverage in accordance with Part V of the policy, upon all remuneration paid to employees while traveling or temporarily residing outside the United States of America, its territories or possessions, or Canada for a period of no longer than ninety days. Remuneration includes overtime, bonuses and cash allowances for cost of living and board and lodging.

B. We will determine the premium for this coverage on the basis of the workers compensation rules, classifications and rates in accordance with the manuals we use for the state workers compensation law designated in item 1 of the Schedule of this endorsement.

C. You must maintain payroll records for any employees covered by the provisions of this endorsement.

### Section 9. Other Insurance

The following provision replaces Section E. of Part One and Section F. of Part Two of the policy with respect to the coverage this endorsement provides.

> The insurance for a loss covered by this endorsement will be excess insurance over and above any other insurance except with respect to insurance provided under Section 5. The limits of liability for this insurance will be reduced by an amount equal to the limits of liability other insurance affords.

CIGA 242

## FOREIGN COVERAGE ENDORSEMENT

### SCHEDULE

| 1. Name(s) of Employees | State or Country of Operations | Designated Workers Compensation Law |
|---|---|---|
| All employees traveling outside of the United States on company business | Various | All states listed in Item 3.A. of the Inform-ation Page. |

2. Limits of Liability for Excess Repatriation Expenses

$ 25,000   each employee

$ 25,000   each accident

3. Limits of Liability for Part Two-Employers Liability

| Bodily Injury by Accident | Bodily Injury by Disease |
|---|---|
| $   500 ,000 | $   500,000 policy limit<br>$   500,000 each employee |

4. Premium

| State of Designated Workers Compensation Law | Premium Basis Estimated Total Annual Remuneration | Rates Per $100 of Remuneration | Advance Premiums |
|---|---|---|---|
| All states listed in Item 3.A. of the Information Page. | Included | Included | Included |

Total Advance Premium   Included

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)

Endorsement Effective    Policy No. WC1-1945251    Endorsement No.
Insured  Hill Brothers Transportation Inc    Premium $    Included

Insurance Company    Countersigned by _____
        Legion Insurance Company

WC 48 06 03
(Ed. 11-87)

CIGA 243

# NOTIFICATION TO POLICYHOLDERS
# OF ACCIDENT PREVENTION SERVICES

Legion Insurance Company
(Name of Carrier)

is required by law to provide its policyholders with certain accident prevention service's as required by the Texas Labor Code, Section 411.066, at no additional cost. If you would like more information Call Regulatory Programs Coordinator at 1-800-467-5721 †. If you have any questions about this requirement, call the Division of Workers' Health and Safety, Texas Workers' Compensation Commission at 1-800-452-9595.

† Typist: If blank, enter carrier's loss control division or provider's telephone number.

WC 7738a (Ed. 3-96) UNIFORM PRINTING & SUPPLY. INC.

CIGA 244

# LEGION INSURANCE COMPANY

## WORKERS COMPENSATION AND
## EMPLOYERS LIABILITY INSURANCE POLICY

### DEDUCTIBLE ENDORSEMENT
### KANSAS

We agree with you as follows:

1.  This deductible endorsement is between you and us.  It does not change the rights of others under this Policy.  The rights of the employees under this policy are not affected by this endorsement.

2.  This endorsement applies only to the states shown in the endorsement schedule.

3.  We will pay and you will reimburse us for the payments we make on your behalf for benefits under Part One - Workers Compensation Insurance or damages under Part Two - Employers Liability Insurance or benefits under Part Three - Other States Insurance up to the deductible amounts as shown below:

    a)  $   250,000  Each Accident for benefits or damages because of bodily injury to one or more employees in any one accident, or
    b)  $   250,000  Each Employee for benefits or damages because of bodily injury by disease to any one employee.

4.  Under Part Two - Employers Liability Insurance, the terms of this policy, including those with respect to (a) our right and duty with respect to the defense of suits and (b) your duties in the event of an injury, apply irrespective of the application of any deductible amount. The applicable limits of liability shall be reduced by the amount of any damages within any deductible amount.

5.  We will have the right at our discretion, to pay any amounts within the deductible amounts or to pay loss adjustment expenses to effect settlement of any claim or suit, and you shall reimburse us for any sums we may have paid.

6.  Upon notification of payments by us, you will promptly reimburse us for any such amounts that we have paid.  If you fail to reimburse us, we may, at our option, cancel either this endorsement or this policy by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect.  Any resulting return premium may be applied to the reinstatement amounts due.

860025 (10-91)                Page 1

CIGA 245

DEDUCTIBLE ENDORSEMENT (cont'd)

7.  The premium is reduced in consideration of this deductible endorsement. The estimated deductible premium is the product of the applicable state standard premium multiplied by the deductible factor in the schedule below.

8.  All the terms and conditions of this policy which are no inconsistent with the endorsement will continue to apply.

## SCHEDULE

STATES APPLICABLE                          DEDUCTIBLE FACTOR

Kansas                                        0.309640

860025 (10-91)                    Page 2

CIGA 246

## TEXAS NEGOTIATED DEDUCTIBLE ENDORSEMENT

This endorsement applies to the insurance provided by Part One (Workers' Compensation Insurance), Part Two (Employers Liability Insurance) and Part Three (Other States Insurance) because Texas is shown in Item 3.A. of the Information Page.

1. Part One (Workers' Compensation Insurance) and Part Three (Other States Insurance) apply only to benefits in excess of the deductible amount shown in the Schedule below. This deductible applies separately to: (a) each person who sustains bodily injury by disease and (b) all bodily injuries arising out of any one accident covered under the policy.

2. Part Two (Employers Liability Insurance) applies only to damages in excess of the deductible amount shown in the Schedule below. This deductible applies separately to: (a) each person who sustains bodily injury by disease and (b) all bodily injuries arising out of any one accident covered under the policy. Our limits of insurance will be reduced by application of deductible payments.

3. In addition, you will pay all allocated loss adjustment expenses. Allocated loss adjustment expenses include expenses allocable to the investigation, adjustment, defense and/or settlement of any claim or suit, including litigation expenses and interest on judgements.

    In the event that a claim or suit exceeds the amount of the deductible, all allocated loss adjustment expenses will be shared by you and us in the same proportion as our respective obligations for payment of the amount of the claim or suit.

4. We will pay the deductible amount for you, but you must reimburse us within 30 days after we send you notice that payment is due. We will send you notice that payment is due on a periodic basis, but not more frequently than on a monthly basis. If you fail to fully reimburse us when due, we may cancel the policy for nonpayment of premium. We may keep the amount of unearned premium that will reimburse us for the payments we made. These rights are in addition to other rights we have to be reimbursed.

5. We have your rights, and the rights of persons entitled to compensation benefits from you, to recover our loss from anyone liable for the injury. The amount recovered after deducting our recovery expenses shall first be applied to the amount paid on the claim by us and then to the amount of the deductible paid by you, with reimbursement being made to you, if necessary.

### Schedule

| Application | Deductible Amount | Deductible Factor |
|---|---|---|
| Part One (Workers' Compensation Insurance) and Part Three (Other States Insurance) | $ 250,000 | .286900 |
| Part Two (Employers Liability Insurance) | $ 250,000 | .286900 |

The first Named Insured shown in the Declarations agrees and is authorized to pay all deductible amounts on behalf of all Named Insureds and to reimburse us for any such amounts that we advance.

All the terms and conditions of this policy which are not inconsistent with this endorsement will continue to apply.

Signed and Accepted By:

_____
Signature and Title

_____
Date

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated. (The information below is required only when this endorsement is issued subsequent to preparation of the policy)

Endorsement Effective                    Policy No. WC1-1945251                    Endorsement No.

Insured   Hill Brothers Transportation Inc                                          Premium $

Insurance Company Legion Insurance Company

Countersigned By: _____

Includes copyright material of the National Council on Compensation Insurance, used with its permission.
©1983, National Council on Compensation Insurance.

CIGA 248

LEGION INSURANCE COMPANY

DEDUCTIBLE ENDORSEMENT

We agree with you as follows:

1.  This deductible endorsement is between you and us.  It does not change the rights of others under this Policy.

2.  This endorsement applies only to the states shown in the endorsement schedule.

3.  We will pay and you will reimburse us for the payments we make on your behalf for benefits under Part One - Workers Compensation Insurance or damages under Part Two - Employers Liability Insurance or benefits under Part Three - Other States Insurance up to the deductible amounts as shown below:

    a)   $ 250,000  Each Accident for benefits or damages because of bodily injury to one or more employees in any one accident, or

    b)   $ 250,000  Each Employee for benefits or damages because of bodily injury by disease to any one employee.

    We must defend and settle all claims as if no deductible applies.

4.  Under Part Two - Employers Liability Insurance, the terms of this policy, including those with respect to (a) our right and duty with respect to the defense of suits and (b) your duties in the event of an injury, apply irrespective of the application of any deductible amount.  The applicable limits of liability shall be reduced by the amount of any damages within any deductible amount.

5.  You will also pay all "allocated loss adjustment expenses".  "Allocated loss adjustment expenses" as used herein shall mean expenses allocable to the investigation, administration, adjustment, defense and/or settlement of any claim or suit, including litigation expenses and interest on judgements.

    In the event that a claim or suit exceeds the amount of the deductible, all allocated loss adjustment expenses in connection therewith shall be shared by you and us in the same proportion as our respective obligations for payment of the amount of the claim or suit.

6. We will have the right at our sole discretion, to pay any amounts within the deductible amounts or to pay allocated loss adjustment expenses to effect settlement of any claim or suit, and you shall reimburse us for any sums we may have paid.

7. Upon notification of payments by us, you will promptly reimburse us for any such amounts that we have paid. If you fail to reimburse us, we may, at our option, cancel either this endorsement or this policy by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect. Any resulting return premium may be applied to the reimbursement amounts due.

8. You will provide to us a clean irrevocable Letter of Credit or other collateral in an amount and form acceptable to us to secure the payment of all amounts you will be obligated to pay pursuant to this deductible endorsement. If you fail to provide and maintain collateral in an amount and form acceptable to us, we may, at our option, cancel either this endorsement or this policy by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect. Any resulting return premium may be applied to the reimbursement amounts due.

9. The premium is reduced in consideration of this deductible endorsement. The estimated deductible premium is the product of the applicable state standard premium multiplied by the deductible factor in the schedule below.

10. We have your rights, and the rights of persons entitled to compensation benefits from you, to recover our loss from anyone liable for the injury. The amount recovered after deducting our recovery expenses shall first be applied to the amount paid on the claim by us and then to the amount of the deductible paid by you, with reimbursement being made to you, if necessary.

11. In the event of cancellation of this endorsement, the premium may only be recalculated as a full coverage policy from the time of cancellation going forward.

**SCHEDULE**

STATES APPLICABLE                                    DEDUCTIBLE FACTOR

Nebraska                                                  .2643791

The first Named Insured shown in the Declarations agrees and is authorized to pay all deductible amounts on behalf of all Named Insureds and to reimburse us for any such amounts that we have paid on your behalf.

All the terms and conditions of this policy which are not inconsistent with this endorsement will continue to apply.

Signed and Accepted By:

_____
Signature and Title

_____
Date

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy)

Endorsement Effective                        Policy No. WC1-1945251

Endorsement No.

Insured Hill Brothers Transportation Inc                    Premium $

Legion Insurance Company

Countersigned by: _____

Includes copyright material of the National Council on Compensation Insurance, used with its permission.
©1983, National Council on Compensation Insurance.

## LEGION INSURANCE COMPANY
## LARGE DEDUCTIBLE
## ENDORSEMENT

We agree with you as follows:

1.  This large deductible endorsement is between you and us.  It does not change the rights of others under this Policy.

2.  This endorsement applies only to the states shown in the endorsement schedule.

3.  We will pay and you will reimburse us for the payments we make on your behalf for benefits under Part One - Workers Compensation Insurance or damages under Part Two - Employers Liability Insurance or benefits under Part Three - Other States Insurance up to the large deductible amounts as shown below:

    a)  $ 250,000  Each Accident for benefits or damages because of bodily injury to one or more employees in any one accident, or

    b)  $ 250,000  Each Employee for benefits or damages because of bodily injury by disease to any one employee, or

4.  Under Part Two - Employers Liability Insurance, the terms of this policy, including those with respect to (a) our right and duty with respect to the defense of suits and (b) your duties in the event of an injury, apply irrespective of the application of any large deductible amount.  The applicable limits of liability shall be reduced by the amount of any damages within any large deductible amount.

5.  You will also pay all "allocated loss adjustment expenses", not to exceed the large deductible amount.  "Allocated loss adjustment expenses" as used herein shall mean expenses allocable to the investigation, administration, adjustment, defense and/or settlement of any claim or suit, including litigation expenses and interest on judgements.

6.  We will have the right at our sole discretion, to pay any amounts within the large deductible limits or to pay allocated loss adjustment expenses within the large deductible limits to effect settlement of any claim or suit, and you shall reimburse us for any sums we may have paid.

7.  Upon notification of payments by us, you will promptly reimburse us for any such amounts that we have paid.  If you fail to reimburse us, we may cancel this endorsement by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect.  We will remain fully responsible for the full amount of all claims incurred prior to the effective date of cancellation.  The failure to reimburse the insurer will not affect coverage for an eligible insured employee under the policy.

8.  You will provide to us a clean irrevocable Letter of Credit or other collateral in an amount and form acceptable to us to secure the payment of all amounts you will be obligated to pay pursuant to this large deductible endorsement.  If you fail to provide and maintain collateral in an amount and form acceptable to us, we may cancel this endorsement by mailing or delivering to you not less than ten days advance written notice stating when the cancellation is to take effect.

9.  The premium is reduced in consideration of this large deductible endorsement.  The estimated large deductible premium is the product of the applicable state standard premium multiplied by the large deductible factor in the schedule below.

10. We have your rights, and the rights of persons entitled to compensation benefits from you, to recover our loss from anyone liable for the injury.  The amount recovered after deducting our recovery expenses shall first be applied to the amount paid on the claim by us and then to the amount of the large deductible paid by you, with reimbursement being made to you, if necessary.

## SCHEDULE

STATES APPLICABLE                                    LARGE DEDUCTIBLE FACTOR

Oklahoma                                                      .277360

The first Named Insured shown in the Declarations agrees and is authorized to pay all large deductible amounts on behalf of all Named Insureds and to reimburse us for any such amounts that we advance.

All the terms and conditions of this policy which are not inconsistent with this endorsement will continue to apply.

Signed and Accepted By:

_____
Signature and Title

_____
Date

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.
(The information below is required only when this endorsement is issued subsequent to preparation of the policy)

Endorsement Effective                    Policy No. WC1-1945251    Endorsement No.

Insured Hill Brothers Transportation                        Premium $

Insurance Company Legion Insurance Company
                                Countersigned
By:_____

Includes copyright material of the National Council on Compensation Insurance, used with its permission.
<1983, National Council on Compensation Insurance.

# **TAB 5**

*Wyoming Medical Center, Inc. v. Wyoming Insurance Guaranty Association,*
225 P.3d 1061, 1068 (Wyo. 2010)

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

225 P.3d 1061
Supreme Court of Wyoming.

WYOMING MEDICAL CENTER, INC., a Wyoming corporation, Appellant (Defendant),
v.
WYOMING INSURANCE GUARANTY ASSOCIATION, a Wyoming non-profit unincorporated legal entity,
Appellee (Plaintiff).

No. S–09–0109. | Feb. 26, 2010.

**Synopsis**
**Background:** Wyoming Insurance Guaranty Association (WIGA) brought action against insured hospital, seeking to recover amounts for deductibles for claims that WIGA had paid under medical professional liability insurance policy after insurer became insolvent. Insured counterclaimed, seeking to recover attorney fees that it had paid in defending claims that were covered under policy. The District Court, Natrona County, David B. Park, J., entered summary judgment in favor of WIGA, and insured appealed.

**Holdings:** The Supreme Court, Kite, J., held that:

[1] res judicata did not bar WIGA's claim for amounts of deductibles, and

[2] WIGA was not required to pay attorney fees.

Affirmed.

West Headnotes (15)

[1]     **Appeal and Error** 〜 Cases Triable in Appellate Court

When reviewing an order granting summary judgment, the Supreme Court considers the record de novo.

2 Cases that cite this headnote

[2]     **Appeal and Error** 〜 Extent of Review Dependent on Nature of Decision Appealed from

On appeal of an order granting summary judgment, the Supreme Court has exactly the same duty as the district judge, and, if there is a complete record on appeal, the Court has exactly the same material as did the district judge and must follow the same standards.

2 Cases that cite this headnote

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

**[3]**     **Appeal and Error** Extent of Review Dependent on Nature of Decision Appealed from

Determining propriety of granting a motion for summary judgment, for purposes of reviewing the grant on appeal, depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law.

4 Cases that cite this headnote

**[4]**     **Appeal and Error** Judgment

On appeal of a grant of summary judgment, the Supreme Court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.

3 Cases that cite this headnote

**[5]**     **Judgment** Questions for jury

The question of whether res judicata bars a claim is one of law.

3 Cases that cite this headnote

**[6]**     **Appeal and Error** Cases Triable in Appellate Court

Statutory construction is a question of law, which the Supreme Court reviews de novo.

1 Cases that cite this headnote

**[7]**     **Judgment** Nature and requisites of former recovery as bar in general

Four factors must exist for res judicata to apply to bar re-litigation of previously litigated causes of action or claims: (1) the parties must be identical; (2) the subject matter must be identical; (3) the issues must be identical and relate to the same subject matter; and (4) the capacities of the persons must be identical in reference to both the subject matter and the issues between them.

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

4 Cases that cite this headnote

[8]     **Insurance**⚊Particular matters concluded

Prior default declaratory judgment, determining that insured hospital was not obligated to pay deductible amounts to insolvent medical professional liability insurer, did not, under doctrine of res judicata, bar claim against insured by Wyoming Insurance Guaranty Association (WIGA), seeking payment of deductible amounts for claims WIGA had paid on liability claims after insurer's insolvency; prior judgment had no effect on WIGA's statutory rights and duties, which were limited expressly to those insurer would have had if it had not become insolvent. West's Wyo.Stat.Ann. §§ 26–31–106, 26–31–108, 26–31–110.

1 Cases that cite this headnote

[9]     **Statutes**⚊Language and intent, will, purpose, or policy

The paramount consideration in statutory interpretation is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute.

Cases that cite this headnote

[10]     **Statutes**⚊What constitutes ambiguity;  how determined

When interpreting a statute, a court looks first to the plain and ordinary meaning of the words to determine if the statute is ambiguous.

2 Cases that cite this headnote

[11]     **Statutes**⚊What constitutes ambiguity;  how determined

A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability.

1 Cases that cite this headnote

[12]     **Statutes**⚊What constitutes ambiguity;  how determined

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

A statute is ambiguous, so as to require judicial construction, if it is found to be vague or uncertain and subject to varying interpretations.

Cases that cite this headnote

[13]     **Statutes** ⛢ Plain language;  plain, ordinary, common, or literal meaning

If a court determines that a statute is clear and unambiguous, the court must give effect to the plain language of the statute.

1 Cases that cite this headnote

[14]     **Statutes** ⛢ What constitutes ambiguity;  how determined
         **Statutes** ⛢ Questions of law or fact

Divergent opinions among parties as to the meaning of a statute may be evidence of ambiguity but is not conclusive; ultimately, whether a statute is ambiguous is a matter of law to be determined by the court.

2 Cases that cite this headnote

[15]     **Insurance** ⛢ Costs and expenses

Wyoming Insurance Guaranty Association (WIGA) was not required to pay attorney fees, that had been paid by insured hospital to its law firm for services provided in defending hospital against claims covered under medical professional liability insurance policy after insurer became insolvent, since Insurance Guaranty Association Act excluded as "covered claims" supplementary payment obligations, including attorney fees, even if insurer would have been liable for the attorney fees under the insurance policy. West's Wyo.Stat.Ann. § 26–31–103(a)(ii)(D).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1062** Representing Appellant: Stephenson D. Emery of Williams, Porter, Day & Neville, P.C., Casper, Wyoming.

Representing Appellee: James R. Bell of Murane & Bostwick, LLC, Casper, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

**Opinion**

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

KITE, Justice.

[¶ 1] After the Wyoming Medical Center's (WMC) insurer became insolvent, the Wyoming Insurance Guaranty Association (WIGA) paid claims made against WMC. WIGA then filed a complaint against WMC claiming that it was obligated to pay the deductibles for each claim. Asserting that WIGA stood in the shoes of the insurer, WMC argued that WIGA's claim was barred by an earlier district court ruling that WMC was not obligated to pay the deductibles to its insolvent insurer. WIGA filed a summary judgment motion which the district court granted, ruling that WMC was obligated to pay the deductibles. WMC appealed. We affirm.

## ISSUES

[¶ 2] WMC states the issues for this Court's determination as follows:

1. In light of the trial court's prior ruling "[t]hat [Wyoming Medical Center **\*1063** ("WMC") ] does not have any obligation to pay [Phico Insurance Company ("Phico") ] any deductible on claims settled by the Wyoming Insurance Guaranty Association [ ("WIGA"),]" is WIGA's complaint in the same court to collect those same deductibles from WMC under a canceled professional liability insurance policy on behalf of the liquidated insurer, Phico, barred by the doctrine of res judicata?

2. Is WMC entitled to a setoff for attorneys' fees incurred in the defense of various covered claims?

WIGA contends the district court properly granted summary judgment in its favor and res judicata does not apply.

## FACTS

[¶ 3] PHICO Insurance Company (PHICO) issued a Health Care Providers Liability Policy to WMC effective from July 16, 1999, to July 16, 2000. The parties renewed the policy twice, and it remained in effect until July 16, 2002. The policy provided that PHICO would pay all sums which WMC became legally obligated to pay as damages because of bodily injury or property damage caused by a medical incident occurring and reported during the effective date of the policy. The policy also provided that PHICO's obligation to pay damages under the policy applied only in excess of a deductible amount of $50,000.

[¶ 4] On February 1, 2002, while the policy was still in effect, a Pennsylvania court entered an order of liquidation against PHICO. The order stated that all insurance policies issued by PHICO were cancelled and terminated for all purposes. Prior to the liquidation, PHICO had been providing a defense to WMC on several claims made against it.

[¶ 5] After entry of the liquidation order, WIGA stepped in to pay the covered claims pursuant to the Wyoming Insurance Guaranty Association Act, Wyo. Stat. Ann. § 26–31–101 through 26–31–117 (1991).

The Act ... is based upon the Post–Assessment Property and Liability Insurance Guaranty Association Model Act ... prepared by the National Association of Insurance Commissioners....

The Act creates an involuntary nonprofit unincorporated legal entity, [WIGA], whose members are insurers qualified to transact business in Wyoming. Wyo.Stat. § 26–31–104(a) and (b). Each member contributes an assessment, based on a percentage of premiums from insurance policies written in Wyoming, to a fund which is used to pay claims. Wyo.Stat. § 26–31–107(a). When an insurance company is determined to be insolvent, [WIGA] "steps into the shoes of the insolvent insurer." [WIGA] is deemed the insurer to the extent of its obligation for covered claims.... Wyo.Stat. § 26–31–106(a)(ii).

*Wyoming Ins. Guar. Ass'n v. Woods,* 888 P.2d 192, 195 (Wyo.1994) (some citations omitted).

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

[¶ 6] In the present case, WIGA paid three claims against WMC, the first in June of 2002 for $25,000; the second in July of 2002 for $165,000; and the third in August of 2002 for $150,000. After paying the claims, WIGA demanded payment from WMC of $125,000, the sum of the deductibles for the claims paid in June ($25,000), July ($50,000) and August ($50,000) of 2002. WMC refused the demand, claiming that it had no obligation to pay the deductibles.

[¶ 7] Subsequently, WMC filed a complaint for declaratory judgment against PHICO in Wyoming district court. WMC sought a declaration that PHICO's liquidation was a breach of the insurance contract and, upon the insurer's breach, WMC had no obligation to pay PHICO any deductible on the claims WIGA paid. PHICO failed to appear in the action and WMC moved for entry of default. The clerk of court entered default and ultimately, in 2004, the district court entered a default judgment declaring that PHICO breached the insurance contract and WMC had no obligation to pay PHICO any deductible on claims paid by WIGA.

[¶ 8] WIGA then filed its complaint requesting judgment against WMC for the $125,000 plus interest and costs. WMC answered, denying any obligation to pay the deductibles on the ground that the default judgment, holding it did not have to pay PHICO, applied also to WIGA. WMC also filed a counterclaim against WIGA alleging **\*1064** that, under § 26–31–106(a)(ii) of the Insurance Guaranty Association Act, WIGA was deemed the insurer upon PHICO's insolvency and was obligated to pay any damages WMC sustained as a result of PHICO's breach of the insurance contract, including $50,000 in settlement costs WMC had paid that PHICO was obligated to pay and $45,000 in legal fees. WMC asked that WIGA's complaint be dismissed and judgment be awarded in its favor on the counterclaim.

[¶ 9] WIGA denied that it was obligated to pay WMC any amounts. WIGA subsequently filed a motion for summary judgment in its favor on both the complaint and the counterclaim.[1] The parties filed briefs and, after a hearing, the district court issued a decision letter in which it concluded WIGA was entitled to judgment against WMC in the amount of $125,000 plus prejudgment interest and WMC was not entitled to a set-off for its payment of $50,000 in settlement of a different claim made against it under the insurance policy. The district court requested additional briefing on the question of whether WMC was entitled to a set-off against the judgment in the amount of fees it had paid directly to attorneys who had defended claims against it.

---

[1]    In its summary judgment motion, in addition to arguing that res judicata did not apply, WIGA argued alternatively that the default judgment entered in Wyoming against PHICO was void because the liquidation order from the Pennsylvania court and Pennsylvania law provided that no action at law or equity could be brought against PHICO in Pennsylvania or elsewhere except as a claim in a liquidation proceeding. WMC responded that this Court rejected a similar argument in *Hoiness–La Bar Ins. v. Julien Constr. Co.,* 743 P.2d 1262 (Wyo.1987) and, in any event, the Pennsylvania order addressed only monetary claims, it did not bar declaratory judgment actions. Neither party raises the issue on appeal and we confine our discussion to the issues raised.

[¶ 10] The parties subsequently filed cross motions for summary judgment on the attorney fees issue. After considering the parties' briefs and arguments at a hearing, the district court entered an order granting summary judgment for WIGA on that claim as well. WMC appealed both orders.

## STANDARD OF REVIEW

[1] [2] [3] [4] [5] [6] [¶ 11] When reviewing an order granting summary judgment, we consider the record *de novo. Stone v. Devon Energy Prod. Co., L.P.,* 2009 WY 114, ¶ 10, 216 P.3d 489, 492 (Wyo.2009).

> [W]e have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did [the district judge]. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

in affidavits, depositions and other proper material appearing in the record.

*McGarvey v. Key Prop. Mgmt. LLC,* 2009 WY 84, ¶ 10, 211 P.3d 503, 506 (Wyo.2009). The question of whether res judicata bars a claim is one of law. *Osborn v. Kilts,* 2006 WY 142, ¶ 6, 145 P.3d 1264, 1266 (Wyo.2006). Statutory construction is also a question of law, which we review *de novo. Luhm v. Bd. of Trustees of Hot Springs Co. Sch. Dist. No. 1,* 2009 WY 63, ¶ 8, 206 P.3d 1290, 1294 (Wyo.2009).

## DISCUSSION

[¶ 12] WMC argues, as it did in the district court, that res judicata barred WIGA's claim for payment of the deductibles. WMC contends the earlier default judgment against PHICO established that it had no obligation to pay PHICO any deductibles on claims settled by WIGA. WMC asserts WIGA stands in the shoes of PHICO, has no more right to payment of the deductibles than PHICO did and its claim is precluded by the earlier ruling.

[¶ 13] WIGA responds that the doctrine of res judicata does not bar its claim because the doctrine only applies when the parties in the earlier action are identical to those in the **\*1065** later action. Because the default judgment was entered in a case between PHICO and WMC, and WIGA was not a party to that action, WIGA contends res judicata does not apply. WIGA further asserts that it does not stand in the shoes of PHICO so as to be considered one and the same for purposes of its right to payment of the deductibles.

[¶ 14] In its ruling on this issue, the district court stated:

The criteria used to determine res judicata's applicability to a situation are: "(1) the parties were identical; (2) the subject matter was identical; (3) the issues were the same and related to the subject matter; and (4) the capacities of the persons were identical in reference to both the subject matter and the issues between them." [*Osborn v. Kilts,* 2006 WY 142, ¶ 8, 145 P.3d 1264, 1266–1267 (Wyo.2006).] At a minimum, the first and the fourth criteria are not present in this case. The parties in this case are not identical, since WIGA is not PHICO for all purposes, nor were the capacities identical. WMC, in the first action, was attempting, reasonably it seems, to avoid having to pay deductibles to an insolvent insurer that had not provided a defense or even had to pay the settlement claim. WIGA, on the other hand, is carrying out its statutory obligation to protect and conserve the funds allocated to it.

Finally, there is considerable logic to support the Default Judgment between WMC and PHICO. It clearly makes sense to protect WMC and save it from having to pay deductibles to an insolvent insurer that failed to meet its obligations under the insurance contract. It makes no sense, however, to interpret the Default Judgment as protecting WMC as against WIGA, which ended up paying the claim settlement amounts. If WMC were to prevail on this argument, it would be in a substantially better position than it would have if PHICO had not become insolvent. The Default Judgment does not preclude WIGA from collecting from WMC, it only prevents PHICO from collection attempts.

[7] [¶ 15] We begin our review of the district court's ruling by considering the law governing the doctrine of res judicata, which bars re-litigation of previously litigated causes of action or claims. *CJ v. SA,* 2006 WY 49, ¶ 11, 132 P.3d 196, 202 (Wyo.2006). As the district court stated, four factors must exist for res judicata to apply: 1) the parties must be identical; 2) the subject matter must be identical; 3) the issues must be identical and relate to the same subject matter; and 4) the capacities of the persons must be identical in reference to both the subject matter and the issues between them. *Id.* The party asserting that res judicata applies must analyze the elements of the relevant doctrine by comparing the earlier proceeding and the present one. *Id.*

[8] [¶ 16] WMC acknowledges that PHICO was a party in the earlier proceeding and WIGA was not, and WIGA, not PHICO, is a party in the present action. WMC contends, however, the requirement that the parties be identical is satisfied because PHICO and WIGA are in privity with one another; that is, they have a close, significant connection and share a direct financial or proprietary interest. *Osborn,* ¶ 10, 145 P.3d at 1267. For purposes of applying res judicata, WMC asserts, the parties need not be identical but may be in privity with each other.

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

[¶ 17] As the basis for its assertion that WIGA and PHICO are in privity with each other, WMC cites the following provisions of the Insurance Guaranty Association Act:

— § 26–31–106(a)(ii), which states that WIGA shall "be deemed the insurer to the extent of its obligation of the covered claims and to that extent has all rights, duties and obligations of the insolvent insurer as if the insurer were not insolvent;"

— § 26–31–110(a), providing that WIGA "has no cause of action against the insolvent insurer's insured for any sums it has paid out except the causes of action as the insolvent insurer would have had if it had paid those sums;"

— § 26–31–108(d)(i)(D), stating that "notice of claims to the receiver or liquidator of the insolvent insurer shall be deemed notice to the association...."

**\*1066** [¶ 18] In addition to the statutory provisions, WMC cites this Court's statement in *Wyoming Ins. Guar. Ass'n v. Allstate Indemnity Co.,* 844 P.2d 464 (Wyo.1992) that WIGA steps into the shoes of an insolvent insurance company by assuming its obligations. WMC also contends WIGA and PHICO acted as if they stood in each other's shoes. WMC asserts that WIGA authorized PHICO to demand payment from WMC of the deductible amounts on WIGA's behalf; thus, by WIGA's own admission, it stands in the shoes of PHICO.

[9] [10] [11] [12] [13] [14] [¶ 19] We consider first the provisions of the Insurance Guaranty Association Act, keeping in mind that our review is governed by the following standards:

The paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

We have recognized that divergent opinions among parties as to the meaning of a statute may be evidence of ambiguity but is not conclusive. Ultimately, whether a statute is ambiguous is a matter of law to be determined by the court.

*Kennedy Oil v. Dep't of Revenue,* 2008 WY 154, ¶ 10, 205 P.3d 999, 1003 (Wyo.2008) (citations omitted).

[¶ 20] In construing specifically the Insurance Guaranty Association Act, we previously have said:

The purpose of the Act is to provide a mechanism for the payment of covered claims which avoids excessive delay in payment and avoids financial loss to claimants or insureds because of the insolvency of an insurer. The Act seeks to remedy the social consequences resulting from the insolvency of an insurer.... Therefore, as remedial legislation designed for the public's protection, this court must liberally construe the Act to achieve its purposes and strictly construe all exceptions to indemnification.

*Woods,* 888 P.2d at 195 (citations omitted).

[¶ 21] Section 26–31–106 sets out WIGA's duties and powers in relevant part as follows:

(a) Except as provided in subsection (c) of this section, [WIGA] shall:

(i) Be obligated to *pay covered claims:*

....

(ii) *Be deemed the insurer to the extent of its obligation of the covered claims* and to that extent has all rights, duties and obligations of the insolvent insurer as if the insurer were not insolvent;



**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

....

(c) Notwithstanding subsection (a) of this section, the association:

....

(iv) Is not obligated to pay a claimant an amount in excess of the obligation of the insolvent insurer under the policy or coverage from which the claim arises.

[¶ 22] Section 26–31–103(a)(ii) defines a "covered claim" for purposes of the Act as follows:

(ii) *"Covered claim" means an unpaid claim* which arises out of and is *within the coverage* and does not exceed the applicable limits *of an insurance policy* to which this chapter applies issued by an insurer, if the insurer is an insolvent insurer and the claimant or insured is a resident of this state at the time of the insured event or the property from which the claim arises is permanently located in this state, *but "covered claim" does not include:*

(A) *Any amount due any* reinsurer, *insurer,* insurance pool or underwriting association as subrogation recoveries or otherwise;

....

(D) *Supplementary payment obligation including* but not limited to adjustment fees and expenses, *attorney fees* and expenses, **\*1067** court costs, interest and bond premiums.

(Emphasis added).

[¶ 23] Pursuant to the plain language of § 26–31–106(a)(i), WIGA is obligated to pay "covered claims." "Covered claims" are those claims the insurer would have been obligated to pay but for its insolvency. Section 26–31–103(a)(ii). The term "covered claims" does not include "any amount due any insurer" nor does it include supplementary payment obligations, such as attorney fees. Section 26–31–103(a)(ii)(A) and (D). Giving this language its plain and ordinary meaning, it appears the legislature intended WIGA to pay only what an insurer would have paid had it remained solvent.

[¶ 24] The legislature's intent that WIGA be obligated to pay only what a solvent insurer would have been obligated to pay is further reflected in the plain language of § 26–31–106(a)(ii), stating that WIGA is "deemed the insurer *to the extent* of [the insurer's] obligation of the covered claims and *to that extent* has all rights, duties and obligations of the insolvent insurer *as if the insurer were not insolvent.*" Similarly, § 26–31–106(c)(iv) states that WIGA is not obligated to pay more than the insolvent insurer would have been obligated to pay. A solvent insurer would have been obligated to pay the claim amount less the deductible.

[¶ 25] Section 26–31–110 provides in relevant part as follows:

(a) Any person recovering under this chapter assigns his rights under the policy to the association to the extent of his recovery from the association. Any insured or claimant seeking the protection of this chapter shall cooperate with the association to the same extent as that person would have been required to cooperate with the insolvent insured. The association has no cause of action against the insolvent insurer's insured for any sums it has paid out except the causes of action as the insolvent insurer would have had it if had paid those sums.

Giving this language its plain and ordinary meaning, WIGA has no cause of action against an insured for any sums it has paid out except those the insurer would have had if it had been solvent.

[¶ 26] The plain and ordinary meaning of the statutory language clearly reflects that the legislature intended WIGA to be obligated to pay the claims against WMC to the same extent PHICO would have been had it not become insolvent. Had PHICO remained solvent, it would have been obligated to pay the claims less the deductibles. Pursuant to the terms of the insurance contract, WMC was required to pay the deductibles. Had WMC refused to pay the deductibles, it would have been



Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)

2010 WY 21

in breach of the insurance contract and a solvent PHICO could have sought recovery from WMC of the deductible amounts. WIGA's rights and duties are no more and no less than PHICO's would have been. Construing the statutory language otherwise would leave WMC in a better position as a result of WIGA's involvement than it would have been if PHICO had not been insolvent, a result we are not convinced the legislature intended.

[¶ 27] The parties have cited no case addressing an insurance guaranty association's right to reimbursement of deductibles it has paid after an insurer's insolvency, and we have found none. However, there is wide support for construing insurance guaranty association statutes, as we have, to mean that the rights and duties of such associations are limited to those explicitly set forth in the statutes. In *T & N PLC v. Pennsylvania Ins. Guar. Ass'n,* 800 F.Supp. 1259, 1263 (E.D.Pa.1992) (citations omitted), for example, the court stated:

> [T]he courts have construed the Insurance Guaranty Act broadly to effect the purposes of the Act and to guarantee the payment of covered claims. Where, however, "the Act explicitly denies a recovery ... or bars a cause of action ... [it] must be strictly construed." Thus, under the provisions of the Insurance Guaranty Act, it is clear that, contrary to T & N's contention, PIGA does not "stand in the shoes" of an insolvent insurer for all purposes.

Similarly, in *Nebraska Life & Health Ins. Guar. Ass'n. v. Dobias,* 247 Neb. 900, 531 N.W.2d 217, 220 (1995), the Court stated: "[A] guarantor is not the legal successor of **\*1068** the insolvent insurer. Rather, as a statutory creation, the guarantor is only liable to the extent provided by the statute creating the guarantor."

[¶ 28] Construing its Insurance Guarantee Act, the court in *Saylin v. Cal. Ins. Guar. Ass'n,* 179 Cal.App.3d 256, 224 Cal.Rptr. 493, 497 (1986) (citations omitted) concluded because:

> "covered claims" are not coextensive with an insolvent insurer's obligations under its policies, CIGA cannot and does not "stand in the shoes" of the insolvent insurer for all purposes. Indeed, CIGA is "expressly forbidden" to do so except where the claim at issue is a "covered claim."

Similarly, the court in *Virginia Property & Casualty Ins. Guaranty Ass'n v. International Ins. Co.,* 238 Va. 702, 385 S.E.2d 614, 616 (1989) stated:

> The Act, considered as a whole, clearly indicates that the General Assembly did not intend that the Association merely "step into the shoes" of the insolvent insurer.... [The Association] is not merely a solvent substitute for an insolvent insurance company....
>
> The insolvency of [the insurer] created a legal relationship between [the insured] and the Association which reflected the terms of the [insurance] policy only to the extent they were not otherwise limited by the Act."

[¶ 29] Thus, our conclusion that WIGA does not step into PHICO's shoes except to the extent provided in the Wyoming act, and is entitled to reimbursement of the deductibles just as PHICO would have been had it remained solvent, is consistent with other courts' interpretations of their insurance guaranty association acts. The 2004 default judgment declaring that PHICO breached the insurance contract and WMC was not obligated to pay the deductible amounts to PHICO does not change this result. The default judgment was entered after and as a result of PHICO's insolvency. The judgment declaring that PHICO's insolvency constituted a breach of contract relieving WMC of the duty to pay PHICO has no effect upon WIGA's statutory rights and duties, which are limited expressly to those PHICO would have had *if it were not insolvent.* But for its insolvency, PHICO would have been required to pay the claims against WMC and WMC would have been obligated to pay the deductible amounts.

[¶ 30] The doctrine of res judicata simply does not apply to bar WIGA's claim. WIGA was not a party to WMC's earlier action against PHICO nor does WIGA stand in the shoes of PHICO so that the judgment relieving WMC from paying the deductibles to the insolvent PHICO likewise relieves WMC from paying the deductibles to WIGA. PHICO breached its insurance contract with WMC and upon its breach WMC was relieved of paying PHICO. WIGA did not have or breach any contract with WMC and the default judgment declaring that PHICO breached the contract did not pertain in any way to WIGA.

[¶ 31] Unlike WMC's action against PHICO, WIGA filed its action against WMC pursuant to the Insurance Guaranty Act

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

seeking payment from WMC for amounts WIGA paid on claims against WMC beyond what a solvent PHICO would have been obligated to pay. WIGA and PHICO are not identical and were not in privity so as to make it appropriate to apply the default judgment in the breach of contract action against WIGA to bar its claim under the Insurance Guaranty Act. The subject matter of the earlier action was whether PHICO breached the insurance contract and WMC was relieved from paying PHICO the deductible amounts. The subject matter of the present action was whether WIGA was entitled to recover the deductible amounts from WMC under the Insurance Guaranty Act as PHICO could have done had it remained solvent. PHICO's capacity in the breach of contract action was different from WIGA's capacity in the statutory action and their capacities were different in terms of their entitlement to payment after PHICO's insolvency of the deductible amounts. We affirm the district court's order granting summary judgment to WIGA on its complaint.

[15] [¶ 32] We turn to consideration of WMC's contention that the district court erred in granting summary judgment to **\*1069** WIGA on its counter-claim for a set-off against the judgment in the amount of attorney fees. After PHICO's insolvency, WMC paid the attorney fees at issue directly to the law firm for services it provided in defending WMC against claims covered under the insurance policy. WMC asserts that but for the insolvency PHICO would have been required to reimburse WMC for attorney fees it paid directly to its attorneys for defending the claims. Likewise, WMC contends, WIGA is obligated for the attorney fees and a set-off against the judgment is an appropriate way to accomplish that.

[¶ 33] The district court found that the attorney fees at issue were incurred prior to PHICO's insolvency. The district court held that they were not "covered claims" under § 26–31–103(a)(ii)(D), which expressly excludes attorney fees. Because WIGA is responsible only for covered claims, which does not include attorney fees, the district court concluded WIGA was not responsible for the attorney fees.

[¶ 34] WMC contends the district court's holding is incorrect because the legislature would not have intended to exclude from "covered claims" the attorney fees the insurer would have been obligated to pay had it remained solvent. Looking at the language of § 26–31–103(a)(ii)(D) excluding "supplementary payment obligation including ... attorney's fees," WMC contends it must mean attorney fees arising out of something besides the insurance contract itself, for example, an attorney fees award in a bad faith action. WMC asserts the words do not mean to exclude from covered claims attorney fees it incurred in the defense of claims covered by the policy.

[¶ 35] WIGA contends the language is clear that attorney fees are excluded from "covered claims." Both parties acknowledge they have found no cases involving language identical to § 26–31–103(a)(ii)(D). However, WIGA cites *Scherer v. Texas Property and Cas. Ins. Guar. Ass'n,* 958 S.W.2d 413 (Tex.Ct.App.1997), in which the court construed the Texas guaranty association statute, which excluded from the definition of covered claims "supplementary payment obligations, including ... attorney's fees ... incurred prior to the determination that an insurer is [insolvent]." Except for the fact that the Texas provision expressly excludes attorney fees incurred prior to the determination of insolvency, and the Wyoming provision appears to exclude all attorney fees, the provisions are identical.

[¶ 36] In *Scherer,* the insureds asserted that because their policy included a duty to defend them from suit and that duty was not fulfilled, their claim for attorney fees reimbursement was within the policy terms and was not a supplementary payment obligation. Like WMC, the insureds in *Scherer* contended the exclusion related solely to other attorney fees not covered by the policy's "duty to defend" clause. The Texas court concluded the statutory language precluded the insureds' recovery of attorney fees, stating that the Texas guaranty act "shows the legislature capable of drawing stark lines with limited exceptions regarding what types of claims and what amounts are compensable." *Id.* at 414. The court concluded the exclusion applied to all attorney fees incurred before the insurer's insolvency for which it would have been liable. *Id.*

[¶ 37] The Wyoming Insurance Guaranty Association Act reflects that our legislature is also capable of drawing the line between what is covered and what is not. As we have said, it is clear the legislature intended WIGA's rights and duties to be defined by the statutes and not to be defined by an insurance policy. Section 26–31–106(a)(i) makes it clear WIGA is obligated to pay covered claims. Section 26–31–103(a)(ii) defines "covered claims" as unpaid claims arising out of and within the coverage of an insurance policy. Section 26–31–103(a)(ii)(D) clearly excludes from "covered claims" supplementary payment obligations, including attorney fees. Giving the statutory language its plain and ordinary meaning, we conclude the legislature intended to exclude attorney fees from the definition of "covered claim." Because § 26–31–106(a)(i) and (ii) provide that WIGA is obligated to pay "covered claims" and is deemed the insurer to the extent of its obligation for the covered claims, we conclude the legislature did not **\*1070** intend for WIGA to be obligated for attorney

**Wyoming Medical Center, Inc. v. Wyoming Ins. Guar. Ass'n, 225 P.3d 1061 (2010)**

2010 WY 21

fees.

[¶ 38] To construe the statutory language as WMC would have us do would require us to ignore the plain language chosen by the legislature. We have said before that the omission of words from a statute is considered to be an intentional act by the legislature and we will not read words into a statute when the legislature has chosen not to include them. *Kennedy,* ¶ 14, 205 P.3d at 1004. When statutory words are clear and unambiguous, a court risks an impermissible substitution of its own views, or those of others, for the intent of the legislature if any effort is made to interpret or construe statutes on any basis other than the language invoked by the legislature. *Id.* The definition of "covered claims" the legislature adopted expressly excludes attorney fees. Absent a clear indication that the legislature did not intend the statute to mean what it says, we conclude WIGA was not responsible for WMC's attorney fees.

[¶ 39] We affirm the district court's orders granting summary judgment in favor of WIGA.

**Parallel Citations**

2010 WY 21

**End of Document**                                         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

40 Pa. Cons. Stat. § 221.23a

Purdon's Pennsylvania Statutes and Consolidated Statutes
    Title 40 P.S. Insurance (Refs & Annos)
        Chapter 1. Insurance Department (Refs & Annos)
            Article V. Suspension of Business--Involuntary Dissolutions (Refs & Annos)
                (c) Formal Proceedings
                    B. Liquidation
                        2. Powers and Duties of Liquidators and Others

40 P.S. § **221.23a**

§ **221.23a**. Policyholder collateral, deductible reimbursements and other policyholder obligations
Effective: June 28, 2004
Currentness

(a) Collateral shall not be considered an asset of the estate and shall be maintained and administered by the receiver as provided in this section, notwithstanding any other provision of law or contract to the contrary.

(b) Subject to the provisions of this section, the collateral shall be used to secure the policyholder's obligation to fund or reimburse claims payment within the agreed deductible amount.

(c) If a claim that is subject to a deductible agreement and secured by collateral is not covered by any guaranty association and the policyholder is unwilling or unable to take over the handling and payment of the non-covered claims, the receiver shall adjust and pay the non-covered claims utilizing the collateral but only to the extent the available collateral, after allocation under subsection (d), is sufficient to pay all outstanding and anticipated claims. A claim against the collateral by a third-party claimant is not a claim against the insolvent insurer's estate for the purposes of releasing the policyholder to the extent of applicable policy coverage. If the collateral is exhausted and the insured is not able to provide funds to pay the remaining claims within the deductible after all collection means against the insured have been exhausted, the receiver's obligation to pay such claims from the collateral terminates, and the remaining claims shall be claims against the insurer's estate subject to complying with other provisions of this article for the filing and allowance of claims. When the liquidator determines the collateral provided by the insured is insufficient to pay all additional and anticipated claims against the insured, the liquidator may file a plan for equitably allocating the collateral among claimants of the insured which provided the collateral, subject to court approval.

(d) To the extent that the receiver is holding collateral that secures other obligations of the policyholder to pay the insurer directly or indirectly amounts that will become assets of the estate, such as reinsurance obligations under a captive reinsurance program or premium obligations under a retrospectively rated insurance policy where the premium due is subject to adjustment based upon actual loss experience, the receiver shall equitably allocate the collateral among such obligations and administer the collateral allocated to the deductible agreement pursuant to this section. With respect to the collateral allocated to obligations under the deductible agreement, if the collateral-secured reimbursement obligations are under more than one line of insurance, then the collateral shall be equitably allocated among the various lines based upon the estimated ultimate exposure within the deductible amount for each line. The receiver shall inform the guaranty associations of the method and details of all the foregoing allocations.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

(e) Regardless of whether there is collateral, if the insurer has contractually agreed to allow the policyholder to fund its own claims within the deductible amount pursuant to a deductible agreement either through the policyholder's own administration of its claims or through the policyholder providing funds directly to a third-party administrator who administers the claims, the receiver shall allow such funding arrangement to continue and, where applicable, will enforce such arrangements to the fullest extent possible. The funding of such claims by the policyholder within the deductible amount will act as a bar to a claim for such amount in the liquidation proceeding, including, but not limited to, a claim by the policyholder or the third-party claimant. The funding will extinguish both the obligation, if any, of any guaranty association to pay such claims within the deductible amount, as well as the obligation, if any, of the policyholder or the third-party administrator to reimburse the guaranty association. No charge of any kind shall be made against a guaranty association on the basis of the policyholder funding of claims payment made pursuant to the mechanism set forth in this subsection.

(f) (1) If the insurer has not contractually agreed to allow the policyholder to fund its own claims within the deductible amount, to the extent a guaranty association is required by applicable State law to pay any claims for which the insurer would have been entitled to reimbursement from the policyholder under the terms of the deductible agreement and to the extent the claims have not been paid by the policyholder or by a third party, the receiver shall promptly bill the policyholder for such reimbursement, and the policyholder will be obligated to pay such amount to the receiver for the benefit of the guaranty associations who paid such claims. Neither the insolvency of the insurer nor its inability to perform any of its obligations under the deductible agreement shall be a defense to the policyholder's reimbursements obligation under the deductible agreement. When the policyholder reimbursements are collected, the receiver shall promptly reimburse such guaranty association for claims paid that were subject to the deductible. If the policyholder fails to pay the amounts due within sixty days after such bill for such reimbursements is due, the receiver shall use the collateral to the extent necessary to reimburse the guaranty association and, at the same time, may pursue other collections efforts against the policyholder. If the policyholder reimbursements are not collected due to the reduction in such reimbursements as provided in paragraph (2), the receiver shall nonetheless reimburse such guaranty association as if such reimbursements had been collected. The receiver will obtain funds to reimburse a guaranty association claim affected by paragraph (2) by subtracting from funds collected by the receiver for other policyholder claim reimbursements under this paragraph amounts sufficient to reimburse the guaranty association affected by the application of paragraph (2). Subtraction of funds shall be made against all guaranty associations, including the guaranty association affected by paragraph (2) on the basis of the ratio stated in paragraph (3). If more than one guaranty association has a claim against the same collateral and the available collateral, after allocation under subsection (d), along with billing and collection efforts, are together insufficient to pay each guaranty association in full, then the receiver will prorate payments to each guaranty association based upon the proportion of the amount of claims each guaranty association has paid bears to the total of all claims paid by such guaranty associations.

(2) The obligation of a policyholder arising solely from a deductible agreement to reimburse the receiver for the benefit of one or more guaranty associations under paragraph (1) for losses paid by one or more guaranty associations shall be reduced by the amount of premium paid by or on behalf of the policyholder for one or more policies issued by a wholly owned affiliate or subsidiary of the insurer, which affiliate or subsidiary was either licensed to do business in this Commonwealth or was an eligible surplus lines insurer under Article XVI of the act of May 17, 1921 (P.L. 682, No. 284),[1] known as "The Insurance Company Law of 1921," at the time of the issuance of such policies where such policies were purchased to fund the policyholder's obligation to reimburse the insurer for deductibles under the deductible agreement, but in no event shall the reduction in liability be less than ninety per centum of the total premiums paid to the insurer and such affiliate or subsidiary for such policies and coverage provided under the related deductible agreement, provided that the policyholder's reimbursement obligation shall be reduced only if: (i) the wholly owned affiliate or subsidiary was merged into the insurer that was a party to the deductible agreement before the entry of a liquidation order against the insurer; (ii) the merger was approved by the commissioner; and (iii) the merger took place before the enactment of this section.

(3) The reduction as a result of paragraph (2) in the amount of deductible reimbursements that one or more guaranty associations would have been entitled to claim from a policyholder of the insurer under paragraph (1) shall be allocated by the receiver pursuant to this paragraph pro rata among all guaranty associations receiving deductible reimbursements under paragraph (1). The pro rata allocation among guaranty associations shall be based upon the ratio of: (i) claims paid and to be paid as estimated

by each guaranty association that are referred to in paragraph (1) to (ii) the total amount of claims paid and to be paid estimated by all the guaranty associations that are referred to in paragraph (1). Amounts used for the pro rata allocation shall be determined after giving effect to the provisions referred to in subsection (k) relating to insured net worth.

(4) Any claim of the policyholder under one or more policies issued by the affiliate or subsidiary as described in paragraph (2) is hereby waived except for those claims under policies that are not paid by a guaranty association as a covered claim or amounts the policyholder has reimbursed a guaranty association under Article XVIII[2] of "The Insurance Company Law of 1921" or similar laws in other states.

(g) If the insurer has not contractually agreed to allow the policyholder to fund its own claims within the deductible amount and a deductible reimbursement policy is present, to the extent a guaranty association is required by applicable State law to pay any claims for which the insurer would have been entitled to reimbursement under the deductible reimbursement policy and to the extent the claims have not been paid by the policyholder or by a third party, the receiver shall first make a good faith attempt to recover reimbursements or collateral under the deductible reimbursement policy. Any resulting recoveries under the deductible reimbursement policy shall by payable to the guaranty associations to the extent of claims paid within the deductible. To the extent the receiver is unable in whole or in part to recover first under the deductible reimbursement policy for claims paid by the guaranty associations, the receiver shall promptly bill the policyholder for the reimbursement, and the policyholder will be obligated to pay the amount to the receiver for the benefit of the guaranty associations who paid the claims. The policyholder shall retain any and all defenses that may be asserted in connection with the receiver's efforts to collect reimbursements from the policyholder.

(h) If the insurer has not contractually agreed to allow the policyholder to fund its own claims within the deductible amount and a deductible reimbursement policy is present and if a guaranty association is not paying claims for any reason for which the insurer would have been entitled to reimbursement under the deductible reimbursement policy, to the extent claims covered under a deductible reimbursement policy have been paid by the policyholder and sufficient information on the payments has been provided by the policyholder to the receiver for purposes of billing under the deductible reimbursement policy, the receiver shall make a good faith attempt to recover reimbursements or collateral under the deductible reimbursement policy from the insurer of the deductible reimbursement policy. Any resulting recoveries under the deductible reimbursement policy shall be payable to the policyholder.

(i) Receiver's duties and powers:

(1) The receiver is entitled to deduct from reimbursements owed to guaranty associations and/or policyholders under this section or collateral to be returned to a policyholder reasonable actual expenses incurred in fulfilling the responsibilities under this provision, not to exceed three per centum of the collateral or the total deductible reimbursements actually collected by the receiver.

(2) With respect to claim payments made by any guaranty associations, the receiver shall promptly provide the guaranty associations with a complete accounting of the receiver's deductible billing and collection activities, including, but not limited to, copies of the policyholder billings when rendered, the reimbursements collected, the available amounts and use of collateral for each account and any proration of payments when it occurs. The receiver's costs of accounting shall be included with expenses referred to under this subsection and, together with other reasonable actual expenses, be subject to the overall limit called for by this subsection. If the receiver fails to make a good faith effort within one hundred twenty days of receipt of claims payment reports to collect reimbursements due from a policyholder under a deductible agreement based on claim payments made by one or more guaranty associations, then after such one-hundred-twenty-day-period such guaranty associations may pursue

<mark>collection from the policyholders directly on the same basis as the receiver and with the same rights and remedies and will report any amounts so collected from each policyholder to the receiver.</mark> To the extent that guaranty associations pay claims within the deductible amount but are not reimbursed by either the receiver under this section or by policyholder payments from the guaranty association's own collection efforts, the guaranty association shall have a claim in the insolvent insurer's estate for such unreimbursed claims payments.

(3) The receiver shall periodically adjust the collateral being held while the claims subject to the deductible agreement are run off, provided that adequate collateral is maintained to secure the entire estimated ultimate obligation of the policyholder plus a reasonable safety factor, and the receiver shall not be required to adjust the collateral more than once a year. The guaranty associations and the policyholder shall be informed of all such collateral reviews, including, but not limited to, the basis for the adjustment. Once all claims covered by the collateral have been paid and the receiver is satisfied that no new claims can be presented, the receiver will release any remaining collateral to the policyholder.

(j) The Commonwealth Court shall have jurisdiction to resolve disputes arising under this section.

(k) Nothing in this section is intended to limit or adversely affect any right the guaranty associations may have under applicable State law to obtain reimbursement from certain classes of policyholders for claims payments made by such guaranty associations under policies of the insolvent insurer, or for related expenses the guaranty associations incur.

<mark>(l) This section will apply to all delinquency proceedings which are open and pending as of the effective date of this section.</mark>

(m) This section shall not apply to first party claims, or to claims funded by a guaranty association net of the deductible unless subsection (e) applies.

(n) For purposes of this section, the following terms shall have the meanings given to them in this subsection:

"Collateral" shall mean collateral held by, for the benefit of or assigned to the insurer or subsequently to the receiver in order to secure the obligations of a policyholder under a deductible agreement and also any collateral recovered or held by the receiver that secured the obligations of a policyholder under a deductible reimbursement policy.

"Deductible agreement" shall include any combination of one or more policies, endorsements, contracts or security agreements which provide for the policyholder to bear the risk of loss within a specified amount per each claim or occurrence covered under a policy of insurance and may be subject to aggregate limit of policyholder reimbursement obligations as set forth in an endorsement to a policy or in a program agreement.

"Deductible reimbursement policy" shall mean a policy other than one referred to in subsection (f)(2), purchased by the policyholder to secure the policyholder's obligation to reimburse the insurer for deductibles under the deductible agreement.

"Non-covered claims" shall mean a claim that is subject to a deductible agreement, may be secured by collateral and is not covered by a guaranty association.

**Credits**

1921, May 17, P.L. 789, art. V, § 523.1, added 2004, June 28, P.L. 443, No. 46, § 1, imd. effective.

Footnotes

1    40 P.S. § 991.1601 et seq.

2    40 P.S. § 991.1801 et seq.

40 P.S. § <mark>221</mark>.<mark>23a</mark>, PA ST 40 P.S. § <mark>221</mark>.<mark>23a</mark>

Current through 2014 Regular Session Acts 1 to 84

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

2004 Pa. Legis. Serv. 2004-46 (S.B. No. 815)

2004 Pa. Legis. Serv. Act 2004-46 (S.B. 815) (PURDON'S)

PENNSYLVANIA 2004 LEGISLATIVE SERVICE
One Hundred Eighty-Eighth Regular Session of the General Assembly

Additions are indicated by Text; deletions by
Text. Changes in tables are made but not highlighted.

ACT NO. 2004–46
S.B. No. 815
INSURANCE—LIQUIDATIONS—POLICYHOLDER COLLATERAL

AN ACT Amending the act of May 17, 1921 (P.L. 789, No. 285), entitled, as amended, "An act relating to insurance; establishing an insurance department; and amending, revising, and consolidating the law relating to the licensing, qualification, regulation, examination, suspension, and dissolution of insurance companies, Lloyds associations, reciprocal and inter–insurance exchanges, and certain societies and orders, the examination and regulation of fire insurance rating bureaus, and the licensing and regulation of insurance agents and brokers; the service of legal process upon foreign insurance companies, associations or exchanges; providing penalties, and repealing existing laws," providing for policyholder collateral, for deductible reimbursements and for other policyholder obligations.

The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows:

Section 1. The act of May 17, 1921 (P.L. 789, No. 285), known as The Insurance Department Act of 1921, is amended by adding a section to read:

<< PA ST 40 P.S. § 221.23a >>

Section 523.1. Policyholder Collateral, Deductible Reimbursements and Other Policyholder Obligations [1]

  (a) Collateral shall not be considered an asset of the estate and shall be maintained and administered by the receiver as provided in this section, notwithstanding any other provision of law or contract to the contrary.
  (b) Subject to the provisions of this section, the collateral shall be used to secure the policyholder's obligation to fund or reimburse claims payment within the agreed deductible amount.
  (c) If a claim that is subject to a deductible agreement and secured by collateral is not covered by any guaranty association and the policyholder is unwilling or unable to take over the handling and payment of the non-covered claims, the receiver shall adjust and pay the non-covered claims utilizing the collateral but only to the extent the available collateral, after allocation under subsection (d), is sufficient to pay all outstanding and anticipated claims. A claim against the collateral by a third-party claimant is not a claim against the insolvent insurer's estate for the purposes of releasing the policyholder to the extent of applicable policy coverage. If the collateral is exhausted and the insured is not able to provide funds to pay the remaining claims within the deductible after all collection means against the insured have been exhausted, the receiver's obligation to pay such claims from the collateral terminates, and the remaining claims shall be claims against the insurer's estate subject to complying with other provisions of this article for the filing and allowance of claims. When the liquidator determines the collateral provided by the insured is insufficient to pay all additional and anticipated claims against the insured, the liquidator may file a plan for equitably allocating the collateral among claimants of the insured which provided the collateral, subject to court approval.
  (d) To the extent that the receiver is holding collateral that secures other obligations of the policyholder to pay the insurer directly or indirectly amounts that will become assets of the estate, such as reinsurance obligations under

a captive reinsurance program or premium obligations under a retrospectively rated insurance policy where the premium due is subject to adjustment based upon actual loss experience, the receiver shall equitably allocate the collateral among such obligations and administer the collateral allocated to the deductible agreement pursuant to this section. With respect to the collateral allocated to obligations under the deductible agreement, if the collateral-secured reimbursement obligations are under more than one line of insurance, then the collateral shall be equitably allocated among the various lines based upon the estimated ultimate exposure within the deductible amount for each line. The receiver shall inform the guaranty associations of the method and details of all the foregoing allocations.

 (e) Regardless of whether there is collateral, if the insurer has contractually agreed to allow the policyholder to fund its own claims within the deductible amount pursuant to a deductible agreement either through the policyholder's own administration of its claims or through the policyholder providing funds directly to a third-party administrator who administers the claims, the receiver shall allow such funding arrangement to continue and, where applicable, will enforce such arrangements to the fullest extent possible. The funding of such claims by the policyholder within the deductible amount will act as a bar to a claim for such amount in the liquidation proceeding, including, but not limited to, a claim by the policyholder or the third-party claimant. The funding will extinguish both the obligation, if any, of any guaranty association to pay such claims within the deductible amount, as well as the obligation, if any, of the policyholder or the third-party administrator to reimburse the guaranty association. No charge of any kind shall be made against a guaranty association on the basis of the policyholder funding of claims payment made pursuant to the mechanism set forth in this subsection.

 (f) (1) If the insurer has not contractually agreed to allow the policyholder to fund its own claims within the deductible amount, to the extent a guaranty association is required by applicable State law to pay any claims for which the insurer would have been entitled to reimbursement from the policyholder under the terms of the deductible agreement and to the extent the claims have not been paid by the policyholder or by a third party, the receiver shall promptly bill the policyholder for such reimbursement, and the policyholder will be obligated to pay such amount to the receiver for the benefit of the guaranty associations who paid such claims. Neither the insolvency of the insurer nor its inability to perform any of its obligations under the deductible agreement shall be a defense to the policyholder's reimbursements obligation under the deductible agreement. When the policyholder reimbursements are collected, the receiver shall promptly reimburse such guaranty association for claims paid that were subject to the deductible. If the policyholder fails to pay the amounts due within sixty days after such bill for such reimbursements is due, the receiver shall use the collateral to the extent necessary to reimburse the guaranty association and, at the same time, may pursue other collections efforts against the policyholder. If the policyholder reimbursements are not collected due to the reduction in such reimbursements as provided in paragraph (2), the receiver shall nonetheless reimburse such guaranty association as if such reimbursements had been collected. The receiver will obtain funds to reimburse a guaranty association claim affected by paragraph (2) by subtracting from funds collected by the receiver for other policyholder claim reimbursements under this paragraph amounts sufficient to reimburse the guaranty association affected by the application of paragraph (2). Subtraction of funds shall be made against all guaranty associations, including the guaranty association affected by paragraph (2) on the basis of the ratio stated in paragraph (3). If more than one guaranty association has a claim against the same collateral and the available collateral, after allocation under subsection (d), along with billing and collection efforts, are together insufficient to pay each guaranty association in full, then the receiver will prorate payments to each guaranty association based upon the proportion of the amount of claims each guaranty association has paid bears to the total of all claims paid by such guaranty associations.

 (2) The obligation of a policyholder arising solely from a deductible agreement to reimburse the receiver for the benefit of one or more guaranty associations under paragraph (1) for losses paid by one or more guaranty associations shall be reduced by the amount of premium paid by or on behalf of the policyholder for one or more policies issued by a wholly owned affiliate or subsidiary of the insurer, which affiliate or subsidiary was either licensed to do business in this Commonwealth or was an eligible surplus lines insurer under Article XVI of the act of May 17, 1921 (P.L. 682, No. 284), known as "The Insurance Company Law of 1921," at the time of the issuance of such policies where such policies were purchased to fund the policyholder's obligation to reimburse

the insurer for deductibles under the deductible agreement, but in no event shall the reduction in liability be less than ninety per centum of the total premiums paid to the insurer and such affiliate or subsidiary for such policies and coverage provided under the related deductible agreement, provided that the policyholder's reimbursement obligation shall be reduced only if: (i) the wholly owned affiliate or subsidiary was merged into the insurer that was a party to the deductible agreement before the entry of a liquidation order against the insurer; (ii) the merger was approved by the commissioner; and (iii) the merger took place before the enactment of this section.

 (3) The reduction as a result of paragraph (2) in the amount of deductible reimbursements that one or more guaranty associations would have been entitled to claim from a policyholder of the insurer under paragraph (1) shall be allocated by the receiver pursuant to this paragraph pro rata among all guaranty associations receiving deductible reimbursements under paragraph (1). The pro rata allocation among guaranty associations shall be based upon the ratio of: (i) claims paid and to be paid as estimated by each guaranty association that are referred to in paragraph (1) to (ii) the total amount of claims paid and to be paid estimated by all the guaranty associations that are referred to in paragraph (1). Amounts used for the pro rata allocation shall be determined after giving effect to the provisions referred to in subsection (k) relating to insured net worth.

 (4) Any claim of the policyholder under one or more policies issued by the affiliate or subsidiary as described in paragraph (2) is hereby waived except for those claims under policies that are not paid by a guaranty association as a covered claim or amounts the policyholder has reimbursed a guaranty association under Article XVIII of "The Insurance Company Law of 1921" or similar laws in other states.

 (g) If the insurer has not contractually agreed to allow the policyholder to fund its own claims within the deductible amount and a deductible reimbursement policy is present, to the extent a guaranty association is required by applicable State law to pay any claims for which the insurer would have been entitled to reimbursement under the deductible reimbursement policy and to the extent the claims have not been paid by the policyholder or by a third party, the receiver shall first make a good faith attempt to recover reimbursements or collateral under the deductible reimbursement policy. Any resulting recoveries under the deductible reimbursement policy shall by payable to the guaranty associations to the extent of claims paid within the deductible. To the extent the receiver is unable in whole or in part to recover first under the deductible reimbursement policy for claims paid by the guaranty associations, the receiver shall promptly bill the policyholder for the reimbursement, and the policyholder will be obligated to pay the amount to the receiver for the benefit of the guaranty associations who paid the claims. The policyholder shall retain any and all defenses that may be asserted in connection with the receiver's efforts to collect reimbursements from the policyholder.

 (h) If the insurer has not contractually agreed to allow the policyholder to fund its own claims within the deductible amount and a deductible reimbursement policy is present and if a guaranty association is not paying claims for any reason for which the insurer would have been entitled to reimbursement under the deductible reimbursement policy, to the extent claims covered under a deductible reimbursement policy have been paid by the policyholder and sufficient information on the payments has been provided by the policyholder to the receiver for purposes of billing under the deductible reimbursement policy, the receiver shall make a good faith attempt to recover reimbursements or collateral under the deductible reimbursement policy from the insurer of the deductible reimbursement policy. Any resulting recoveries under the deductible reimbursement policy shall be payable to the policyholder.

 (i) Receiver's duties and powers:

 (1) The receiver is entitled to deduct from reimbursements owed to guaranty associations and/or policyholders under this section or collateral to be returned to a policyholder reasonable actual expenses incurred in fulfilling the responsibilities under this provision, not to exceed three per centum of the collateral or the total deductible reimbursements actually collected by the receiver.

 (2) With respect to claim payments made by any guaranty associations, the receiver shall promptly provide the guaranty associations with a complete accounting of the receiver's deductible billing and collection activities, including, but not limited to, copies of the policyholder billings when rendered, the reimbursements collected, the available amounts and use of collateral for each account and any proration of payments when it occurs. The receiver's costs of accounting shall be included with expenses referred to under this subsection and, together

with other reasonable actual expenses, be subject to the overall limit called for by this subsection. If the receiver fails to make a good faith effort within one hundred twenty days of receipt of claims payment reports to collect reimbursements due from a policyholder under a deductible agreement based on claim payments made by one or more guaranty associations, then after such one-hundred-twenty-day-period such guaranty associations may pursue collection from the policyholders directly on the same basis as the receiver and with the same rights and remedies and will report any amounts so collected from each policyholder to the receiver. To the extent that guaranty associations pay claims within the deductible amount but are not reimbursed by either the receiver under this section or by policyholder payments from the guaranty association's own collection efforts, the guaranty association shall have a claim in the insolvent insurer's estate for such unreimbursed claims payments.

(3) The receiver shall periodically adjust the collateral being held while the claims subject to the deductible agreement are run off, provided that adequate collateral is maintained to secure the entire estimated ultimate obligation of the policyholder plus a reasonable safety factor, and the receiver shall not be required to adjust the collateral more than once a year. The guaranty associations and the policyholder shall be informed of all such collateral reviews, including, but not limited to, the basis for the adjustment. Once all claims covered by the collateral have been paid and the receiver is satisfied that no new claims can be presented, the receiver will release any remaining collateral to the policyholder.

(j) The Commonwealth Court shall have jurisdiction to resolve disputes arising under this section.

(k) Nothing in this section is intended to limit or adversely affect any right the guaranty associations may have under applicable State law to obtain reimbursement from certain classes of policyholders for claims payments made by such guaranty associations under policies of the insolvent insurer, or for related expenses the guaranty associations incur.

(l) This section will apply to all delinquency proceedings which are open and pending as of the effective date of this section.

(m) This section shall not apply to first party claims, or to claims funded by a guaranty association net of the deductible unless subsection (e) applies.

(n) For purposes of this section, the following terms shall have the meanings given to them in this subsection:

"Collateral" shall mean collateral held by, for the benefit of or assigned to the insurer or subsequently to the receiver in order to secure the obligations of a policyholder under a deductible agreement and also any collateral recovered or held by the receiver that secured the obligations of a policyholder under a deductible reimbursement policy.

"Deductible agreement" shall include any combination of one or more policies, endorsements, contracts or security agreements which provide for the policyholder to bear the risk of loss within a specified amount per each claim or occurrence covered under a policy of insurance and may be subject to aggregate limit of policyholder reimbursement obligations as set forth in an endorsement to a policy or in a program agreement.

"Deductible reimbursement policy" shall mean a policy other than one referred to in subsection (f)(2), purchased by the policyholder to secure the policyholder's obligation to reimburse the insurer for deductibles under the deductible agreement.

"Non-covered claims" shall mean a claim that is subject to a deductible agreement, may be secured by collateral and is not covered by a guaranty association.

Section 2. This act shall take effect immediately.

Approved June 28, 2004.

[1] 40 P.S. § 221.23a.

# **TAB 8**

*Canal Ins. Co. v. Pro Search*, 648 S.E.2d 497, 498 (Ga. Ct. App. 2007)

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** [Williams Service Group, LLC v. National Union Fire Ins. Co. of Pittsburgh,](link) N.D.Ga., June 20, 2011

286 Ga.App. 164
Court of Appeals of Georgia.

CANAL INSURANCE COMPANY

v.

PRO SEARCH et al.

No. A07A0477. | June 26, 2007. | Certiorari Denied Nov. 5, 2007.

**Synopsis**

**Background:** Workers' compensation insurance carrier brought action against insured to recover amounts that carrier paid regarding insured's deductibles. The State Court, Cobb County, [Collins](link), J., granted insured's motion for summary judgment. Carrier appealed.

**[Holding:]** The Court of Appeals, [Andrews](link), P.J., held that claim accrued, and limitations period began to run, when carrier demanded reimbursement.

Reversed.

West Headnotes (3)

**[1]** **Limitation of Actions** 🔑 Demand for Performance of Contract

Workers' compensation insurance carrier's breach-of-contract claim against insured, which allegedly failed to reimburse carrier for carrier's payment of insured's deductibles, accrued, and limitations period began to run, when carrier demanded reimbursement, not 30 days after payment on deductible was made by carrier; policy provided that insured was required to reimburse carrier within 30 days after carrier sent notice that payment was due.

[Cases that cite this headnote](link)

**[2]** **Limitation of Actions** 🔑 Liability Payable on Demand

Where a debt is not at once due and no time is specified for its payment, it is due and payable in a reasonable time or upon demand subsequently made, and the statute of limitations does not begin to run until after demand.

[1 Cases that cite this headnote](link)

**[3]** **Limitation of Actions** 🔑 Time for Making Demand

For purposes of statute of limitations regarding debt that is not at once due and no time is specified for its payment, demand for payment, which begins limitations period, must be made within a reasonable time, which is ordinarily the period of the statute of limitations, but where the parties contemplated a delay in making the demand to some indefinite time in the future, the statutory period for bringing the action is not controlling as to the question of reasonable time.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*497** Brian D. Hardison, Powder Springs, for appellant.

Proctor, Chambers & Hutchins, Robert J. Proctor, Bradley A. Hutchins, Adam C. Caskey, Carlock, Copeland, Semler & Stair, Edward T. McAfee, Atlanta, for appellees.

**Opinion**

ANDREWS, Presiding Judge.

**\*164** Canal Insurance Company appeals from the trial court's grant of Pro Search and Pro Temps's (Pro Search) motion for summary judgment. The trial court held that Canal's claim for amounts due under its contract to provide workers' compensation insurance to Pro Search was barred by the statute of limitation. Because the law in Georgia is that the statute of limitation begins to run at the time contemplated by the contract, which in this case is 30 days after notice was sent of the amount due, we reverse.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56(c)." *Matjoulis v. Integon Gen. Ins. Corp.,* 226 Ga.App. 459(1), 486 S.E.2d 684 (1997). We review the grant or denial of summary judgment de novo, construing the evidence in favor of the nonmovant. Id.

Although Canal's brief on appeal is lacking and fails to provide any record cites whatsoever, it appears that the underlying facts in this case are largely undisputed. [1] The record shows that Canal and Pro Search contracted for Canal to provide workers' compensation insurance for Pro Search beginning on June 9, 1997. The policy at issue provided that Canal would pay the applicable $2,500 deductible on each claim, and would in turn bill Pro Search for reimbursement. Canal billed Pro Search $42,755.54 on November 25, 2002. Pro **\*\*498** Search refused to pay and Canal sued. Pro Search moved for summary judgment, contending that the statute of limitation had run on the claim. The trial court granted the motion and this appeal followed.

[1] Pro Search acknowledged that it did not dispute the amount of the claim.

The contract between Canal and Pro Search provided: "We will pay the deductible amount for you to the claimant or provider of services, but you must reimburse us within 30 days after we sent you notice that payment is due."

**[1]** **\*165** Accordingly, the issue is when does the statute of limitation begin to run against an action on a contract which contemplates an actual demand. The trial court held that the statute of limitation began to run 30 days after each payment on the deductible was made by Canal, because Canal could have "successfully brought suit within 30 days of payment to the medical providers as to each claim." This is incorrect. Under the clear language of the contract, payment was not due until 30 days after Canal sent notice to Pro Search of the amount due. Accordingly, there could have been no suit under the contract until notice was sent.

**[2]** **[3]** "Where a debt is not at once due and no time is specified for its payment, it is due and payable in a reasonable time or upon demand subsequently made and the statute of limitations does not begin to run until after demand." *Scarboro v. Ralston Purina Co.,* 160 Ga.App. 576, 578, 287 S.E.2d 623 (1981).

> Where, by the contract of the parties, express or implied, the money or debt which is the subject-matter thereof is payable only upon a demand in fact therefor, the statute of limitations does not begin to run until an actual demand for payment is made. The demand, however, must be made within a reasonable

time, which is ordinarily the period of the statute of limitations; but where the parties contemplated a delay in making the demand to some indefinite time in the future, the statutory period for bringing the action is not controlling as to the question of reasonable time.

*Smith v. Early,* 60 Ga.App. 506, 511, 3 S.E.2d 913 (1939).

*Kicklighter v. Woodward,* 267 Ga. 157, 476 S.E.2d 248 (1996), cited by Pro Search, is not helpful. That case states: "When money is loaned and *there is no agreement as to the time of repayment,* the amount loaned is in law due immediately, and the statute of limitations begins to run at once in favor of the borrower." (Emphasis supplied.) Id. at 159, 476 S.E.2d 248. Clearly, in the instant case, the amount was not due immediately because the agreement provided otherwise.

Here, the contract did not provide that the demand had to be made at any particular time, and Canal made its claim while payments under the contract were ongoing. Therefore, the statute of limitation began to run at the time of the demand. See *Ranwal Properties, LLC v. John H. Harland Co.,* 285 Ga.App. 532, 646 S.E.2d 730 (2007). Because the court erred in determining when the statute of limitation began to run on Canal's claim, the trial court's grant of summary judgment to Pro Search is reversed.

*Judgment reversed.*

ELLINGTON and ADAMS, JJ., concur.

**All Citations**

286 Ga.App. 164, 648 S.E.2d 497, 07 FCDR 2094

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

*AMS Constr. Co., Inc. v. Reliance Ins. Co.*,
No. Civ.A. 04-CV-2097, 2004 WL 2600792 (E.D. Penn. Nov. 15, 2004)

2004 WL 2600792
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

AMS CONSTRUCTION COMPANY, INC. d/b/a AMS Staff Leasing, et al., Plaintiff

v.

RELIANCE INSURANCE COMPANY, (In Liquidation) Defendant.

No. Civ.A. 04-CV-2097. | Nov. 15, 2004.

**Attorneys and Law Firms**

Peter A. Vonmehren, Spector, Gadon & Rosen, P.C., Philadelphia, PA, for Plaintiffs.

William E. Mahoney, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, PA, for Defendant.

**Opinion**

*OPINION*

STENGEL, J.

**\*1** On May 14, 2004, Texas corporations AMS Construction Company, Inc., and Breckenridge Enterprises, Inc. ("Plaintiffs") filed a complaint in this court against Reliance Insurance Company ("Defendant"), an insolvent Pennsylvania corporation, [1] for breach of contract and declaratory relief pursuant to 28 U.S.C. §§ 2201-02. Florida Workers' Compensation Insurance Guaranty Association ("Florida Guaranty"), a non-profit Florida corporation, has filed a motion pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 24(a)(2) requesting the court to allow it to intervene as of right as a defendant/counterplaintiff in this action, or in the alternative, for leave to intervene permissively pursuant to Fed.R.Civ.P. 24(b). For the reasons discussed in this opinion, I will grant Florida Guaranty's motion for leave to intervene permissively.

[1]   On October 3, 2001, an order of liquidation was entered by the Commonwealth Court of Pennsylvania, adjudicating Defendant to be insolvent. On the same day, the Honorable M. Diane Koken, Pennsylvania Commissioner of Insurance, was appointed statutory liquidator of Defendant, with power to resolve its insolvent estate.

*BACKGROUND*

In the 1990's, Plaintiffs entered into an insurance program with Defendant from whom they purchased a series of workers' compensation policies. In 1998, Breckenridge Enterprises purchased a Philadelphia Life Insurance Company accident insurance policy (the "Reinsurance Policy") that reinsured a certain amount of the risk covered by the workers' compensation policies making up the Defendant's program.

This case stems from a Settlement, Release and Joint Prosecution Agreement (the "Agreement") entered into on May 29, 2003 between the parties to an action in the United States District Court for the Northern District of Texas. (*Breckenridge Enterprises, Inc., et al. v. Philadelphia Life Insurance Company, et al.*) The Agreement was a contract that controlled the joint effort of Plaintiffs and Defendant to recover money owed under the Reinsurance Policy. Pursuant to the Agreement, Defendant received approximately $15 million made up of amounts recovered under the Reinsurance Policy and of collateral specifically held by Southwest Underwriters

to secure Plaintiffs' obligation to fund or reimburse claims paid under Defendant's workers' compensation and general liability programs.

In their complaint, Plaintiffs allege that Defendant breached its obligations under the Agreement by failing to reimburse Plaintiffs for Defendant's portion of litigation fees and costs related to the Texas action. Plaintiffs also claim that Defendant waived its right to seek deductible reimbursements under the express language of the Agreement. Plaintiffs seek a declaration from the court holding that they do not have an obligation to reimburse Defendant for the deductibles under the policies.

Defendant filed an answer, affirmative defenses, and a four-count counterclaim asserting breach of contract, unjust enrichment, equitable subrogation, and a request for declaratory relief in connection with the Agreement.

Florida Guaranty exists pursuant to Florida's enactment of the Uniform Insurer Liquidation Act, Chapter 631 of the Florida Statutes, which provides a mechanism for the prompt payment of workers' compensation claims incurred by insolvent insurers. Its main purpose is to avoid financial loss to injured Florida workers due to the insolvency of any workers' compensation insurer. Pennsylvania has also adopted such a statute. *See* 40 P.S. §§ 211-221.63. Prior to its insolvency, Defendant wrote workers' compensation coverage in Florida. At the time of the order of liquidation, there were unpaid claims of injured Florida workers whose employers were insured by Defendant. Since the order of liquidation, new workers' compensation claims have been brought and are being paid by Florida Guaranty.

 **\*2** Florida Guaranty seeks leave to intervene in this matter in order to assert and protect its statutorily-granted right to recover from Plaintiffs' insurance policy deductible reimbursements due pursuant to Plaintiffs' obligations under the workers' compensation policies issued by Defendant. Florida Guaranty contends that Plaintiffs are trying to extinguish Florida Guaranty's right to the deductible reimbursements by claiming that Defendant waived, settled, discharged, and/or released Plaintiffs' deductible reimbursement obligations pursuant to the Agreement. In their responses, Plaintiffs vehemently oppose the motion, and Defendant supports it indicating that Florida Guaranty's participation in the case would be appropriate and beneficial.

### DISCUSSION

Motions to intervene are governed by Fed.R.Civ.P. 24. In this case, Florida Guaranty seeks to intervene under Rule 24(a)(2), which provides that intervention shall be permitted as of right "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2). The Third Circuit has interpreted Rule 24(a)(2) to include four requirements for intervention as of right: (1) the intervention must be timely; (2) the intervenor must have a sufficient interest relating to the subject of the action; (3) the action must potentially impede the applicant's ability to protect its interest; and (4) the existing parties must not adequately represent the applicant's interest. *Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.,* 72 F.3d 361, 366 (3d Cir.1995) (*quoting Harris v. Pernsley,* 820 F.2d 592, 596 (3d Cir.1987)).

Whether a moving party claims intervention as of right or permissively, Rule 24 requires that the application be timely, a determination to be made from all the circumstances. *NAACP v. New York,* 413 U.S. 345, 365-366, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973). There are three factors which must be considered in evaluating the timeliness of a motion to intervene: 1) how far the proceedings have gone when the movant seeks to intervene; 2) prejudice which resultant delay might cause to other parties; and 3) the reason for the delay. *Commonwealth v. Rizzo,* 530 F.2d 501, 506 (3d Cir.1976).

Here, the case was filed in this court in May 2004; Plaintiffs' response to Defendant's counterclaim was filed in August 2004; the motion itself was filed in October 2004; discovery is not set to finish until November 2004;

and there has been no ruling from the court which has affected the interest of the other parties. Moreover, Florida Guaranty does not seek to add new issues to the case which even at this early stage might result in prejudice to the other parties. As a reason for its slight delay in filing this motion, Florida Guaranty claims that its status as a real party in interest was only recently clarified when the Pennsylvania Legislature signed 40 P.S. § 221.23a into law on June 28, 2004. Thus, this motion to intervene is timely, and satisfies the first requirement of Rule 24(a)(2).

**\*3** Next, by having a sufficient interest relating to the subject of this action, Florida Guaranty also satisfies the second requirement of the rule. An intervenor's interest is sufficient if it is "significantly protectable." *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). A "significantly protectable" interest is "a legal interest as distinguished from interests of a general and indefinite character." *Harris v. Pernsley,* 820 F.2d at 601. Accordingly, a mere economic interest in the outcome of a particular litigation is insufficient to support a motion to intervene. *United States v. Alcan Aluminum, Inc.,* 25 F.3d 1174, 1185 (3d Cir.1984). An intervenor's interest in a specific monetary fund, however, is sufficient to render intervention proper in a case affecting that fund. *Mountain Top,* 72 F.3d at 366 (funds deposited with district court were assets of an express trust, of which the individual intervenors are the intended beneficiaries).

Here, Florida Guaranty has demonstrated a particular interest in the specific funds at issue in this case, rather than a general economic interest in its outcome. Having paid workers' compensation claims of Plaintiffs' employees, Florida Guaranty claims a "direct and non-contingent" interest in the deductible reimbursements that are at issue here. In their response to this motion, Plaintiffs concede that Florida Guaranty has an existing statutory right to obtain its fair share of any funds collected by the receiver under 40 P.S. §§ 221.23a(f) and (g). These two statutory provisions provide that the receiver must reimburse state guaranty associations for claims payments within a deductible amount from any money collected from collateral and/or a deductible reimbursement policy. A policyholder's deductible reimbursements under policies issued by an insolvent insurer, such as the deductible reimbursements here, as well as the collateral provided to secure such policyholder's reimbursement obligations, never become assets of the estate of the insolvent insurer, and are payable to the guaranty associations if the guaranty associations paid claims under the policies. As discussed above, the Reinsurance Policy funded the $15 million payment to Defendant pursuant to the Agreement. Under this set of facts, Florida Guaranty has a sufficient interest in the subject of the action, and thus satisfies the second requirement of the rule.

Nevertheless, it is at the third and fourth requirements of Rule 24(a)(2) that the success of Florida Guaranty's application becomes doubtful. As stated above, the action must potentially impede Florida Guaranty's ability to protect its interest. Proposed intervenors must demonstrate that their interest might become affected or impaired, as a practical matter, by the disposition of the action in their absence. *United States v. Alcan Aluminum, Inc.,* 25 F.2d at 1185 n. 15.

Florida Guaranty insists that it is so situated that the disposition of this case may as a practical matter impair or impede its ability to protect its interest in the deductible reimbursements. Hypothesizing that if this court were to rule that Defendant waived its right to receive the deductible reimbursements *retrospectively and/or prospectively,* Florida Guaranty is concerned that its ability to be reimbursed for claims would likely be impaired without its being heard. For example, if Florida Guaranty were to bring an independent action against Plaintiffs to collect its fair share of the reimbursements, Plaintiffs could argue that Florida Guaranty's case was somehow precluded by the outcome of the instant case.

**\*4** However, the disposition of this case should have no effect on Florida Guaranty's right to reimbursement from the already-existing fund which Defendant received as a result of the Agreement. A review of the language of Pennsylvania's statute establishes that a scheme is in place whereby the Pennsylvania Commissioner, as receiver, has the primary duty to collect unpaid deductible amounts from a policyholder under Pennsylvania law:

With respect to claim payments made by any guaranty associations, the receiver shall promptly provide the guaranty associations with a complete accounting of the receiver's deductible billing and collection activities,

including but not limited to copies of the policyholder billings when rendered, the reimbursements collected, the available amounts and use of collateral for each account and any proration of payments when it occurs. The receiver's costs of accounting shall be included with expenses referred to under this subsection and, together with other reasonable actual expenses, be subject to the overall limit called for by this subsection. If the receiver fails to make a good faith effort within one hundred twenty days of receipt of claims payment reports to collect reimbursements due from a policyholder under a deductible agreement based on claims payments made by one or more guaranty associations, then after such one-hundred-twenty-day period such guaranty associations may pursue collection directly on the same basis as the receiver and with the same rights and remedies and will report any amounts so collected from each policyholder to the receiver. To the extent that guaranty associations pay claims within the deductible amount but are not reimbursed by either the receiver under this section or by policyholder payments from the guaranty association's own collection efforts, the guaranty association shall have a claim in the insolvent insurer's estate for such unreimbursed claims payments.

40 P.S. § 221.23a(i)(2)(emphasis added).

This statutory scheme provides a mechanism for the prompt payment of a guaranty association's fair share of deductible reimbursements. It further delineates the rights and remedies of a guaranty association in pursuing its own claims should the receiver not make a good faith effort to collect the reimbursements. Here, Florida Guaranty concedes that in order to assert its rights to the deductible reimbursements, Florida Guaranty may either assert them here or in an independent action. Florida Guaranty has not alleged that the Pennsylvania Commissioner, as receiver, has failed to make a good faith effort to collect deductible amounts from Plaintiffs. It also has not alleged that, in following the scheme, it submitted claims for payment but was unsuccessful. In fact, Plaintiffs represent in their response that the Pennsylvania Commissioner has vigorously pursued collections efforts against Plaintiffs and has collected millions of dollars in deductible and reinsurance payments.

 **\*5** Florida Guaranty has established a sufficient interest in these funds as the subject of this case. However, Florida Guaranty has not established that the case would potentially impede its ability to protect that interest. Whatever the ultimate outcome of this case is, Florida Guaranty would still be able to follow successfully Pennsylvania's statutory mechanism for reimbursement.

The final requirement of Rule 24(a)(2) is also not satisfied. The burden, however minimal, is on Florida Guaranty to show that its interests are not adequately represented by the existing parties. *Hoots v. Pennsylvania,* 672 F.2d 1133, 1135 (3d Cir.1982). This burden may be discharged by Florida Guaranty showing: (1) that although its interests are similar to those of one of the parties, they diverge sufficiently that the existing party cannot devote proper attention to Florida Guaranty's interests; (2) that there is collusion between the representative party and the opposing party; *or* (3) that the representative party is not diligently prosecuting the suit. *Id.* (emphasis added).

A party charged by law with representing the interests of the absent party will usually be deemed adequate to represent the absentee. *Delaware Valley Citizens' Council for Clean Air, et al. v. Commonwealth of PA, et al.* 674 F.2d 970, 973 (3d Cir.1982). As discussed above, the Pennsylvania Commissioner, as receiver, has the statutory right and obligation to represent all state insurance guaranty associations in connection with deductible amounts owed by policyholders. Florida Guaranty has not shown that the Pennsylvania Commissioner will not exercise her statutory rights or perform her statutory obligations. Besides suggesting that the Pennsylvania Commissioner might not be as motivated to collect deductible reimbursements as Florida Guaranty itself would, Florida Guaranty has made no allegation of collusion between the existing parties.

Furthermore, to its motion, Florida Guaranty attached a proposed answer, affirmative defenses, and counterclaims in the event its application were successful. These proposed pleadings are almost identical to Defendant's pleadings, with the exception of Florida Guaranty's additional affirmative defense based on 40 P.S. § 221.23a, and Florida Guaranty's deletion of Defendant's counterclaim based on breach of contract against Plaintiffs. These

interests do not diverge sufficiently to suggest that Defendant would not devote proper attention to Florida Guaranty's interests.

Thus, because I find that Florida Guaranty has not satisfied the requirements of Rule 24(a)(2), I will deny its request to intervene as of right.

However, Florida Guaranty also moves, in the alternative, for leave to intervene permissively pursuant to Fed.R.Civ.P. 24(b). A denial of intervention as of right does not automatically mandate a denial of permissive intervention. *McKay v. Heyison,* 614 F.2d 899, 906 (3d Cir.1980). Fed.R.Civ.P. 24(b) provides that upon "timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." The rule also provides that in "exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

 **\*6** As discussed above, Florida Guaranty shares both its claims and defenses with Defendant in this case; and the delay or prejudice at this stage of the case is minimal. There being common issues of law and fact with minimal delay or prejudice, I will grant Florida Guaranty's motion to intervene permissively pursuant to Fed.R.Civ.P. 24(b) (2).

An appropriate order follows.

### *ORDER*

AND NOW, this 15 th day of November, 2004, upon consideration of Florida Workers' Compensation Insurance Guaranty Association's Motion to Intervene (Document No. 11), and the parties' responses thereto,

IT IS HEREBY ORDERED that, pursuant to Federal Rule of Civil Procedure 24(b), said Motion is GRANTED. The Clerk of Court shall amend the caption to reflect Florida Workers' Compensation Insurance Guaranty Association as Defendant/Counterplaintiff.

**End of Document**                                                        © 2011 Thomson Reuters. No claim to original U.S. Government Works.

# **TAB 10**
Final Summary Judgment, dated March 6, 2015

Filed in The District Court
of Travis County, Texas

MAR – 6 2015

At _____7:00 P_____ M.
Velva L. Price, District Clerk

D-1-GN-09-001010

| | | |
|---|---|---|
| California Insurance Guarantee Association, Florida Workers' Compensation Insurance Guaranty Association, Illinois Insurance Guaranty Association, Nebraska Property & Liability Insurance Guaranty Association, Oklahoma Property & Casualty Insurance Guaranty Association, and Texas Property & Casualty Insurance Guaranty Association | §§§§§§§§§§§§ | 201st Judicial District Court<br><br>Travis County, Texas |
| v. | §§§ | |
| Hill Brothers Transportation, Inc. | § | |

## FINAL SUMMARY JUDGMENT

On February 3, 2015, the Court heard: (1) Defendant's Motion to Dismiss for Lack of Jurisdiction; (2) Defendant's Motion for No-Evidence Summary Judgment; and (3) Defendant's Motion for Traditional Summary Judgment. The Parties appeared before the Court for the hearing on said motions.

After considering the pleadings, the evidence, and the arguments of counsel the Court:

**DENIES** Defendant's Motion to Dismiss for Lack of Jurisdiction;



FINAL SUMMARY JUDGMENT – p. 1

1

**DENIES** Defendant's Motion for No-Evidence Summary Judgment; and

**GRANTS** Defendant's Motion for Traditional Summary Judgment on limitations only—*i.e.*, the Court finds that Plaintiffs' claims are barred by the four-year statute of limitations.

Further, the Court **SUSTAINS** and **GRANTS** Plaintiffs' Objections to and Motion to Strike Defendant's Exhibit C, which is attached to Defendant's Motion for Traditional Summary Judgment.

The Court hereby **RENDERES** judgment for Defendant.

1.      Accordingly, the Court **ORDERS** Plaintiffs to take nothing on their cause of action against Defendant for breach of contract.

2.      Further, the Court **ORDERS** that Defendant recover court costs from Plaintiffs.

This judgment finally disposes of all claims and all parties, and is appealable.

SIGNED on ~~February~~ March 6 , 2015.


                                        Hon. Lora J. Livingston
                                        Presiding Judge, 261st District Court

**Approved as to form:**


Dan Price
*Attorney for Plaintiffs*



Adrian Ciechanowicz
*Attorney for Defendant*


**APPROVED**
**By ProcelB at 9:21 am, Mar 18, 2015**


I, VELVA L. PRICE, District Clerk, Travis County,

Texas, do hereby certify that this is a true and

correct copy as same appears of record in my

office. Witness my hand and seal of office

On _____

VELVA L. PRICE
DISTRICT CLERK
By Deputy: *BP*

FINAL SUMMARY JUDGMENT – p. 3